2014-1782, -1783, -1784, -1785

𝕴𝖓 𝕿𝖍𝖊
𝖀𝖓𝖎𝖙𝖊𝖉 𝖘𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
𝕱𝖔𝖗 𝕿𝖍𝖊 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

# AVAYA INC., DELL INC., SONY CORPORATION OF AMERICA, AND HEWLETT-PACKARD CO.,

*Appellants*,

v.

# NETWORK-1 TECHNOLOGIES, INC. (formerly known as Network-1 Security Solutions, Inc.),

*Appellee*.

APPEALS FROM THE UNITED STATES PATENT AND
TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD
IN NOS. IPR2013-00071, IPR2013-00385, AND IPR2013-00495.

———————

## BRIEF OF APPELLANTS

———————

**Jeffrey D. Sanok**
**Brian M. Koide**
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 624-2500

*Counsel for Avaya Inc.*

**Jonathan M. Lindsay**
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, California  92614-8505
(949) 263-8400
*Counsel for Avaya Inc.*

**Scott L. Bittman**
CROWELL & MORING LLP
590 Madison Avenue
New York, New York  10022
(212) 895-4223

*Counsel for Avaya Inc.*

**Robert J. Walters**
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC  20001
(202) 756-8000

*Counsel for Hewlett-Packard Co.*

**David H. Dolkas**
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, California  92614
(650) 815-7400
*Counsel for Hewlett-Packard Co.*

**Lionel M. Lavenue**
**Daniel C. Cooley**
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, Virginia  20190
(571) 203-2700

*Counsel for Sony Corporation of America*

**Thomas M. Dunham**
**J. Michael Woods**
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
(202) 282-5000

*Counsel for Dell Inc.*

**Kimball R. Anderson**
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
(312) 558-5600
*Counsel for Dell Inc.*

**Michael J. Scheer**
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, California  90071
(213) 615-1700

*Counsel for Dell Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Avaya Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

Avaya Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Avaya Inc.

3.     All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by me are:

Avaya Inc. is owned by parent company, Avaya Holdings Corp., a company formed and owned by affiliates of TPG Capital and Silver Lake Partners, and by members of management.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

<u>Crowell & Moring LLP</u>: Jeffrey D. Sanok, Brian M. Koide, Jonathan M. Lindsay, and Scott L. Bittman
<u>The Dacus Firm, PC</u>: Deron R Dacus and Shannon Dacus

January 9, 2015                              Respectfully submitted,

 /s/ Jeffrey D. Sanok
Jeffrey D. Sanok
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500 (Telephone)
(202) 628-5116 (Facsimile)
jsanok@crowell.com

*Counsel for Avaya Inc.*

i

Form 9

FORM 9.   Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Hewlett-Packard Co.            v. Network-1 Security Solutions

No. 14-1785

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) Hewlett-Packard Company   certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Hewlett-Packard Company

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

McDermott Will & Emery LLP: Robert J. Walters and Charles J. Hawkins

September 12, 2014
Date

/s/ Robert J. Walters
Signature of counsel

Robert J. Walters
Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

ii

**Form 9**

FORM 9.  Certificate of Interest

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Dell Inc. _____ v. Network-1 Security Solutions Inc. _____

No. 14-1783

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Dell Inc. _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Dell Inc.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Dell Inc.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

As of October 29, 2013, Dell is a privately held corporation and its direct parent company is Denali Intermediate Inc.  There is no publicly held company owning 10% or more of Denali Intermediate Inc.'s stock.

_____

4. ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Winston & Strawn LLP: Thomas M. Dunham, Michael J. Scheer, Kimball R. Anderson, and J. Michael Woods

_____

September 12, 2014
_____
Date

_____
Signature of counsel

Thomas M. Dunham
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

---

124

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## Avaya Inc. v. Network-1 Security Solutions

## No. 2014-1782, -1783, -1784, -1785

## <u>Certificate of Interest</u>

Counsel for Sony Corporation of America certifies the following:

1. The full name of every party or amicus represented by me is:

   Sony Corporation of America

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Sony Corporation of America

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Sony Corporation of America is an indirect, wholly owned subsidiary of Sony Corporation. No other publicly held corporation owns 10% or more of Sony Corporation of America or Sony Corporation.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   FINNEGAN, HENDERSON, FARABOW,
     GARRETT & DUNNER, LLP
   Lionel M. Lavenue
   Daniel C. Cooley
   Erika Arner

Date: September 12, 2014                    /s/ Lionel M. Lavenue
                                            Lionel M. Lavenue

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTS ............................................................................i

TABLE OF CONTENTS .....................................................................................v

TABLE OF AUTHORITIES.............................................................................. vii

STATEMENT OF RELATED CASES ..................................................................1

JURISDICTIONAL STATEMENT ......................................................................3

STATEMENT OF ISSUES ..................................................................................4

STATEMENT OF THE CASE..............................................................................5

STATEMENT OF FACTS ....................................................................................7

     I.       Background .......................................................................................7

           A.     Remote Powering of Devices on Data Networks Was
                 Known Prior to the '930 Patent ..................................................7

           B.     The '930 Patent Claims a Method for Remotely
                 Powering Access Equipment in a Data Network.....................11

           C.     The PTAB Instituted *Inter Partes* Review Based on Its
                 Preliminary Finding of "Low Level Current" in Matsuno .......14

           D.     The PTAB Again Found that Matsuno Discloses "Low
                 Level Current" in Dell's *Inter Partes* Review ..........................17

           E.     The PTAB Adopted Its Prior Rulings on "Low Level
                 Current" When It Instituted the Sony-HP *Inter Partes*
                 Review ...................................................................................19

            F.     Network-1 Sought to Limit the "Low Level Current"
                 Construction by Adding a Cable-Length Restriction ...............19

G.     The PTAB Reversed Its Position on "Low Level Current" in Matsuno in Its Final Written Decision ..................20

SUMMARY OF THE ARGUMENT ......................................................24

ARGUMENT ..........................................................................................27

I.     Standard of Review ...........................................................27

II.    Matsuno Discloses "Low Level Current" ..........................................28

III.   The PTAB Misapplied Its Claim Construction and Focused on the Wrong "Access Device"..................................................31

IV.   This Court Should Remand ................................................35

CONCLUSION ......................................................................................35

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Celeritas Techs. v. Rockwell Int'l Corp.*,
    150 F.3d 1354 (Fed. Cir. 1998) .....................................................31

*Falkner v. Inglis*,
    448 F.3d 1357 (Fed. Cir. 2006) ....................................................27

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
    340 F.3d 1314 (Fed. Cir. 2003) ....................................................31

*In re Lister*,
    583 F.3d 1307 (Fed. Cir. 2009) ....................................................27

*In re Oelrich*,
    666 F.2d 578 (CCPA 1981).............................................................28

*Leggett & Platt, Inc. v. VUTEk, Inc.*,
    537 F.3d 1349 (Fed. Cir. 2008) ....................................................33

*Network-1 Security Solutions, Inc. v. Cisco Systems, Inc.*,
    No. 6:08-cv-30-LED (E.D. Tex. Feb. 7, 2008) ..............................1

*Network-1 Security Solutions, Inc. v. D-Link Corp.*,
    No. 6:05-cv-00291 (E.D. Tex. Aug. 10, 2005)...............................1

*Network-1 Technologies, Inc. v. Alcatel-Lucent USA, Inc.*,
    No. 6:11-cv-00492 (E.D. Tex. Sept. 15, 2011) ..............................1

*PowerDsine, Inc. v. Network-1 Security Solutions, Inc.*,
    No. 1:04-cv-02502 (S.D.N.Y. Mar. 31, 2004) ...............................1

*Schering Corp. v. Geneva Pharm.*,
    339 F.3d 1373 (Fed. Cir. 2003) ....................................................28

*Smith & Nephew*, *Inc. v. Rea*,
    721 F.3d 1371 (Fed. Cir. 2013) ........................................................27, 28, 31

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005) ............................................................28, 31

## **STATUTES**

28 U.S.C. § 1295(a)(4)(A) ..........................................................................2

35 U.S.C. § 6 ..............................................................................................2

35 U.S.C. § 102(b) ....................................................................................17

35 U.S.C. § 103(a) ....................................................................................17

35 U.S.C. § 329 ...........................................................................................2

## STATEMENT OF RELATED CASES

This set of consolidated appeals arises from the decision of the PTAB in the *inter partes* review proceedings of the '930 Patent in the -071 Case. The PTAB below joined the -385 and -495 Cases with the -071 Case. No other appeal in or from the same *inter partes* review proceeding before the PTAB was previously before this or any other court.

The '930 Patent is the subject of a set of consolidated district court litigations currently before the United States District Court for the Eastern District of Texas in *Network-1 Technologies*, *Inc. v. Alcatel-Lucent USA*, *Inc.*, No. 6:11-cv-00492 (filed Sept. 15, 2011) (the "Current Litigation"). In the Current Litigation, Network-1 has accused Appellants and other defendants of infringing the '930 Patent. The Current Litigation was stayed pending completion of *inter partes* review. On January 6, 2015, the district court lifted the stay and reopened the Current Litigation.

Network-1 also asserted the '930 Patent in three other litigations, but none of those litigations reached a final judgment: (i) *PowerDsine*, *Inc. v. Network-1 Security Solutions*, *Inc.*, No. 1:04-cv-02502 (S.D.N.Y. filed Mar. 31, 2004); (ii) *Network-1 Security Solutions*, *Inc. v. D-Link Corp.*, No. 6:05-cv-00291 (E.D. Tex. filed Aug. 10, 2005); and (iii) *Network-1 Security Solutions*, *Inc. v. Cisco Systems*, *Inc.*, No. 6:08-cv-30-LED (E.D. Tex. filed Feb. 7, 2008).

The '930 Patent was also the subject of an *ex parte* reexamination, the request for which was granted on September 6, 2012, and accorded Application Number 90/012,401. An anonymous party requested the *ex parte* reexamination. On August 14, 2014, the PTO issued a Notice of Intent to Issue an *Ex Parte* Reexamination Certificate confirming patentability of claims 6, 8, and 9, and adding further claims. The PTO issued the Reexamination Certificate on October 14, 2014.

## **JURISDICTIONAL STATEMENT**

The PTAB had jurisdiction over Appellants' respective petitions under 35 U.S.C. § 6. The PTAB issued a Final Written Decision on May 22, 2014. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.

## STATEMENT OF ISSUES

1.     Whether the PTAB committed an "analytical error," which is not entitled to deference, by concluding that prior art does not expressly or inherently disclose "delivering a low level current . . . to the access device" even though Network-1's own interpretation of the prior art confirms that this element is necessarily present.

2.     Whether the PTAB committed legal error by effectively requiring that the prior art disclose a low level of current at a certain cable length even though (a) the construed claim did not include a cable length-based limitation and (b) the PTAB had expressly rejected a cable length-based limitation when construing the claim.

## STATEMENT OF THE CASE

This appeal arises from three petitions for *inter partes* review of the '930 Patent. On December 5, 2012, Avaya filed the first petition for *inter partes* review in the -071 Case seeking review on five separate grounds. A1010. On May 24, 2013, the PTAB instituted an *inter partes* review of claims 6 and 9 on two of the five grounds of unpatentability, both of which relied on Matsuno in whole or in part. A1148.

After the PTAB instituted the -071 Case, Dell petitioned for *inter partes* review in the -385 Case on the same two grounds on which the PTAB instituted review in the -071 Case. A2602, A2645. Dell also moved to join its petition with the -071 Case. A2723. The PTAB instituted Dell's *inter partes* review and joined Dell as a party to the -071 Case in a limited capacity. A2731-33.

Sony and HP then filed a similar petition for *inter partes* review in the -495 Case on the same two grounds on which the PTAB instituted in the -071 Case. Like Dell, Sony and HP moved to join the -071 Case. A2742-43. The PTAB instituted *inter partes* review and joined Sony and HP as parties to the -071 Case in a limited capacity. A2785, A2796-97.[1]

---

[1] The PTAB decided not to institute *inter partes* reviews based on two other petitions filed by HP, Sony, Axis Communications AB, and Axis Communications, Inc.

The PTAB issued a Final Written Decision on May 22, 2014, in the -071 Case. A1-34. This set of consolidated appeals follows.

## STATEMENT OF FACTS

I.    **Background**

    A.    **Remote Powering of Devices on Data Networks Was Known Prior to the '930 Patent**

The technology at issue in the '930 Patent relates to remote powering of a device in a data network. *See* A48 at 4:50-51.

At the time of the invention, a variety of telecommunications devices, including telephones, were already powered remotely over the traditional copper wires of existing networks. A47 at 1:22-24. This remote power removed the need to plug the telecommunications devices into a local power outlet, such as a wall socket. *Id*. 1:37-39. The remote powering also created a desirable, centrally-powered system that could be operated during a power outage, i.e., the telecommunications devices could still be used if local power was lost. *Id*. 1:39-40.

In addition to remote powering, existing communication networks were also capable of transmitting both voice and data. Standards were created to control the simultaneous transmission of voice and data, including the well-known "Integrated Services Digital Network" standard or "ISDN." A1504 at ¶ 17. The ISDN standard of a "circuit-switched network" that permits transmission of "digital voice and data over media, including traditional telephone copper wires," was defined in 1988 by the Telephone and Telegraph Consultative Committee in the "Red Book." *See id.*

7

at ¶¶ 17-18. In simpler words, ISDN provided a standard for a digital data network using the traditional telephone cables (i.e., the copper wire pairs).

The ISDN standard defines mandatory cable lengths (referred to as "subscriber loops") over which all ISDNs must operate. A1895 at ¶ 20; A1489 at ¶ 2. For example, the ISDN standard requires that all ISDNs be designed to operate over a cable length of approximately three (3) miles. A1895 at ¶ 20.

The prior art centrally-powered systems operated on ISDN standard networks in order to remotely power telephones, but also to remotely power other electronic devices accessing the network. One such centrally-powered system is described in Matsuno, published January 16, 1998. *See* A1487; A1488-98; A2983-2993.

Matsuno discloses a "power supply circuit that switches power supply voltage and supplies the desired power while ensuring safety." A1488 at Abstract; A1489 at ¶ 01. Both Network-1 and Avaya agreed Matsuno disclosed an ISDN network. A1220 at ¶ 1; A1934 at 245:17-21.

Matsuno noted that the prior art remote powering of analog subscriber lines (e.g., telephone cables) generally used a voltage of only about -48 V, while in ISDN the remote powering of digital subscriber lines required about 120 V to provide the prescribed power to operate the devices. A1490 at ¶ 5. The 120 V, however, created a safety problem when remote powering was not required.

A1490 at ¶¶ 5, 6. To solve the problem, Matsuno used the lower voltage of -48 V

only to deliver a current to the devices when a local power outage occurred.  This

current could then be sensed in order to switch the power supply to the higher

voltage of 120 V for operating the devices. A1490 at ¶¶ 7, 8.

Figure 1 of Matsuno depicts a network terminal (NT1) and a subscriber

terminal (DTE) coupled—over a digital subscriber line (the cable 12)—to a remote

power supply in an ISDN:



A1134-35.

Matsuno teaches that a local power supply (e.g., a commercial AC power

supply) provides power to the network terminal (NT1) and subscriber terminal

(DTE). A1490 at ¶¶ 4, 8. When the local power is available, the remote power

supply applies a "low voltage $V_2$" of -48 volts, A1490-91 at ¶¶ 7, 18-20, to the digital subscriber line (12) connected to the network terminal (NT1) and subscriber terminal (DTE). *See* A1490 at ¶ 18, A1495 at Fig. 1. This low voltage is sufficient to provide current over the digital subscriber line to an access device (e.g., the NT1/DTE) within the ISDN. *Id.* This current is delivered to the access device within the ISDN when local power is lost, forming a loop back to the power supply circuit that can be detected.

Thus, the power supply circuit monitors the digital subscriber line (12) to determine whether the access device is receiving local power. *See* A1490-91 at ¶¶ 7, 18-19. When the access device loses local power, the remote power supply senses this loss of power (due to the sensing of a voltage level corresponding to the loop current provided by the "low voltage"), and the remote power supply switches to a "high voltage $V_1$" of -120 volts to provide the desired power/current necessary to allow the access device to operate with at least minimal communication. A1490-91 at ¶¶ 01, 04,18-19. *see also* ¶ 20 ("Consequently, when local power supply is occurring, low voltage is supplied to the digital subscriber line 12, and thus safety can be improved. In addition, when local power supply is stopped, high-voltage is supplied to the digital subscriber line 12, thereby allowing the desired power to be supplied from the station.").

**B.    The '930 Patent Claims a Method for Remotely Powering Access Equipment in a Data Network**

Notwithstanding the existence of remote powering on a data/voice network (as disclosed, for example, in Matsuno), the later-filed '930 Patent claims a "[m]ethod for remotely powering access equipment in a data network," A48 at 4:50-51, alleging that the "convergence of voice and data technologies," such as VOIP (Voice over Internet Protocol), had created a "push[]" to add "remotely powered devices to a data network." A47 at 1:33-47.

The first objective of the '930 Patent is to "determin[e] if a remote piece of equipment is capable of accepting remote power." A47 at 1:41-43. The second objective is to "deliver[] remote power to remote equipment over 10/100 switched Ethernet segments and maintain compliance with IEEE 802.3 standards." *Id.* at 1:44-47. Independent claim 6, however, is devoid of any step for "determining" whether a device is "capable of accepting remote power" or limitations relating to "Ethernet segments" or "IEEE standards."

Referring to Figure 3, reproduced below, the '930 Patent's specification discloses an access device, or remote telephone 62, that receives and transmits data. A46 at Fig. 3 and A48 at 3:60-67. Telephone 62 is connected to Ethernet switch 68 by wiring 66, and through this wiring 66, telephone 62 can receive both data and operational power. *See* A46 at Fig. 3. The '930 Patent describes detecting remote access devices (e.g., telephone 62 or other access devices) and deciding

11

whether/when to supply operational power. This detection is done by "delivering a low level current (approx. 20 ma)" over the cable and "measuring a voltage drop in the return path." A47-48 at 2:66-3:2. Based on the measured voltage drop, the '930 device controls the power to be supplied to the access device. *Id.* at 2:66-3:27.



*Fig. 3*

Independent method claim 6 of the '930 Patent recites:

> 6. Method for remotely powering access equipment in a data network, comprising,
>
>> providing a data node adapted for data switching, an access device adapted for data transmission, at

least one data signaling pair connected between the data node and the access device and arranged to transmit data therebetween, a main power source connected to supply power to the data node, and a secondary power source arranged to supply power from the data node via said data signaling pair to the access device,

delivering a low level current from said main power source to the access device over said data signaling pair,

sensing a voltage level on the data signaling pair in response to the low level current, and

controlling power supplied by said secondary power source to said access device in response to a preselected condition of said voltage level.

A48 at 4:50-67. Dependent claim 9 recites:

9. Method according to claim 6, including the step of continuing to sense voltage level and to decrease power from the secondary power source if voltage level drops on the data signaling pair, indicating removal of the access device.

A49 at 6:1-5.

Slightly more than a year after the application that resulted in the '930 Patent was filed, and without providing any substantive office actions, the PTO issued the '930 Patent. A1019-20. After issuance, Network-1 purchased the '930 Patent. A2800-02. Since that time, Network-1 has repeatedly asserted the '930 Patent against companies who sell Ethernet-based products that comply with IEEE standards. A1007-08.

### C.    The PTAB Instituted *Inter Partes* Review Based on Its Preliminary Finding of "Low Level Current" in Matsuno

On December 5, 2012, Avaya filed a petition in the -071 Case seeking *inter partes* review of claims 6 and 9 of the '930 Patent based on five asserted grounds, two of which relied upon Matsuno. A1010 at 7. In its petition, Avaya identified Matsuno's "network terminal device (NT1) 2," either alone or in combination with its "subscriber terminal (DTE 3)" as the "access device" within the meaning of claim 6 of the '930 patent. A1022 at 19.

The PTAB construed the term "low level current" in the claimed step of "delivering a low level current . . ." to mean a "current (e.g., approximately [20] mA)[2] that is sufficiently low that, by itself, it will not operate the access device." A1129, A1151.

In opposing the petition, Network-1 filed a preliminary response arguing, *inter alia*, that "[a]ll currents generated by the voltages disclosed in Matsuno are . . . at a level sufficient to . . . operate *an* access device." A1101 (emphasis added). Network-1 went on to argue that the currents generated from the -48-volt power supply of Matsuno are sufficient to power one particular type of "access device": a telephone. *Id.*

---

[2] The PTAB's decision instituting *inter partes* review contained a typographical error, and originally referred to this number as "2 mA" instead of "20 mA." A1151.

14

In its argument, Network-1 did not address the *particular* access device identified by Avaya in its petition (the NT1/DTE installation of Matsuno), and instead combined the voltage from Matsuno (-48 volts) with a different type of access device (a telephone). Using this mix-and-match approach, Network-1 argued to the PTAB that the current generated from the -48-volt power supply of Matsuno could not be a "low level current" because the particular type of access device *Network-1 identified* would operate with such a current. *Id.* But Network-1 could not extend its "telephone argument" to all access devices, and conceded that current generated by the -48-volt power supply of Matsuno "may not be able to fully power all connected ISDN equipment." A1099-1100.

The PTAB rejected Network-1's mix-and-match approach in instituting the review, and concluded that Avaya had made a threshold showing that Matsuno discloses delivering a "low level current":

> Patent Owner **does not point to any disclosure in Matsuno itself** indicating that the current generated from low voltage $V_2$ (-48 V) is sufficient, by itself, to operate network terminal device 2. Indeed, the opposite appears to be the case. Low voltage $V_2$ (-48 V) is applied when the device is operating under local power, but high voltage $V_1$ (-120 V) is applied if the local power fails. *See* Matsuno ¶¶ 7-8, 18-22 (describing the "low voltage power supply" and "high voltage power supply"). **If low voltage $V_2$ (-48 V) was sufficient, by itself, for the device to operate, presumably there would be no need to switch to high voltage $V_1$(-120 V) when local power is unavailable.** Patent Owner has not argued otherwise except to say that "conventional" telephones require a 48

> V power supply. *See* Prelim. Resp. 35, 39-40. Whether the current in Matsuno would be sufficient for "conventional" devices in other contexts is not the issue. ***The issue is whether the specific current in Matsuno is sufficient, by itself, to operate the specific access device in Matsuno such that it would be more than a "low level current" as recited in claim 6.*** Seeing no indication that it is, we conclude that Petitioner has made a threshold showing that Matsuno discloses delivering a "low level current."

A1136 (emphasis added).

In that regard, Matsuno never states that the low voltage of -48 volts is sufficient to operate ISDN devices.  Rather, as noted above, Matsuno repeatedly teaches that switching to the high voltage of -120 volts is what allows the desired operational power to be supplied to the ISDN equipment.  A1490, ¶ 5 ("in order to provide the prescribed power to the subscriber terminal 103, for example, the line voltage is taken to be about 120 V"); A1491, ¶ 19 ("By this [high voltage power supply V1 of -120 V], it is possible to supply the desired current . . . to the network terminal device 2."); A1492, ¶ 32 ("High voltage is thus applied to the digital subscriber line 12, and the desired power is supplied to the network terminal device 2."); and A1492, ¶ 35 (". . . the power supply voltage is high during local power supply stoppage, which allows the desired power to be supplied.").

Relying in part on its conclusion that Matsuno discloses delivering a "low level current" and other bases, the PTAB found that there was a reasonable likelihood that Avaya would prevail on the asserted grounds that (i) claims 6 and 9

16

are anticipated by Matsuno under 35 U.S.C. § 102(b) and (ii) claims 6 and 9 are

unpatentable over De Nicolo in view of Matsuno under 35 U.S.C. § 103(a). A1137,

A1141.

### D.    The PTAB Again Found that Matsuno Discloses "Low Level Current" in Dell's *Inter Partes* Review

After the PTAB instituted proceedings in the -071 Case, Dell filed a petition

in the -385 Case seeking *inter partes* review of claims 6 and 9 on the same two

grounds on which the PTAB instituted trial in the -071 Case, and moved to join

that proceeding. A2703.[3] Like Avaya, Dell identified the "access device" in

Matsuno as the NT1/DTE installation. A2614-15.

In opposing Dell's petition, Network-1 again argued that Matsuno did not

disclose a "low level current." A2667-68. Having gained the benefit of the PTAB's

institution decision in the -071 Case, on this second bite at the apple Network-1

abandoned its earlier mix-and-match telephone argument.  Rather than focus on the

NT1/DTE combination, Network-1 instead now focused on the subscriber terminal

103 as the "access device." *Id.*

Using the disclosure associated with this alternative configuration, Network-

1 argued that 40 volts is sufficient to operate a subscriber terminal 103, and,

---

[3] Dell originally petitioned on a third ground, but subsequently withdrew it before
the PTAB instituted proceedings. A2645.

therefore, the voltage of 48 volts in Matsuno must also be sufficient. A2662-68.

But the PTAB rejected Network-1's argument because the "access device"

identified by Dell in its petition was the "network terminal device, either alone or

in combination with the [subscriber terminal]," not the subscriber terminal by

itself, as identified by Network-1. A2717. The issue was not whether Network-1

could identify *any* access device that would receive current sufficient to operate,

but whether at least one access device, i.e., the particular "access device" identified

by Dell in its petition, would not receive such operational current.

At a higher level, the PTAB rejected Network-1's argument as inconsistent

with the disclosure of Matsuno:

> As explained in our previous decision [in the -071 Case], low voltage $V_2$ (-48 V) is applied when the device is operating under local power, but high voltage $V_1$ (-120 V) is applied if the local power fails, providing the "desired" power for communication. *See* '71 Dec. 16-18; Matsuno ¶¶ 7-8, 18-22, 35, 56 (describing the "low voltage power supply" and "high voltage power supply"). ***If low voltage $V_2$ (-48 V) was sufficient, by itself, for the device to operate, presumably there would be no need to switch to high voltage $V_1$ (-120 V) when local power is unavailable.***

A2716.

After rejecting Network-1's arguments concerning "low level current" and

other elements, the PTAB instituted an *inter partes* review, and joined Dell as a

party to the -071 Case in a limited capacity. A2720, A2731-33.

**E.    The PTAB Adopted Its Prior Rulings on "Low Level Current" When It Instituted the Sony-HP *Inter Partes* Review**

Sony and HP subsequently filed a similar petition and joinder motion in the -495 Case seeking *inter partes* review on the same two grounds instituted in the -071 Case. A2784-85. The PTAB instituted *inter partes* review and joined both Sony and HP as parties to the -071 Case in a limited capacity. A2796-97, A2785. In instituting the proceedings, the PTAB adopted the claim constructions and analyses from the -071 and -385 Cases, including its treatment of the "low level current" limitation in view of Matsuno. A2784-85.

**F.    Network-1 Sought to Limit the "Low Level Current" Construction by Adding a Cable-Length Restriction**

In the course of the *inter partes* review, Network-1 attempted to further narrow the PTAB's construction of "low level current" by imposing a restriction on the cable length between the power supply and the access device.  Network-1 wanted the construction of "low level current" to include that the access device will not operate "***at all reasonable data signaling pair lengths (unless the system specifically precludes certain data signaling pair lengths)***." A1177 (emphasis added).  The PTAB had previously construed "low level current" to be merely "sufficiently low that, by itself, it will not operate the access device."  A1129. Network-1's expert reasoned that "if the lengths of the data signaling pairs (subscriber loops) are long enough, any voltage (no matter how high) could be

insufficient to operate the connected access device, even if the voltage is more than sufficient to generate enough current to operate access devices at subscriber loop lengths contemplated by the system." A2838.

### G. The PTAB Reversed Its Position on "Low Level Current" in Matsuno in Its Final Written Decision

On May 22, 2014, the PTAB issued its Final Written Decision, ordering that claims 6 and 9 of the '930 Patent had not been shown to be unpatentable.

The Board commenced its Final Written Decision by rejecting Network-1's argument that "low level current" should be modified to account for the cable-length restriction:

> ***Network-1 contends that***, due to the resistance of the data signaling pair, a particular voltage at the data node could be sufficient to generate enough current to operate the access device ***if the length of the data signaling pair is very short, and at the same time not be sufficient to generate enough current to operate the same device when the data signaling pair is very long***. Therefore, according to Network-1, a "low level current" is one that is sufficiently low that it will not operate the access device "at all reasonable data signaling pair lengths (unless the system specifically precludes certain data signaling pair lengths)." Avaya disagrees with Network-1's proposed interpretation, arguing that the Specification of the '930 patent never mentions the length of the data signaling pair.
>
> We are not persuaded that our previous interpretation of "low level current" is incorrect, and incorporate our previous analysis for purposes of this decision.

A9 (internal citations omitted) (emphasis added).

20

Siding with Avaya, the PTAB noted that Network-1's argument is premised on "a particular voltage generating the 'low level current,' and on that voltage being sufficient to generate a 'low level current' for some lengths of the data signaling pair but not for others." *Id.* The PTAB further noted that "[c]laim 6 . . . does not recite or impose any conditions on a voltage generating the 'low level current," and that "[a]ll that is required is that the current be 'low level.'" A10. The PTAB supported its construction by further noting that the specification of the '930 Patent "does not mention the length of the data signaling pair or indicate its importance in connection with determining whether a current is 'low level.'" *Id.*

Notwithstanding the PTAB's statements rejecting Network-1's cable-length restriction, in rendering its decision the PTAB nevertheless did rely on the distance/length-based argument advanced by Network-1's expert, Dr. Knox, in concluding that Matsuno did not disclose a "low level current."

Dr. Knox used Ohm's law—a law of nature that current (I) equals voltage (V) divided by resistance (R). Because an NT1/DTE assembly that is geographically close to the power supply will have a relatively short length for its data signaling pair, the resistance of this data signaling pair will be relatively low, which per Ohm's law means that the corresponding current will be relatively high. For an NT1/DTE assembly that is farther from the power supply, the opposite will be true—the data signaling pair will be longer, the resistance higher, and the

corresponding current lower. Thus, given a fixed applied voltage, the current to the NT1/DTE assembly would be higher with shorter data signaling pairs, and lower with longer data signaling pairs.

Dr. Knox made some calculations with respect to Matsuno and alleged that *some* of the NT1/DTE combinations (i.e., those within about one mile of the power supply station) receive a current that, by itself, is sufficient for operation. Dr. Knox argued that:

> the specific current disclosed in Matsuno (i.e., the current generated from the 48 volts) is sufficient, by itself, to operate the specific devices (NT1/DTEs) in Matsuno that require a current generated from 40 volts ***for a distance of almost a mile*** from the power source, which could be roughly equivalent to about 8,500 homes with NT1/DTE installations, without any additional or higher power above the 48 volts provided.

A2861, ¶ 115 (emphasis added).

But neither Dr. Knox nor the PTAB addressed the nature of the low current that would exist for devices located at distances *greater* than "almost a mile" from the power source. The ISDN standard, which is explicitly referenced in Matsuno, requires that ISDN equipment be designed to operate over a distance greater than three miles:

> The ANSI T1.601 standard specifies 12 mandatory test loops which are representative of the subscriber loop lengths in North America. *See* Pages 123-124 from Burd Reference Book, (AV-1032). Those test loops require all compliant ISDN equipment to operate at a distance of

22

> 18,000 feet[4] from the switching station. That is, the
> design loop distance for ISDN equipment is 18,000 feet.

A1895 at ¶ 20; A1489 at ¶ 2.

As Dr. Zimmerman (Appellants' expert) noted in his second declaration, Dr. Knox's "one mile" calculation would cover only about 7.5% of the actual subscriber area that is mandated by the ISDN standard. A1895 at ¶ 21. Dr. Zimmerman also questioned other assumptions underlying Dr. Knox's calculations. For example, Dr. Zimmerman noted that the power requirements for the access devices Dr. Knox used in his calculations were artificially low and based on devices that did not even exist at the time Matsuno was first published, and indeed would not exist for another decade. A1896 ¶¶ 24-25.

Notwithstanding these facts, the PTAB applied its understanding of the legal requirements for anticipation and its conclusions about Matsuno and held that Matsuno did not anticipate claims 6 and 9 because it does not disclose a "low level current." A15-29.

---

[4] 18,000 feet is equal to 3.41 miles.

## SUMMARY OF THE ARGUMENT

The PTAB erred in ruling claims 6 and 9 of the '930 Patent have not been shown to be unpatentable. The PTAB based its Final Written Decision with respect to both claims 6 and 9 on a narrow issue—whether Matsuno discloses, either expressly or inherently, "delivering a low level current . . . to the access device" as recited in claim 6 of the '930 Patent. In resolving this issue, the PTAB committed two errors.

I.     First, the PTAB erred by finding that Matsuno does not expressly or inherently disclose a "low level current." The PTAB construed the term "low level current" in claim 6 as "a current (e.g., approximately 20 mA) that is sufficiently low that, by itself, it will not operate the access device." A10. Even though Matsuno never once states that its "low voltage" setting is used to operate the NT1/DTE (Matsuno only states that the low voltage is used to sense a power failure), the PTAB relied upon and adopted Network-1's argument that the current created by the low voltage was sufficient to operate certain NT1/DTEs, and in particular, those at a distance of "*almost a mile*" from the power source. Because the PTAB believed that Matsuno could power these NT1/DTEs located within a mile of the power source, the PTAB erroneously concluded that Matsuno did not disclose the claimed "low level current."

24

But in reaching this conclusion, the PTAB failed to consider that under Ohm's law, a cable longer than Dr. Knox's "almost a mile" would have a higher resistance and a smaller current, thus making it incapable of operating the NT1/DTE, even under Network-1's theory.  The PTAB further failed to consider that the power supply circuit of Matsuno, operating in an ISDN-compliant network, must necessarily be designed to deliver currents to NT1/DTEs located at a distance of *greater* than one mile from the power source. As the record confirms, ISDN-standard equipment must be compatible with a cable length of up to 18,000 feet (or 3.41 miles). Therefore, even under Network-1's theory, Matsuno discloses a current that must necessarily reach an access device beyond one mile, but at the same time would be "sufficiently low that, by itself, it will not operate the access device."

II.    The PTAB also legally erred by improperly applying its construction and underlying reasoning to Matsuno. The fact that *some* NT1/DTE combinations could receive a current sufficient, by itself, for operation is wholly irrelevant if other NT1/DTE combinations do not. This is because the claim language only requires "delivering *a* low level current from said main power source to *the* access device over said data signaling pair." In construing "low level current," the PTAB specifically rejected Network-1's attempt to interject a cable length-based limitation into the claims. As noted above, "*the* access device" is any single access

device "adapted for data transmission." For anticipation based on this construction, there is no requirement that every possible NT1/DTE combination at every length of cable satisfy the "low level current" limitation as long as ***at least one*** of them falls within the non-operational range. As noted above and shown in the illustration below, such "access devices" exist—i.e., those NT1/DTE combinations within the ISDN standard of Matsuno that are outside of the "almost a mile" range created by Dr. Knox.



Applying the proper standard for anticipation, Matsuno must be found to disclose the "low level current" step of the challenged claims.

Had it not committed these errors, the PTAB would have found that Avaya had met its burden by a preponderance of the evidence that Matsuno expressly or inherently discloses "low level current." Indeed, the testimony of Network-1's expert supports Avaya's position when the PTAB's adopted claim construction is properly applied.

## ARGUMENT

### I.    Standard of Review

This Court reviews questions of law de novo. *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009). The PTO's factual determinations are reviewed under the substantial evidence standard—i.e., whether a reasonable fact finder could have arrived at the agency's decision after examining the record as a whole, including evidence supporting and detracting from the PTAB decision. *Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006). This Court does not afford deference to the PTAB's decision when the facts are largely undisputed, but when, like here, the PTAB makes "analytical errors" concerning the legal requirements for validity. *See Smith & Nephew*, *Inc. v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013).

## II. Matsuno Discloses "Low Level Current"

The PTAB erred as a matter of law in finding that Matsuno does not disclose a "low level current." The PTAB's error stems from the misapplication of inherency law, not from any question of fact—since the relevant facts necessary to decide the issue are largely undisputed. Because the error is analytical in nature, and not factual, this Court should not afford deference to the PTAB's decision. *See Smith & Nephew*, 721 F.3d at 1380.

As a general matter, "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). But inherency does not require that the missing characteristic exist homogeneously throughout a prior art reference as long it is present to some degree. *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1344 (Fed. Cir. 2005) (reasoning that a chemical process that produces only "trace" amounts of a compound inherently anticipates that compound). All that need be shown is that the outcome of the process is a "natural result flowing from the operation as taught in the prior art." *Id.* (citing *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981)).

As an initial matter, the PTAB correctly interpreted Matsuno upon institution, finding that it discloses a "low level current," i.e., "current . . . that is

28

sufficiently low that, by itself, it will not operate the access device." As the PTAB repeatedly noted upon institution of the various IPRs at issue here, "If low voltage V2 (-48 V) was sufficient, by itself, for the device to operate, presumably there would be no need to switch to high voltage V1 (-120 V) when local power is unavailable." A2716-17. The PTAB even defended its prior analysis in its Final Written Decision, stating, "[c]ertainly, this reading is one assumption that one might make based on the disclosure of Matsuno." A21.  But not only is it just one assumption, it is the only reasonable one since Matsuno expressly states that the lower 48 volts may be sufficient for remotely powering telephones on analog subscriber lines, but that remote powering of digital subscriber lines requires a higher voltage of, for example, 120 volts. A1490 at ¶ 05.

But even accepting Network-1's interpretation of Matsuno, an access device contemplated by Matsuno will *still* receive current that is insufficient for operation. *See* A26, A1894-96 at ¶¶ 18-23. Both experts' testimonies support the proposition that the "natural result flowing from the operation as taught" in Matsuno would result in some of the access devices not receiving a current sufficient for operation. For instance, while both experts dispute certain underlying assumptions in the calculations, A27, both experts' calculations confirm that at least some NT1/DTE installations in Matsuno would not receive a current sufficient to operate the device.

For his part, Dr. Knox limits his calculations to access devices that are less than 4,945 feet (what he described as about one mile) from the power supply, concluding that *those* access devices would be operational. *See* A26. He thus acknowledged by implication that access devices farther from the power supply than that distance would **not be** operational, since, under Ohm's law, the current would be smaller at greater distances. Indeed, Dr. Knox stated that "[a]s an engineer" he understands there may be devices "that might not operate on the lower voltages." A2148, ll. 1-6. But he then ignores those non-operational devices by saying they are "irrelevant," presumably meaning for an anticipation analysis, since some devices would operate. A2148, ll. 1-6. Avaya's expert, Dr. Zimmerman, calculated that the vast majority of the access devices in the service area mandated under the ISDN standard would receive an insufficient current to render them operable. *See* A1894-96 at ¶¶ 18-23.

Thus, there is no dispute that a "natural result" of the system described in Matsuno, even under Network-1's interpretation of the reference, is to have at least one access device receiving current insufficient for operation. By its very nature, the ISDN network disclosed in Matsuno is designed to serve a wide geographic area. Indeed, according to the ISDN standard, 92.5 percent of the geographic area serviced by an ISDN switching station would be further than 4,945 feet. A1895 at ¶¶ 20-21. Thus, the case for inherency is much stronger here compared to some of

the "trace" amount chemical cases where inherency was found. *See SmithKline Beecham*, 403 F.3d at 1344. Accordingly, the PTAB committed an analytical error in failing to find that the "low level current" is expressly, or at a minimum inherently, in Matsuno, and this Court should reverse.

## III. The PTAB Misapplied Its Claim Construction and Focused on the Wrong "Access Device"

The PTAB likewise erred as a matter of law by analyzing whether Matsuno disclosed a "low level current" that is sent to access devices within an "almost one mile" range, rather than analyzing whether a "low level current" is sent to an access device located at any distance from the power source (within ISDN constraints), which is all that the claim requires.[5] *See Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1324 n.6 (Fed. Cir. 2003) ("The anticipation analysis asks solely whether the prior art reference discloses and enables the claimed invention, and not how the prior art characterizes that disclosure or whether alternatives are also disclosed.") (citing *Celeritas Techs. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998)).

At the outset of the proceeding, the PTAB properly framed the "low level current" issue as follows:

---

[5] Again, because the error is analytical rather than factual, this Court should not afford deference to the PTAB's decision. *See Smith & Nephew*, 721 F.3d at 1380.

> The issue is whether *the specific current in Matsuno* is sufficient, by itself, to operate *the specific access device in Matsuno* such that it would be more than a "low level current" as recited in claim 6.

A1136 (emphasis in original). The PTAB did not require that the current be incapable of powering every device to be anticipatory, nor did the PTAB impose any kind of length or distance limitation on the claim construction. *Id*. Indeed, the PTAB specifically rejected Network-1's attempt to impose a length/distance requirement in the construed claims. *See* A9.

In its Final Written Decision, however, the PTAB deviated from the proper application of its claim construction. The PTAB adopted arguments by Network-1 and Dr. Knox suggesting that the claims require that devices located within "almost a mile" must receive a current that is insufficient for operation. Dr. Knox made supposedly "conservative" calculations based on Matsuno that purportedly showed why ***certain*** access devices (under conditions that Avaya contended were unreasonable) would receive a current sufficient for operation. But even Dr. Knox's analysis establishes that access devices in Matsuno fall into two categories: (i) those being less than 4,945 feet (i.e., almost a mile) from the power supply and therefore receiving operational power; and (ii) those being greater than 4,945 feet from the power supply and therefore receiving non-operational power.

Dr. Knox acknowledged that Ohm's law applies to Matsuno (as it must being a law of nature). He confirmed that "current would be the same at all points

along the subscriber line." A2858 at ¶ 111. He recognized that the current would decrease as the length of subscriber line increases. And, Dr. Knox agreed that higher power consuming access devices would not be guaranteed to operate using Matsuno's 48-volt power supply. A2145 ll. 22-25. But Dr. Knox erred in applying the law of anticipation by arguing that non-operational devices are "irrelevant" if there are some operational ones.  A2148, ll. 1-6. To be clear, the PTAB's construction did not require all of the access devices to receive a current insufficient for operation, just "***the*** access device" (i.e., at least one access device that is provided in the network). Even if other access devices receive current sufficient for operation, they are not relevant to the presence of at least one access device that does not receive current sufficient for operation. *See Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1356 (Fed. Cir. 2008) (rejecting argument that "relies on the erroneous assumption that the disclosure of multiple examples renders one example less anticipatory").

Here, the NT1/DTE installations within the one-mile operational range calculated by Dr. Knox are red herrings (shown in red in the illustration below).



The existence of NT1/DTE installations outside the one-mile operational range (shown in blue in the illustration) is sufficient to establish that the "low level current" step is present in Matsuno.

As noted above, the PTAB's reasoning supporting its construction of "low level current" requires that it not limit the NT1/DTE installations to particular cable lengths and corresponding operational ranges. A10. The PTAB's failure in

logic was the disconnect between its own claim construction of "low level current" and the manner in which that same construction was applied to Matsuno.

Accordingly, the PTAB legally erred in failing to find that the "low level current" is disclosed in Matsuno, and this Court should reverse.

## IV.    This Court Should Remand

In its Final Written Decision, the PTAB based its ruling on both instituted grounds on its perceived lack of a "low level current" in Matsuno. In particular, the PTAB recognized Avaya's arguments concerning Matsuno's application to the other steps of claim 6. A14-15. But in concluding that Avaya had not shown that Matsuno anticipates claims 6 and 9, it only focused on the "delivering a low level current . . . to the access device" step. It further relied on that analysis in rejecting the obviousness ground, failing to make any findings whatsoever on the other reference (Di Nicolo) or the motivation to combine Matsuno with Di Nicolo.

Given this record, this Court should remand this case back to the PTAB for further proceedings.

## CONCLUSION

For all of the foregoing reasons, Appellants respectfully request that the PTAB's decision be vacated, and remanded for further proceedings.

January 9, 2015

Respectfully submitted,

/s/  Jeffrey D. Sanok

JEFFREY D. SANOK
BRIAN M. KOIDE
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2500 (Telephone)
(202) 628-5116 (Facsimile)
jsanok@crowell.com
bkoide@crowell.com

JONATHAN M. LINDSAY
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400 (Telephone)
(949) 263-8414 (Facsimile)
jlindsay@crowell.com

SCOTT L. BITTMAN
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022
(212)895-4223 (Telephone)
(212)895-4201 (Facsimile)
sbittman@crowell.com

*Counsel for Appellant*
*Avaya Inc.*

/s/ Robert J. Walters (with consent)
ROBERT J. WALTERS
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000
rwalters@mwe.com

DAVID H. DOLKAS
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 92614
(650) 815-7400
ddolkas@mwe.com

*Counsel for Appellant Hewlett-Packard Co.*

/s/ Thomas M. Dunham (with consent)
THOMAS M. DUNHAM
J. MICHAEL WOODS
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
(202) 282-5000
tdunham@winston.com
mwoods@winston.com

KIMBALL R. ANDERSON
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
(312) 558-5600
kanderson@winston.com

MICHAEL J. SCHEER
WINSTON & STRAWN LLP
333 S. Grand Avenue
38th Floor
Los Angeles, CA 90071-1543
(213) 615-1700
mscheer@winston.com

*Counsel for Appellant Dell Inc.*

/s/ Lionel M. Lavenue (with consent)
LIONEL M. LAVENUE
DANIEL C. COOLEY
FINNEGAN, HENDERSON,
  FARABOW,  GARRETT &
  DUNNER, LLP
Two Freedom Square,
11955 Freedom Drive
Reston, VA 20190
(571) 203-2700
lionel.lavenue@finnegan.com
daniel.cooley@finnegan.com

*Counsel for Sony Corporation of America*

# **ADDENDUM**

# TABLE OF CONTENTS

**Addendum Page**

Final Written Decision of
The United States Patent and Trademark Office,
Patent Trial and Appeal Board
        entered May 22, 2014 ................................................................. A000001

U.S. Patent No. 6,218,930 B1................................................................. A000043

Trials@uspto.gov                                    Paper 103
571-272-7822                                      Entered: May 22, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

AVAYA INC., DELL INC., SONY CORPORATION OF AMERICA,
and HEWLETT-PACKARD CO.
Petitioners

v.

NETWORK-1 SECURITY SOLUTIONS, INC.
Patent Owner
_____

Case IPR2013-00071[1]
Patent 6,218,930 B1


Before JONI Y. CHANG, JUSTIN T. ARBES, and GLENN J. PERRY,
*Administrative Patent Judges.*

ARBES, *Administrative Patent Judge.*


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

---

[1] Cases IPR2013-00385 and IPR2013-00495 have been joined with this
proceeding.

Case IPR2013-00071
Patent 6,218,930 B1

## I. BACKGROUND

Petitioner Avaya Inc. ("Avaya") filed a Petition (Paper 1) ("Pet.")
seeking *inter partes* review of claims 6 and 9 of U.S. Patent No. 6,218,930
B1 (Ex. 1001) ("the '930 patent") pursuant to 35 U.S.C. §§ 311-19.  On May
24, 2013, we instituted an *inter partes* review of claims 6 and 9 on two
grounds of unpatentability (Paper 18) ("-71 Dec. on Inst.").

This proceeding involves three other Petitioners in addition to Avaya.
Subsequent to institution in Case IPR2013-00071, Dell Inc. ("Dell") filed a
petition in Case IPR2013-00385 seeking *inter partes* review of claims 6 and
9 on the same grounds on which a trial was instituted in Case
IPR2013-00071, and a motion for joinder with that proceeding.  *See*
IPR2013-00385, Papers 2, 4, 11.  We instituted an *inter partes* review and
joined Dell as a party to Case IPR2013-00071 in a limited capacity.  *See*
IPR2013-00385, Papers 16 ("-385 Dec. on Inst."), 17.  Specifically, we
ordered Avaya and Dell to file all papers, other than motions not involving
the other party, as consolidated filings, and permitted Dell to file an
additional paper addressing any points of disagreement with each
consolidated filing if necessary.  *See* IPR2013-00385, Paper 17 at 11.  Over
the course of this proceeding, Dell did not file any paper disagreeing with
any filing made by Avaya.

Sony Corporation of America ("Sony") and Hewlett-Packard Co.
("HP") also filed a similar petition and motion for joinder in Case
IPR2013-00495.  *See* IPR2013-00495, Papers 3, 7.  We instituted an *inter
partes* review and joined Sony and HP as parties to Case IPR2013-00071 in
a limited capacity.  *See* IPR2013-00495, Papers 12, 13.

Case IPR2013-00071
Patent 6,218,930 B1

Avaya, Dell, Sony, and HP are all Petitioners for purposes of this proceeding.  For ease of reference, however, we refer herein to arguments as being made by Avaya, the original Petitioner.

Patent Owner Network-1 Security Solutions, Inc. ("Network-1") filed a Patent Owner Response (Paper 44)[2] ("PO Resp."), and Avaya filed a Reply (Paper 56) ("Reply").  Along with its Patent Owner Response, Network-1 filed a Motion to Amend (Paper 43) ("Mot. to Amend"), proposing substitute claim 10 if the Board determines claim 6 to be unpatentable, and substitute claim 11 if the Board determines claim 9 to be unpatentable. Avaya filed an Opposition to the Motion to Amend (Paper 57), and Network-1 filed a Reply (Paper 65).

Avaya filed a Motion for Observation (Paper 80) ("Mot. for Obs.") on the cross-examination testimony of Network-1's declarant, James M. Knox, Ph.D., and Network-1 filed a Response (Paper 90) ("Obs. Resp.").

Avaya filed a Motion to Exclude (Paper 79) ("Pet. Mot. to Exclude") certain testimony of Dr. Knox submitted by Network-1 with Network-1's Reply to Avaya's Opposition to the Motion to Amend.  Network-1 filed an Opposition to the Motion to Exclude (Paper 88), and Avaya filed a Reply (Paper 95).  Network-1 also filed a Motion to Exclude (Paper 83) ("PO Mot. to Exclude") the expert report of Dr. Melvin Ray Mercer (Exhibit 1042) submitted by Avaya with its Reply to Network-1's Patent Owner Response. Avaya filed an Opposition to the Motion to Exclude (Paper 91), and Network-1 filed a Reply (Paper 94).

---

[2] It appears that Network-1 filed two copies of its Patent Owner Response in the Patent Review Processing System (PRPS) as Papers 42 and 44.  Paper 42 will be expunged.

3

Case IPR2013-00071
Patent 6,218,930 B1

An oral hearing was held on January 9, 2014, and a transcript of the hearing is included in the record (Paper 102) ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c).  This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons that follow, we determine that Avaya has not shown by a preponderance of the evidence that claims 6 and 9 of the '930 patent are unpatentable.

## A. The '930 Patent

The '930 patent relates to "the powering of 10/100 Ethernet compatible equipment," specifically "automatically determining if remote equipment is capable of remote power feed and if it is determined that the remote equipment is able to accept power remotely then to provide power in a reliable non-intrusive way."  Ex. 1001, col. 1, ll. 13-19.  The '930 patent describes how it generally was known in the prior art to power telecommunications equipment, such as telephones, remotely, but doing so had not "migrated to data communications equipment" due to various problems, such as the high power levels required by data communications equipment.  *Id*. at col. 1, ll. 22-32.  The '930 patent describes a need in the art to power data communications equipment remotely and to "reliably determin[e] if a remote piece of equipment is capable of accepting remote power."  *Id*. at col. 1, ll. 42-43.

4

Case IPR2013-00071
Patent 6,218,930 B1

Figure 3 of the '930 patent is reproduced below.



*Fig. 3*

Figure 3 depicts remote telephone 62 capable of receiving and transmitting both voice and data. *Id*. at col. 3, ll. 60-66. Telephone 62 is connected to access node 64 at the customer's premises, and access node 64 is connected to one of the ports of Ethernet switch 68 via wiring 66 comprising "a Category 5 Ethernet 100BaseX cable of 4 sets of unshielded twisted pairs." *Id*. Ethernet switch 68 comprises automatic remote power detector 22 (shown in Figure 1) and remote power supply 34 (shown in Figure 2). *Id*. at col. 4, ll. 1-4.

The preferred embodiment described in the '930 patent operates as follows. A remote access device, such as the telephone shown in Figure 3, normally is powered by "an [alternating current] ac transformer adapter plugged in to the local 110 volt supply," but may or may not be capable of being powered remotely. *Id*. at col. 2, ll. 40-44. The system detects whether the access device is capable of being powered remotely by "delivering a low level current (approx. 20 [milliamperes (mA)])" over existing twisted pairs

5

Case IPR2013-00071
Patent 6,218,930 B1

of an Ethernet cable used for data signaling and "measuring a voltage drop in the return path." *Id*. at col. 2, l. 66-col. 3, l. 2; col. 3, ll. 44-48. If there is no voltage drop or a fixed voltage level is detected, the device is not capable of accepting remote power. *Id*. at col. 3, ll. 2-11. If a varying or "sawtooth" voltage level occurs (caused by the access device repeatedly beginning to start up but being "unable to sustain the start up" due to the low current level), the device is capable of accepting remote power. *Id*. at col. 3, ll. 12-22. The system then increases the power being supplied remotely to the access device. *Id*. Once the access device is operating under remote power, the system looks for removal of the access device and decreases the power being supplied when the device is no longer connected. *Id*. at col. 3, ll. 49-58.

*B. Challenged Claims*

Claims 6 and 9 of the '930 patent are the only claims at issue:

6. Method for remotely powering access equipment in a data network, comprising,

providing a data node adapted for data switching, an access device adapted for data transmission, at least one data signaling pair connected between the data node and the access device and arranged to transmit data therebetween, a main power source connected to supply power to the data node, and a secondary power source arranged to supply power from the data node via said data signaling pair to the access device,

delivering a low level current from said main power source to the access device over said data signaling pair,

sensing a voltage level on the data signaling pair in response to the low level current, and

6

Case IPR2013-00071
Patent 6,218,930 B1

controlling power supplied by said secondary power source to said access device in response to a preselected condition of said voltage level.

9. Method according to claim 6, including the step of continuing to sense voltage level and to decrease power from the secondary power source if voltage level drops on the data signaling pair, indicating removal of the access device.

### C. Prior Art

The pending grounds of unpatentability in this *inter partes* review are based on the following prior art:

1. U.S. Patent No. 6,115,468, filed March 26, 1998, issued September 5, 2000 ("De Nicolo") (Ex. 1007); and

2. Japanese Unexamined Patent Application Publication No. H10-13576, published January 16, 1998 ("Matsuno") (Ex. 1004).[3]

### D. Pending Grounds of Unpatentability

This *inter partes* review involves the following grounds of unpatentability:

| Reference(s) | Basis | Claims |
|---|---|---|
| Matsuno | 35 U.S.C. § 102(b) | 6 and 9 |
| De Nicolo and Matsuno | 35 U.S.C. § 103(a) | 6 and 9 |

---

[3] We refer to "Matsuno" as the English translation (Ex. 1004) of the original reference (Ex. 1002).  Avaya provided an affidavit attesting to the accuracy of the translation.  *See* Ex. 1003; 37 C.F.R. § 42.63(b).

7

Case IPR2013-00071
Patent 6,218,930 B1

## II. ANALYSIS

### *A. Claim Interpretation*

Consistent with the statute and legislative history of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), the Board interprets claims using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *see also* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012). There is a "heavy presumption" that a claim term carries its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). However, a "claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *Id.* "Although an inventor is indeed free to define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Also, we must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment. *See In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) ("limitations are not to be read into the claims from the specification").

### *1. "Low Level Current"*

Avaya did not propose an interpretation for "low level current" in its Petition. Network-1, in its Preliminary Response, argued that the term means "a current at a level that is sufficiently low that it will not (a) operate the access device, or (b) damage an access device that is not designed to

8

Case IPR2013-00071
Patent 6,218,930 B1

accept power through the data signaling pair." Prelim. Resp. 24. In the
Decisions on Institution, we interpreted the term to mean a current (e.g.,
approximately 20 mA) that is sufficiently low that, by itself, it will not
operate the access device. -71 Dec. on Inst. 7-10; Paper 21; -385 Dec. on
Inst. 8-10. Avaya does not argue in its Reply that this interpretation is
incorrect.

Network-1, however, argues in its Patent Owner Response that our
prior interpretation should be modified slightly to account for the length of
the data signaling pair. PO Resp. 3-4. Network-1 contends that, due to the
resistance of the data signaling pair, a particular voltage at the data node
could be sufficient to generate enough current to operate the access device if
the length of the data signaling pair is very short, and at the same time not be
sufficient to generate enough current to operate the same device when the
data signaling pair is very long. *Id*. at 3 (citing Ex. 2015 ¶ 63). Therefore,
according to Network-1, a "low level current" is one that is sufficiently low
that it will not operate the access device "at all reasonable data signaling pair
lengths (unless the system specifically precludes certain data signaling pair
lengths)." *Id*. at 4. Avaya disagrees with Network-1's proposed
interpretation, arguing that the Specification of the '930 patent never
mentions the length of the data signaling pair. Reply 2.

We are not persuaded that our previous interpretation of "low level
current" is incorrect, and incorporate our previous analysis for purposes of
this decision. *See* -71 Dec. on Inst. 7-10; Paper 21; -385 Dec. on Inst. 8-10.
Network-1's argument is premised on a particular voltage generating the
"low level current," and on that voltage being sufficient to generate a "low
level current" for some lengths of the data signaling pair but not for others.

9

Case IPR2013-00071
Patent 6,218,930 B1

Claim 6, however, does not recite or impose any conditions on a voltage generating the "low level current." All that is required is that the current be "low level." In addition, as explained in the Decisions on Institution, "low level current" is a term of degree, and we refer to the Specification of the '930 patent for a standard with which to measure that degree. *See* -71 Dec. on Inst. 7-10. The Specification does not mention the length of the data signaling pair or indicate its importance in connection with determining whether a current is "low level." Accordingly, applying the broadest reasonable interpretation, we interpret "low level current" in claim 6 to mean a current (e.g., approximately 20 mA) that is sufficiently low that, by itself, it will not operate the access device.

## 2. *Other Terms*

In the Decisions on Institution in Cases IPR2013-00071 and IPR2013-00385, we interpreted three other claim terms as follows:

| Term | Interpretation |
|------|----------------|
| "data node adapted for data switching" (claim 6) | a data switch or hub configured to communicate data using temporary rather than permanent connections with other devices or to route data between devices |
| "data signaling pair" (claim 6) | a pair of wires used to transmit data |
| "sensing a voltage level on the data signaling pair" (claim 6) | sensing a voltage at a point on the pair of wires used to transmit data |

-71 Dec. on Inst. 10-14; -385 Dec. on Inst. 11-13. Further, we did not interpret "main power source" and "secondary power source" in claim 6 as

10

Case IPR2013-00071
Patent 6,218,930 B1

requiring physically separate devices.  -71 Dec. on Inst. 13-14.  We
incorporate our previous analysis for purposes of this decision.


### B. Anticipation by Matsuno

With respect to the alleged anticipation of claims 6 and 9 by Matsuno,
we have reviewed Avaya's Petition, Network-1's Patent Owner Response,
and Avaya's Reply, as well as the evidence discussed in each of those
papers.  We are not persuaded, by a preponderance of the evidence, that
claims 6 and 9 are anticipated by Matsuno under 35 U.S.C. § 102(b).


### 1. Matsuno

Matsuno discloses a "power supply circuit that switches power supply
voltage and supplies the desired power while ensuring safety."  Ex. 1004,
Abstract.  Matsuno describes a prior art "conventional example" of remote
power supply in an Integrated Services Digital Network (ISDN), as shown in
Figure 11 reproduced below.



11

Case IPR2013-00071
Patent 6,218,930 B1

*Id.* ¶ 2.  Figure 11 depicts subscriber terminal (DTE) 103, network terminal device (NT1) 102, and power supply circuit 101.  *Id.*  Power supply circuit 101, having power source 105, is capable of supplying power to NT1 102 over digital subscriber line 104, which comprises a TIP line and RING line.  *Id.* ¶¶ 2-3.  NT1 102 and DTE 103 may be powered locally by commercial AC power source 111, or may be powered by "station power supply" from power supply circuit 101 when local power is unavailable.  *Id.* ¶¶ 3-4.  Matsuno discloses the following with respect to Figure 11:

> When the commercial AC power source 111 is functioning normally, for example, an AC current of 100 V is rectified in the phantom power supply part 112 and is converted to a prescribed voltage, for example, a *DC voltage of 40 V*, for use as the local power supply that is supplied to the subscriber terminal 103.  Switching to the aforementioned station power supply occurs with shutdown of the commercial AC power supply, and *power sufficient to allow minimal communication on the digital subscriber terminal 103 is thus supplied*.

*Id.* ¶ 4 (emphasis added).

According to Matsuno, the high voltages required in conventional arrangements of the type shown in Figure 11 cause various safety problems.  *Id.* ¶¶ 5-6.  To address those problems, Matsuno discloses a particular remote power supply arrangement that "suppl[ies] a prescribed power level while maintaining safety by applying a low voltage during local power supply and a high voltage during station power supply."  *Id.* ¶ 6.

12

Figure 1 of Matsuno is reproduced below.



Figure 1 depicts DTE 3 and NT1 2 in communication with power supply circuit 1 in an ISDN "switching station" over digital subscriber line 12. *Id.* ¶ 16. NT1 2 typically is powered by local AC power supply 11, and powers DTE 3. *Id.* ¶ 8. When local power is available, contact breaker point 8 in NT1 2 is OFF, loop detection part 4 in power supply circuit 1 detects no DC loop, and power supply circuit 1 supplies "low voltage $V_2$" (-48 V) to digital subscriber line 12. *Id.* ¶¶ 7-8, 18-20. When local power stops, the stoppage is detected by power stoppage detection part 10 in NT1 2, contact breaker point 8 turns ON, loop detection part 4 detects the resulting DC loop, and power supply circuit 1 switches to "high-voltage $V_1$" (-120 V), "thereby allowing the desired power to be supplied from the station." *Id.*

13

Case IPR2013-00071
Patent 6,218,930 B1

### 2. Avaya's Contentions Regarding Matsuno

In its Petition, Avaya identifies the following devices in Matsuno as disclosing the various devices recited in claim 6:

| Claim Limitation | Identified Device(s) in Matsuno |
|---|---|
| "data node adapted for data switching" | ISDN switching station (including power supply circuit 1) |
| "data network" | ISDN network |
| "access device" | network terminal device (NT1) 2, "either alone or in combination" with subscriber terminal (DTE) 3 |
| "data signaling pair" | subscriber line 12 |
| "main power source" | a power supply of the switching station providing "a standard -48V supply" |
| "secondary power source" | power supply circuit 1 applying current from -120 V |

Pet. 18-24.[4]  Avaya's declarant, George A. Zimmerman, Ph.D., identifies the same devices in his declaration served with the Petition.  Ex. 1011 ¶¶ 30-37.

As to the step of "delivering a low level current from said main power source to the access device over said data signaling pair," Avaya argues that the ISDN switching station in Matsuno "provides a low level current/voltage ($-V_2$) to an access device (NT1/DTE) over the data signaling pair (subscriber line 12)."  Pet. 20-21.  Avaya further includes a claim chart citing paragraphs 6, 7, 18, 20, and 22, and claims 1-9, of Matsuno, which describe

---

[4] Dell's Petition asserts the same ground of unpatentability based on Matsuno and makes the same arguments as Avaya does in its Petition. *Compare* Pet. 18-24, *with* IPR2013-00385, Paper 2 at 17-24.

14

"low-voltage power supply" $V_2$ (-48 V). *Id*. at 24. Dr. Zimmerman testifies as follows:

> Matsuno further describes how, in response to providing a low level current, such as -$V_2$, it detects a resulting voltage or current and, based on that detected voltage or current, it then controls whether to provide a high voltage or a low voltage. See e.g., Matsuno (AV-1004), ¶¶ (0018) - (0020), (0033), (0035), (0036) and (0039). Thus, Matsuno teaches the same general approach to controlling power as claim 6 in the '930 Patent.

Ex. 1011 ¶ 40. Thus, Avaya's position, as argued in the Petition, is that the current generated from low voltage $V_2$ (-48 V) in Matsuno is a "low level current" as recited in claim 6.

As to the step of "sensing a voltage level on the data signaling pair in response to the low level current," Avaya cites loop detection part 4 in power supply circuit 1, which detects "the voltages at both terminals of the constant-current circuits 21a and 21b" (shown in Figure 2 of Matsuno). Pet. 21, 25 (citing Ex. 1004 ¶ 33) (emphasis omitted).

As to the step of "controlling power supplied by said secondary power source to said access device in response to a preselected condition of said voltage level," Avaya argues that Matsuno controls the power supplied to NT1 2 and DTE 3 by increasing the voltage from low voltage $V_2$ (-48 V) to high voltage $V_1$ (-120 V) when local power is unavailable. *Id*. at 21, 25 (citing Ex. 1011 ¶ 40).

### 3. Analysis

For the reasons explained below, we conclude that Avaya has not shown, by a preponderance of the evidence, that Matsuno discloses "delivering a low level current from said main power source to the access

15

Case IPR2013-00071
Patent 6,218,930 B1

device over said data signaling pair," as recited in claim 6.  It is Avaya's

burden to establish that Matsuno discloses the "low level current" step.  *See*

35 U.S.C. § 316(e); *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,

868 F.2d 1251, 1255-56 (Fed. Cir. 1989) ("Anticipation requires that every

limitation of the claim in issue be disclosed, either expressly or under

principles of inherency, in a single prior art reference.").  Avaya's position,

as argued in the Petition, is that the current generated from low voltage $V_2$

(-48 V) in Matsuno is a "low level current."  Pet. 20-21, 24.  Thus, Avaya

must show sufficient proof, amounting to a preponderance of the evidence,

that such current is a "low level current," which we interpret to mean a

current (e.g., approximately 20 mA) that is sufficiently low that, by itself, it

will not operate the access device.  Avaya has not done so.


   *a. Avaya Has Not Shown That Matsuno Expressly or Inherently*
        *Discloses the "Low Level Current" Recited in Claim 6*

   We begin by noting that Avaya does not point to any express

statement in Matsuno that the current generated from low voltage $V_2$ (-48 V)

is insufficient by itself to operate the alleged "access device" in Matsuno

(i.e., the NT1, either alone or in combination with the DTE).  Avaya's

declarant, Dr. Zimmerman, acknowledged this lack of disclosure during

cross-examination:

   Q. Does Matsuno anywhere expressly state that the 48
   volts is insufficient to operate a DTE that requires 40 volts?

   A. Matsuno does not expressly state that 48 volts
   delivered at the U interface point would be insufficient.

   . . .

16

Case IPR2013-00071
Patent 6,218,930 B1

> Q. Does Matsuno disclose that the 48 volts would be insufficient to operate the NT1?

> A. He doesn't discuss that at all.

Ex. 2016 at 36:24-37:3, 39:6-8.  Indeed, throughout its disclosure, Matsuno speaks in terms of voltage, not current.  *See, e.g.*, Ex. 1004 ¶¶ 4, 7, 18-20. Matsuno discloses, for example, "high-voltage $V_1$ of -120 V and low voltage $V_2$ of -48 V," but never discloses the specific amount of current that is generated on digital subscriber line 12 from low voltage $V_2$ (-48 V).  *See id.* ¶ 18; *see also id.* ¶ 19 (stating that "the desired current" is supplied upon the application of high voltage $V_1$ (-120 V), but not providing a precise amount). Nor does Matsuno disclose the specific amount of current that would be needed for the NT1 or DTE to operate.  Thus, we simply cannot compare one level of current to another to determine whether what Avaya identifies as a "low level current" is sufficient.

Similarly, Dr. Zimmerman acknowledged that the current generated from low voltage $V_2$ (-48 V) is not inherently sufficient or insufficient for at least the DTE to operate.  Dr. Zimmerman testified as follows:

> Q. Is it inherent in Matsuno that the 48 volts would be insufficient to operate the DTE?

> A. It is not inherent.  It is implied.

> . . .

> Q. Is it the case that, if we have a relatively short subscriber line, that 48 volts would be sufficient to power a DTE?

> A. Not necessarily.  And Matsuno doesn't really speak to that at all.

Ex. 2016 at 38:17-19, 42:20-24.  Avaya's position, therefore, appears to be that, although not expressly stated in Matsuno, it is implicit that the current

17

Case IPR2013-00071
Patent 6,218,930 B1

generated from low voltage $V_2$ (-48 V) is insufficient by itself to operate the NT1 and DTE.

What Avaya relies on—and what we found in the Decisions on Institution to indicate a reasonable likelihood of prevailing—are two statements that Matsuno makes about how its devices operate. First, paragraph 4 of Matsuno discloses the following:

> When the commercial AC power source 111 is functioning normally, for example, an AC current of 100 V is rectified in the phantom power supply part 112 and is converted to a prescribed voltage, for example, a DC voltage of 40 V, for use as the local power supply that is supplied to the subscriber terminal 103. Switching to the aforementioned station power supply occurs with shutdown of the commercial AC power supply, and *power sufficient to allow minimal communication on the digital subscriber terminal 103 is thus supplied*.

Ex. 1004 ¶ 4 (emphasis added). Avaya did not rely specifically on this language in its Petition, but cites the language in its Reply for the proposition that if "minimal communication" is provided when the high voltage source in Matsuno (120 volts according to Avaya) is in effect, the low voltage source (48 volts according to Avaya) must not generate enough current for the NT1 and DTE to operate. *See* Reply 4; Ex. 1041 ¶ 36.

We are not persuaded that Avaya's assumption necessarily follows from the statement in paragraph 4. The cited statement appears in the context of Matsuno's discussion of the prior art arrangement shown in Figure 11, not the description of Figures 1 and 2 that Avaya relies on as allegedly teaching the method of claim 6. *See* Ex. 1004 ¶¶ 2, 4; Pet. 24. It is not clear that the station power supply in the prior art arrangement is necessarily the same as the high voltage power supply $V_1$ (-120 V) in the disclosed invention. Matsuno also does not describe in any detail what is

18

meant by "minimal communication," or indicate whether such communication equates with overall operation of the NT1 and DTE. Further, as Dr. Knox points out, just because one power level is sufficient for "minimal communication" does not mean necessarily that a lower power level is not. *See* Ex. 2015 ¶ 120 ("if I said that 10 watts is sufficient to power a device, it is not expressed or inherent that 9 watts, 8 watts, or any other wattage would be insufficient to power the device").

Paragraph 4 of Matsuno cannot necessarily be read in the manner proposed by Avaya for another reason as well. Matsuno's discussion of the Figure 11 prior art arrangement continues in paragraphs 5 and 6:

> The voltage of station power supply for analog subscriber lines is generally -48 V. However, in regard to the voltage for a station power supply for a digital subscriber line 104, in order to provide the prescribed power to the subscriber terminal 103, for example, the line voltage is taken to be about 120 V for the power supply power source 105 of the power supply circuit 101. In addition, because the digital subscriber line 104 runs into the home of the consumer, it is desirable to ensure safety by decreasing the line voltage of the digital subscriber line 104 in the home of the subscriber.

> *During station power supply, the line impedance of the digital subscriber line 104 in the network terminal device 102 becomes small, and the line voltage is sufficiently reduced. However, during local power supply, the line impedance of the digital subscriber line 104 is large, and thus the line voltage is, for example, 85 to 105 V.* This type of voltage has been problematic in terms of safety when applied as the line voltage for the digital subscriber line 104 that runs into the homes of subscribers. An object of the present invention is to supply a prescribed power level while maintaining safety by applying a low voltage during local power supply and a high voltage during station power supply.

19

Case IPR2013-00071
Patent 6,218,930 B1

Ex. 1004 ¶¶ 5-6 (emphasis added).  Figure 11 depicts one remote power

supply, which is not the 48 volt power supply of the disclosed invention.

*See id*. ¶ 2, Fig. 11.  When local power is available in Figure 11, the line

impedance is large and the line voltage is 85-105 V.  *Id*. ¶ 6.  Conversely,

when station power is being supplied, the line impedance is low and the line

voltage is reduced below 85 V.  *Id*.  Avaya contends that "minimal

communication" is permitted upon switching to a 120 V power supply.  *See*

Reply 4.  Paragraph 6 above, however, indicates that a line voltage of less

than 85 V available to the NT1 and DTE would be sufficient for operation.

*See* Ex. 1004 ¶ 6.  Matsuno does not disclose precisely what that line voltage

is, but does state that 40 V is sufficient during local power supply.  *Id*. ¶¶ 4,

6.  Thus, reading the "minimal communication" language in context with the

following paragraphs describing the same prior art arrangement, we are not

persuaded by Avaya's argument that operation/"minimal communication" is

only available based on high voltage $V_1$ (-120 V).[5]

 Second, Matsuno discloses that low voltage $V_2$ (-48 V) is applied

when the NT1 and DTE are operating under local power, but high voltage

$V_1$ (-120 V) is applied if the local power fails.  *See* Ex. 1004 ¶¶ 7-8, 18-22.

Citing our analysis in the Decisions on Institution, Avaya in its Reply

concludes that if the low voltage power supply was sufficient by itself to

operate the access device, there would be no need to switch to high voltage

when local power is unavailable.  Reply 3 (citing -385 Dec. on Inst. 15).

---

[5] We note that Network-1 presented this argument for the first time at the
hearing.  *See* Tr. at 36:10-38:7.  We exercise our discretion to consider this
argument, however, given the fact that Avaya did not make its "minimal
communication" argument in the Petition, and only raised the argument for
the first time in its Reply.

20

Case IPR2013-00071
Patent 6,218,930 B1

Certainly, this reading is one assumption that one might make based on the disclosure of Matsuno.  Given the lack of express disclosure in Matsuno as to whether the current generated from low voltage $V_2$ (-48 V) is sufficient to operate the NT1 and DTE, however, it is not the only possible one.  As explained herein, Network-1 has come forward with sufficient evidence and reasoning, particularly with respect to Dr. Knox's testimony, to put that assumption into question.  Dr. Knox also provides numerous reasons why the opposite would be true (i.e., high voltage is used even though the NT1 and DTE would operate based on the low voltage).  Ex. 2015 ¶ 118.  According to Dr. Knox, (1) some devices may need extra power for certain functionality, (2) some devices may operate more efficiently at higher voltages, (3) higher power would allow for additional premises equipment beyond a single DTE, (4) transmitting power at higher voltages would be more cost effective for the telephone company, and (5) higher power would allow devices to operate at full functionality over very long subscriber loop runs.  *Id*.  Avaya does not argue in its Reply that the reasons cited by Dr. Knox are technically incorrect or not possible, and we find them persuasive.

The fact that Matsuno does not disclose expressly that the current generated from low voltage $V_2$ (-48 V) is insufficient to operate the NT1 and DTE forces Avaya to attempt to make certain assumptions based on what Matsuno does disclose.  Those assumptions, although possible, are not enough to prove by a preponderance of the evidence that Matsuno expressly or inherently discloses the "low level current" recited in claim 6.

21

Case IPR2013-00071
Patent 6,218,930 B1

### b. Dr. Knox's Analysis is Persuasive That the Identified Current in Matsuno is Not a "Low Level Current"

In its Patent Owner Response, Network-1 relies extensively on the testimony of Dr. Knox (Exhibit 2015).[6] PO Resp. 2-14. Dr. Knox describes various disclosures in Matsuno, performs a technical analysis based on the limited detail provided in Matsuno and "conservative" assumptions, and concludes that the current generated from low voltage $V_2$ (-48 V) would be sufficient to operate the NT1 and DTE in Matsuno. Ex. 2015 ¶¶ 97-120. We find Dr. Knox's analysis persuasive.

First, Dr. Knox cites paragraph 4 of Matsuno, but draws a different conclusion from it than Avaya did. Paragraph 4 reads:

> When the commercial AC power source 111 is functioning normally, for example, an AC current of 100 V is rectified in the phantom power supply part 112 and is converted to a prescribed voltage, for example, *a DC voltage of 40 V*, for use as the local power supply that is supplied to the subscriber terminal 103. Switching to the aforementioned station power supply occurs with shutdown of the commercial AC power supply, and power sufficient to allow minimal communication on the digital subscriber terminal 103 is thus supplied.

Ex. 1004 ¶ 4 (emphasis added); *see* Ex. 2015 ¶ 100. Matsuno discloses in paragraph 4 that the NT1 and DTE, in normal operation, can operate based on a current generated from 40 V (rectified from the 100 V provided by the AC power source).[7] Ex. 2015 ¶ 100. Dr. Knox, therefore, concludes that because the NT1 and DTE are capable of operating based on 40 V, low

---

[6] It appears that Network-1 filed two copies of Exhibit 2015 in PRPS. The duplicate copy will be expunged.

[7] Dr. Zimmerman agrees that "the only voltage identified in Matsuno that would be potentially needed by a subscriber terminal, a DTE, is the 40 volts." Ex. 2016 at 32:4-8.

A000022

Case IPR2013-00071
Patent 6,218,930 B1

voltage $V_2$ (-48 V) in Matsuno also is sufficient to operate the devices because it can provide more power to a given load than 40 V.  *Id.* ¶ 102; *see* PO Resp. 8.  Dr. Knox also notes that Matsuno never states that 40 V is the minimum operating voltage—it just indicates that 40 V is sufficient for operation, such that voltages below 40 V may be sufficient as well.  *Id.* ¶ 100.

Avaya's response is that "a *local* power source providing 40 V says nothing about the amount of *current* that is required to operate the equipment."  Reply 4 (emphasis in original).  As explained above, however, Avaya is relying on two voltages at the power supply circuit (48 volts and 120 volts) in arguing that the current generated from low voltage $V_2$ (-48 V) is insufficient to operate the NT1 and DTE.  *See* Pet. 20-21, 24; Reply 3.  Again, Matsuno does not speak in terms of current—it only discloses voltages.  Thus, even if Dr. Knox's assumptions regarding the disclosed 40 volts are unfounded, so are Avaya's assumptions regarding the 48 volts and 120 volts.  At the very least, it is questionable as to what the language in Matsuno means, which does not amount to a preponderance of the evidence in favor of Avaya.

Second, Dr. Knox cites the following statement in Matsuno:  "[L]ow voltage is supplied to the digital subscriber line 12.  The voltage to ground or the line voltage of the digital subscriber line 12 that runs into the home of the subscriber is thus at *approximately 48 V*, allowing safety to be ensured."  Ex. 1004 ¶ 26 (emphasis added).  Dr. Knox concludes that, based on this disclosure, when low voltage $V_2$ (-48 V) is applied by the power supply circuit in Matsuno, the line voltage at the subscriber is approximately 48 volts.  Ex. 2015 ¶ 103.  Dr. Knox then explains why the approximately 48 V

23

Case IPR2013-00071
Patent 6,218,930 B1

line voltage would be sufficient for operation.  *Id.* ¶ 104.  When local power
is available, the NT1 and DTE operate based on 40 V.  *Id.*  Polarity guard
110 in Figure 11 causes a voltage drop of approximately 1.2 V, leaving a
"headroom" difference of 6.8 V between the supplied 48 V and the required
41.2 V.  *Id.*  Dr. Knox, therefore, concludes that "the 48 volt current
disclosed in Matsuno is sufficient to power the specific access device
disclosed in Matsuno that requires a current from a 40 volt source."  *Id.*
¶ 103.

Avaya disputes that approximately 48 V is available at the NT1 in
Matsuno, relying on the testimony of Dr. Zimmerman.  Reply 4-5 (citing Ex.
1041 ¶¶ 32-35).  Dr. Zimmerman testifies that only "about 8 V of potential
would be available to the NT1/DTE, which . . . would be well below any
level of voltage that could operate such an NT1/DTE, and certainly well
below the 41.2 volts that Dr. Knox's calculations rely on."  Ex. 1041 ¶ 32.
Dr. Zimmerman bases his conclusion on the fact that 40 V of potential is lost
across the digital subscriber line when providing high voltage power.  *Id.*
(citing Ex. 1004 ¶¶ 20, 27).  According to Dr. Zimmerman, a corresponding
amount of potential would be lost when providing low voltage power
because the "voltage drop is a function of power supply efficiency (in the
NT1) and the resistance seen on the line."  *Id.*  Also, contrary to Dr. Knox's
reading, Dr. Zimmerman interprets paragraph 26 of Matsuno to describe
"the situation when the breakers 8 are open so only minimal current flows,"
and "[w]hen local power is lost and the breakers 8 close, . . . only about 8 V
would be available at the NT1/DTE."  *Id.* ¶ 35.

Avaya's arguments are not persuasive, as they would require us to
ignore the express language in Matsuno.  Matsuno states plainly that "the

24

Case IPR2013-00071
Patent 6,218,930 B1

line voltage of the digital subscriber line 12 that runs into the home of the subscriber is thus at approximately 48 V." Ex. 1004 ¶ 26. Indeed, Dr. Zimmerman testified as follows:

> Q. Is it your understanding that in the Matsuno reference, it discloses that the 48-volt low-level current will provide 48 volts to the subscriber at his home?
>
> A. It says "approximately 48 volts," but yes.

*See* Ex. 2016 at 28:4-8. Matsuno does not state that the line voltage at the subscriber *is* 48 V, but rather that it is "approximately" 48 V (most likely slightly less than 48 V due to the line resistance). Dr. Knox's explanation as to the line voltage of "approximately" 48 V is persuasive. *See* Ex. 2015 ¶¶ 103-104.

Third, Dr. Knox performs a set of calculations to determine whether the NT1 and DTE in Matsuno would be capable of operating based on the 48 volts applied at the power supply circuit. Ex. 2015 ¶¶ 105-14. In doing so, Dr. Knox makes a number of "conservative" "worst case assumptions" due to the limited detail available in Matsuno:

(1)     The 40 V applied to the NT1 and DTE is the "minimum voltage" for operation, even though Matsuno does not state that to be the case and a reference book (Nick Burd, THE ISDN SUBSCRIBER LOOP 126 (1997) ("Burd") (Ex. 2019)) indicates that NT1 devices of the time required only 28 V;

(2)     The 40 V represents the voltage presented internal to the NT1, not the voltage at the U-feed;

(3)     The NT1 alone consumes 500 mW of power when active (based on Burd), additional power is required for the DTE, and the NT1 and DTE together consume 1.1 watts in "emergency" conditions. Dr. Knox refers to a "Cisco Unified IP Phone 6945" specification, which "does not give the actual power requirement, but under Class 1 it

25

Case IPR2013-00071
Patent 6,218,930 B1

> can use no more than 3.84 watts," and "[t]his reasonably allows the [Voice over Internet Protocol] VoIP phone and NT1 to fall within the 1.1 watt emergency power feed when local power is not available."; and

(4)  "Standard telco subscriber line wiring is 24 gauge (although some older lines do use 26 gauge). The American Wire Gauge guide gives the resistance for 24 gauge solid copper wire as 25 ohms per 1000 feet (under standard temperature = 20 degrees C)."

*Id.* ¶ 106-110, 112. Assuming the 1.1 watt maximum for both devices and the actual 40 V disclosed in Matsuno, Dr. Knox calculates that the current on the digital subscriber line would be 27.5 milliamps, and "[t]his current would be the same at all points along the subscriber line, regardless of line loop distance." *Id.* ¶ 111. Dr. Knox further testifies:

> If we use the previously calculated value of 41.2 volts needed at the NT1 U-feed interface to power both the NT1 and the DTE, the voltage drop which will sustain that is 6.8 volts. From ohms law this equates to:

> $R = E / I = 6.8 / 0.0275 = 247$ ohms.

> At 25 ohms per 1000 feet, this produces run of 9,890 feet of 24 gauge wire, or (twisted pair) a subscriber loop of 4,945 feet from the last telco power supply to the subscriber. This means that, at the lowest voltage provided from the telco as disclosed in Matsuno, *every NT1 (with a valid DTE) within 4,945 feet of the telco power (station or repeater) would be operational.* Put into other terms, an average suburban lot in the United States is frequently given as 75' x 120' (although many are much smaller in more crowded areas). Using the above figures, the Matsuno invention, as disclosed, would successfully operate approximately 8,500 homes with NT1/DTE installations based on the lower voltage of 48 volts without any additional or higher power. The number of NT1/DTE installations could theoretically be much higher (for example, if an office building is located within the operating radius which could incorporate many NT1/DTE installations).

26

Case IPR2013-00071
Patent 6,218,930 B1

*Id.* ¶ 114 (emphasis in original).

Avaya and Dr. Zimmerman dispute the assumptions made by Dr. Knox in his analysis. For example, Avaya contends that Dr. Knox's assumption for line resistance (247 ohms) and subscriber service area (4945 feet) are lower than the ISDN standards for North America (1300 ohms and 18,000 feet, respectively). Reply 2 (citing Ex. 1041 ¶¶ 18-23). Dr. Knox, however, explains in his declaration how he calculated the line resistance and subscriber service area, based on figures from Matsuno itself and other assumptions that Avaya does not challenge. Ex. 2015 ¶¶ 111-14. Avaya does not explain sufficiently why the identified standards would apply necessarily to the system disclosed in Matsuno. Further, Matsuno does not disclose the actual length for its digital subscriber line. Thus, some assumption must be made, and we are not persuaded that Dr. Knox's assumptions are unreasonable under the circumstances.

Avaya further argues that Dr. Knox's assumption of a maximum power requirement of 1.1 watts for the NT1 and DTE is unreasonable because it is based on a specification for a Cisco "Class 1" device not introduced until 15 years after Matsuno. Reply 2 (citing Ex. 1041 ¶¶ 24-25). In addition, Avaya contends that Dr. Knox admitted on cross-examination that Cisco "Class 2" or "Class 3" devices would not be "guaranteed" to operate based on Matsuno's low voltage power supply. *Id.* at 2-3 (citing Ex. 1041 ¶¶ 27-31; Ex. 1028 at 54:12-24). Although Dr. Knox bases his "conservative" power requirement assumption on a device introduced later in time, we cannot say that the assumption is incorrect or unfounded given the lack of detailed disclosure in Matsuno. Again, because Matsuno does not state expressly the power required by the NT1 and DTE, some

27

Case IPR2013-00071
Patent 6,218,930 B1

assumption must be made. Avaya does not explain sufficiently why the "Class 2" and "Class 3" devices would be any better for making that assumption than the "Class 1" device identified by Network-1. Nor did Avaya and Dr. Zimmerman include any such analysis in the Petition and initial declaration.

For the reasons explained above, we find Dr. Knox's analysis persuasive. We also note, as a final matter, that none of the points raised by Dr. Zimmerman in his reply declaration (Exhibit 1041) were made in his initial declaration (Exhibit 1011) served with the Petition, or in the Petition itself. Unlike Dr. Knox, Dr. Zimmerman did not analyze the disclosure of Matsuno in detail and prepare a technical analysis explaining why the identified current is or is not a "low level current."[8] We have reviewed Dr. Zimmerman's new analysis only to determine whether it refutes the points made by Dr. Knox in his declaration. We have not considered it as part of Avaya's attempt to make out a *prima facie* case of unpatentability of the challenged claims. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012); Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions; Final Rule, 77 Fed. Reg. 48,612, 48,620 (Aug. 14, 2012) ("Oppositions and replies may rely upon appropriate evidence to support the positions asserted. Reply evidence, however, must be responsive

---

[8] Dr. Zimmerman states in his reply declaration that, in forming his opinion that Matsuno discloses a "low level current," he "applied the Board's broadest reasonable construction" from our Decision on Institution in this proceeding. Ex. 1041 ¶ 16. Dr. Zimmerman, however, did not provide an interpretation for "low level current" in his initial declaration, and our Decision on Institution was entered after Avaya filed Dr. Zimmerman's initial declaration.

A000028

Case IPR2013-00071
Patent 6,218,930 B1

and not merely new evidence that could have been presented earlier to support the movant's motion.").

### c. Conclusion

Matsuno does not expressly or inherently disclose that the current generated from low voltage $V_2$ (-48 V) is a "low level current," i.e., a current (e.g., approximately 20 mA) that is sufficiently low that, by itself, it will not operate the access device.  Avaya and Dr. Zimmerman rely on various statements in Matsuno not directly disclosing the identified current, and based on those statements conclude that the identified current is insufficient.  In response, Network-1 provides persuasive evidence to the contrary, or, at the very least, evidence showing that Avaya's conclusions are not the only ones that can be drawn from the language of Matsuno.  Upon review of all of the evidence, we do not find the disclosure in Matsuno to be sufficiently clear to allow a determination that the identified current is a "low level current."  Therefore, Avaya has not shown, by a preponderance of the evidence, that claim 6, and claim 9 depending therefrom, are anticipated by Matsuno.

### C. Obviousness over De Nicolo and Matsuno

With respect to the alleged obviousness of claims 6 and 9 over De Nicolo and Matsuno, we have reviewed Avaya's Petition, Network-1's Patent Owner Response, and Avaya's Reply, as well as the evidence discussed in each of those papers.  We are not persuaded, by a preponderance of the evidence, that claims 6 and 9 are unpatentable over De Nicolo and Matsuno under 35 U.S.C. § 103(a).

29

Case IPR2013-00071
Patent 6,218,930 B1

In its Petition, Avaya relies on De Nicolo as teaching the "providing" step of claim 6, including the claimed devices of a data node, access device, data signaling pair, and power sources.  Pet. 36-42.  Avaya relies on Matsuno as teaching the remaining steps, including "delivering a low level current from said main power source to the access device over said data signaling pair."  *Id*. at 36-43.  Avaya does not contend that delivery of a "low level current" would have been obvious in view of the combination of De Nicolo and Matsuno.  For the reasons explained above in Section II.B, we are not persuaded that Matsuno teaches delivery of a "low level current." Therefore, Avaya has not shown, by a preponderance of the evidence, that claim 6, and claim 9 depending therefrom, would have been obvious over De Nicolo and Matsuno.

### D. Network-1's Motion to Amend

In its Motion to Amend, Network-1 proposes substitute claim 10, "[i]f the Board determines that Claim 6 is unpatentable as issued," and substitute claim 11, "[i]f the Board also determines that Claim 9 is unpatentable as issued."  Mot. to Amend 2.  As explained herein, we do not determine that claims 6 and 9 are unpatentable and, therefore, dismiss Network-1's Motion to Amend as moot.

### E. Avaya's Motion for Observation on Cross-Examination

The majority of Avaya's Motion for Observation on the cross-examination testimony of Dr. Knox pertains to Dr. Knox's testimony regarding the proposed substitute claims in Network-1's Motion to Amend. It is unnecessary to consider these observations, or Network-1's responses,

30

Case IPR2013-00071
Patent 6,218,930 B1

given our disposition of the Motion to Amend.  To the extent Avaya's

Motion for Observation pertains to testimony allegedly impacting

Dr. Knox's credibility, we have considered Avaya's observations and

Network-1's response.  *See* Mot. for Obs. 8-9; Obs. Resp. 6-7.


### F. Motions to Exclude

Avaya moves to exclude certain testimony of Dr. Knox submitted by

Network-1 with its Reply to Avaya's Opposition to the Motion to Amend.

Pet. Mot. to Exclude 1-2.  Because we do not reach the merits of

Network-1's Motion to Amend, we also do not reach the merits of Avaya's

Motion to Exclude, and dismiss the motion as moot.

Similarly, Network-1 moves to exclude the expert report of

Dr. Melvin Ray Mercer (Exhibit 1042) submitted by Avaya with its Reply to

Network-1's Response.  PO Mot. to Exclude 1.  Avaya relied on

Dr. Mercer's report to rebut Network-1's argument regarding recognition by

those of skill in the art as a secondary consideration of nonobviousness.

*See* PO Resp. 54-56; Reply 14.  As explained above, we are not persuaded

by Avaya's arguments that Matsuno discloses the "low level current" step

recited in claim 6.  Therefore, we need not reach the merits of Network-1's

arguments regarding secondary considerations of nonobviousness, or

Avaya's purported rebuttal of the same, and dismiss Network-1's motion as

moot.


### G. Reexamination Stay

On December 26, 2012, we entered an Order (Paper 9) staying

Reexamination Control No. 90/012,401, an *ex parte* reexamination of claims

31

Case IPR2013-00071
Patent 6,218,930 B1

6, 8, and 9 of the '930 patent. As noted in the Order, the reexamination is based on different prior art than that presented in this proceeding, and involves an additional claim (claim 8). We determine in this proceeding that claims 6 and 9 of the '930 patent have not been shown to be unpatentable. Under the circumstances, we are persuaded that the stay should be lifted before the time for any appeal in this proceeding has expired and any appeal has terminated.

## III. ORDER

Avaya has not demonstrated, by a preponderance of the evidence, that claims 6 and 9 are anticipated by Matsuno under 35 U.S.C. § 102(b) or that claims 6 and 9 are unpatentable over De Nicolo and Matsuno under 35 U.S.C. § 103(a). Claims 1-5, 7, and 8 of the '930 patent are not subject to the instant *inter partes* review.

In consideration of the foregoing, it is hereby:

ORDERED that claims 6 and 9 of the '930 patent have not been shown to be unpatentable;

FURTHER ORDERED that Network-1's Motion to Amend, Avaya's Motion to Exclude, and Network-1's Motion to Exclude are *dismissed* as moot;

FURTHER ORDERED that Paper 42 is expunged from the record of this proceeding;

FURTHER ORDERED that the duplicate copy of Exhibit 2015, filed on August 7, 2013, is expunged from the record of this proceeding; and

32

Case IPR2013-00071
Patent 6,218,930 B1

FURTHER ORDERED that the stay of Reexamination Control No. 90/012,401 is lifted so that any necessary action that is consistent with the Board's orders in Case IPR2013-00071 can be taken.

This is a final decision. Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

33

Case IPR2013-00071
Patent 6,218,930 B1

PETITIONERS:

Jeffrey D. Sanok
Jonathan Lindsay
CROWELL & MORING LLP
JSanok@Crowell.com
JLindsay@Crowell.com

Michael J. Scheer
Thomas M. Dunham
WINSTON & STRAWN LLP
mscheer@winston.com
tdunham@winston.com

Lionel M. Lavenue
Erika Arner
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
Sony-IPR@finnegan.com
erika.arner@finnegan.com

Robert J. Walters
Charles J. Hawkins
McDERMOTT WILL & EMERY LLP
HP1-IPR@mwe.com
chawkins@mwe.com


PATENT OWNER:

Robert G. Mukai
Charles F. Wieland III
BUCHANAN, INGERSOLL & ROONEY P.C.
Robert.Mukai@bipc.com
Charles.Wieland@bipc.com

34



US006218930B1

(12) **United States Patent**

Katzenberg et al.

(10) Patent No.: **US 6,218,930 B1**

(45) Date of Patent: **Apr. 17, 2001**

(54) **APPARATUS AND METHOD FOR REMOTELY POWERING ACCESS EQUIPMENT OVER A 10/100 SWITCHED ETHERNET NETWORK**

(75) Inventors: **Boris Katzenberg**, Trumbull; **Joseph A. Deptula**, Watertown, both of CT (US)

(73) Assignee: **Merlot Communications**, Bethel, CT (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/520,350**

(22) Filed: **Mar. 7, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/123,688, filed on Mar. 10, 1999.

(51) **Int. Cl.**[7] ................................................. **M04M 11/04**

(52) **U.S. Cl.** ................................ **340/310.01**; 340/310.02; 340/310.06; 340/310.07; 379/386; 379/400; 379/32

(58) **Field of Search** ......................... 340/310.01, 310.07, 340/825.16, 310.02, 310.06; 379/386, 400, 32

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,144,544 |   | 9/1992 | Jenneve et al. . |
| 5,289,359 | * | 2/1994 | Ziermann ................................. 363/21 |
| 5,406,260 | * | 4/1995 | Cummings et al. ................. 340/568 |
| 5,461,671 | * | 10/1995 | Sakuragi et al. ..................... 379/400 |
| 5,483,574 | * | 1/1996 | Yuyama ................................. 379/32 |
| 5,608,792 | * | 3/1997 | Laidler ................................. 379/386 |

* cited by examiner

Primary Examiner—Jeffery A. Hofsass
Assistant Examiner—Tai T. Nguyen
(74) Attorney, Agent, or Firm—William C. Crutcher

(57) **ABSTRACT**

Apparatus for remotely powering access equipment over a 10/100 switched Ethernet network comprises an Ethernet switch card with a phantom power supply for remote access equipment and added circuitry for automatic detection of remote equipment being connected to the network; determining whether the remote equipment is capable of accepting remote power in a non-intrusive manner; delivering the phantom power to the remote equipment over the same wire pairs that deliver the data signals, and automatically detecting if the remote equipment is removed from the network.

**9 Claims, 3 Drawing Sheets**



A000043



*Fig. 1*



*Fig. 2*



*Fig. 3*

US 6,218,930 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# APPARATUS AND METHOD FOR REMOTELY POWERING ACCESS EQUIPMENT OVER A 10/100 SWITCHED ETHERNET NETWORK

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefits of prior filed, application Ser. No. 60/123,688 filed Mar. 10, 1999.

## FIELD OF THE INVENTION

This invention broadly relates to the powering of 10/100 Ethernet compatible equipment. The invention more particularly relates to apparatus and methods for automatically determining if remote equipment is capable of remote power feed and if it is determined that the remote equipment is able to accept power remotely then to provide power in a reliable non-intrusive way.

## BACKGROUND OF THE INVENTION

A variety of telecommunications equipment is remotely powered today. Telephones and Network Repeater devices are examples of remotely powered equipment. Obviously there are many advantages to remotely powering equipment, however this technique has not migrated to data communications equipment for several reasons. Data communications equipment has traditionally required high power levels to operate which has made it prohibitive to implement. The widely distributed nature as well as the use of shared media used in data networks has also made remote power impractical.

The desire to add remotely powered devices to a data network is being pushed by the convergence of voice and data technologies. The advent of IP Telephony, Voice over IP and Voice over Packet technologies has brought traditional telephony requirements into the data environment. It is not desirable to have a phone powered by a local wall transformer. It is desirable to have a centrally powered system that can be protected during a power outage.

It is therefore an object of the invention to provide methods and apparatus for reliably determining if a remote piece of equipment is capable of accepting remote power.

It is another object of this invention to provide methods and apparatus for delivering remote power to remote equipment over 10/100 switched Ethernet segments and maintain compliance with IEEE 802.3 standards.

## SUMMARY OF THE INVENTION

In accord with the objects of the invention an apparatus for remotely powering access equipment over a 10/100 switched Ethernet network comprises: automatic detection of remote equipment being connected to the network; determining whether the remote equipment is capable of accepting remote power in a non-intrusive manner; delivering the power to remote equipment over the same wire pairs that deliver the data signals; automatic detection of remote equipment being removed from the network.

The complete apparatus comprises a data node adapted for data switching, an access device adapted for data transmission, at least one data signaling pair connected between the data node and the access device and arranged to transmit data therebetween, a main power source connected to supply power to the data node, a secondary power source arranged to supply power from the data node via the data signaling pair to the access device, sensing means for

delivering a low level current from said main power source to the access device over the data signaling pair and sensing a resulting voltage level thereon, and control means responsive to said voltage level and adapted to control power supplied by the secondary power source to said access device in response to a preselected condition of the voltage level.

The method includes the steps of delivering a low level current from the main power source to the access device over the data signaling pair, sensing a voltage level on the data signaling pair in response to the low level current, and controlling power supplied by the secondary power source to the access device in response to a preselected condition of the voltage level.

## DRAWINGS

The invention will be more clearly understood by reference to the following description, taken in connection with the accompanying drawings, in which:

FIG. 1 is a simplified schematic diagram of the remote power automatic detection system of the present invention, shown in conjunction with a single unit of remote access equipment connected as part of an Ethernet local area network,

FIG. 2 is a simplified schematic drawing of a power feed configuration for supplying power to the remote access equipment on the local area network, and

FIG. 3 is a simplified physical layout of a portion of a switched Ethernet network segment showing a telephone device powered through the network data carrying medium.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to FIG. 1 of the drawing, a remote access device 10 which is compatible with 10/100 Ethernet requirements is connected through a data communications network interface adapter to a high data rate network cable 12. Remote access device 10 requires power to carry out its operation and includes an internal dc-dc switching supply which, in the absence of the present invention, would be supplied by an ac transformer adapter plugged in to the local 110 volt supply. Cable 12 is preferably Category 5 wiring such as 100BaseX suitable for 100 Mb/s data communications over a switched Ethernet network, and is connected to a port in a network data node 14, such as a switch or hub. Ethernet frames containing data are transmitted over cable 12 between node 14 and device 10, and from node 14 to and from the network in accordance with selected protocols in a conventional manner known in the art.

In accordance with the present invention, a power source 16, which may be the same as the conventional main power supply used to power the node 14, is connected to cable 12 via lines 18 to supply a power level sensing potential to the remote access equipment 10 over one of the cable conductors. A return path from remote access equipment 10 is connected through a lead 20 to an automatic remote power detector, shown generally as 22. Detector 22 includes an A/D converter and microprocessor control unit 24, operating a detection circuit consisting of a resistor 26, with shunting switch 28, both connected in parallel to a resistor 30, providing a path to ground. Switch 28 is actually an internal software controlled switch depicted diagrammatically as actuated by operator 32.

Automatic detection of remote equipment being connected to the network is accomplished by delivering a low

A000047

US 6,218,930 B1

3

level current (approx. 20 ma) to the network interface and measuring a voltage drop in the return path. There are three states which can be determined: no voltage drop, a fixed level voltage drop or a varying level voltage drop. If no voltage drop is detected then the remote equipment does not contain a dc resistive termination, and this equipment is identified as unable to support remote power feed. If a fixed voltage level is detected then the remote equipment contains a dc resistive termination (a "bob smith" is typical for Ethernet terminations), and this equipment is identified as unable to support remote power feed.

If a varying voltage level is detected, this identifies the presence of dc-dc switching supply in the remote equipment. The varying level is created by the remote power supply beginning to start up but the low current level is unable to sustain the start up. This cycle continues to be repeated creating a "sawtooth" voltage level in the return path. When this cycle is confirmed, switch S1 is closed which increases the power output to the remote equipment. When the power to the remote equipment reaches the proper level the remote power supply turns on and the remote equipment becomes active. At this point a second, software level, confirmation takes place. The remote equipment must respond to a poll using a coded response with a unique MAC address. When this process is complete the remote equipment is identified as known access equipment capable of accepting remote power.

Referring now to FIG. 2 of the drawing, a suitable remote power supply is shown generally as 34, which may be conveniently incorporated into an Ethernet 8 port switch card. A first center tap data transformer 36 includes a transformer winding 38 with opposite ends connected by leads 40, 42 to terminals 6, 3 respectively of an RJ45 connector 43. A second center tap transformer 44 with a transformer winding 46 has its opposite ends connected via leads 48, 50 to terminals 2, 1 respectively of the connector 43. Power feed is through a center tap lead 39 and power return is through a center tap lead 45. Inactive terminals 7, 8 of connector 43 are connected via lead 52 to a resistor 54. Inactive terminals 1, 2 of connector 43 are connected via lead 56 to a resistor 58. A junction between resistors 54 and 58 is connected to ground via a capacitor 60.

Remote power is delivered to the remote equipment over the existing data signaling pairs (phantom power feed). Although it is typical that all 8 signal leads are delivered to remote equipment, only the 4 signaling leads are guaranteed in practice. See FIG. 2 for the power feed configuration.

Once the remote equipment is operating and confirmed as a known remote power enabled device, the logic circuit shown in FIG. 1 begins to look for removal of the remote equipment or an overload fault condition. If the measured voltage level drops, then this indicates that the remote equipment has been removed and the logic circuit returns to the initial hunt state. If an overload condition is detected then the logic circuit returns to its initial state. It can then be programmed to either wait for the fault state to be cleared or continue to cycle through the state machine.

FIG. 3 illustrates the physical layout of components corresponding to the schematic diagram of FIG. 1. The remote access equipment in this case is a telephone 62 equipped to handle data communications as well as voice and is connected through an access node 64 to premises wiring 66, comprising a Category 5 Ethernet 100BaseX cable of 4 sets of unshielded twisted pairs, which carry both data and power to the telephone 62. Wiring 66 is connected to one of the ports of an 8 port Ethernet switch 68 which is

4

powered from a main power supply 70. The Ethernet switch card incorporates the automatic remote power detector 22 discussed in FIG. 1 and the remote power supply 34 discussed in FIG. 2. The power is provided over the wiring 66 both to the remote access node 64 and telephone 62.

While there is disclosed what is considered to be the preferred embodiment of the invention, other modifications will occur to those skilled in the art.

What is claimed is:

1. Apparatus for remotely powering access equipment in a data network, comprising:

a data node adapted for data switching,

an access device adapted for data transmission,

at least one data signaling pair connected between the data node and the access device and arranged to transmit data therebetween,

a main power source connected to supply power to the data node,

a secondary power source arranged to supply power from the data node via said data signaling pair to the access device,

sensing means for delivering a low level current from said main power source to the access device over said data signaling pair and sensing a resulting voltage level thereon, and

control means responsive to said voltage level and adapted to control power supplied by said secondary power source to said access device in response to a preselected condition of said voltage level.

2. Apparatus according to claim 1, wherein there are at least two data signaling pairs connected between the data node and the access device to supply phantom power from the secondary power source to the access device, and wherein said access device includes a pair of data transformers having center taps connected for locally powering the access device.

3. Apparatus according to claim 1, wherein said preselected condition comprises a varying "sawtooth" voltage level detected by said sensing means which causes said control means to increase the power supply from the secondary power source to the access device.

4. Apparatus according to claim 1, wherein the data node is an Ethernet switch card incorporating said secondary power supply, said sensing means and said control means.

5. Apparatus according to claim 1, and further including a software program associated with said control means and arranged to poll the access device to identify itself and confirm that it is capable of accepting remote power.

6. Method for remotely powering access equipment in a data network, comprising,

providing a data node adapted for data switching, an access device adapted for data transmission, at least one data signaling pair connected between the data node and the access device and arranged to transmit data therebetween, a main power source connected to supply power to the data node, and a secondary power source arranged to supply power from the data node via said data signaling pair to the access device,

delivering a low level current from said main power source to the access device over said data signaling pair,

sensing a voltage level on the data signaling pair in response to the low level current, and

controlling power supplied by said secondary power source to said access device in response to a preselected condition of said voltage level.

US 6,218,930 B1

5

**7**. Method according to claim **6**, including the step of:

increasing power supplied to the access device in response to a "sawtooth" voltage level sensed on the data signaling pair.

**8**. Method according to claim **6**, including the step of polling the access device to identify it and confirm that it is capable of accepting remote power.

6

**9**. Method according to claim **6**, including the step of continuing to sense voltage level and to decrease power from the secondary power source if voltage level drops on the data signaling pair, indicating removal of the access device.

\* \* \* \* \*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 9th day of January, 2015, I caused this Brief of Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users, and one PDF copy was served via email, upon:

> Gregory S. Dovel
> Sean Luner
> DOVEL & LUNER, LLP
> 201 Santa Monica Boulevard, Suite 600
> Santa Monica, California 90401
> greg@dovellaw.com
> luner@dovellaw.com
>
> *Counsel for Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief of Appellants will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/  Jeffrey D. Sanok
*Counsel for Appellant Avaya Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*7,158*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: January 9, 2015                    /s/ Jeffrey D. Sanok
                                          *Counsel for Appellant Avaya Inc.*