**Docket Nos. 2014-1782, -1783, -1784, -1785**

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

———————————

AVAYA INC., DELL INC.,
SONY CORPORATION OF AMERICA, HEWLETT-PACKARD CO.,

*Appellants,*

v.

NETWORK-1 SECURITY SOLUTIONS, INC.,

*Appellee.*

———————————

*Appeal from the United States Patent and Trademark Office · Case IPR2013-00071*
*Before Administrative Patent Judges Joni Y. Chang, Justin T. Arbes and Glenn J. Perry*

## CORRECTED BRIEF OF APPELLEE
## NETWORK-1 TECHNOLOGIES, INC.

GREGORY S. DOVEL, ESQ.
SEAN A. LUNER, ESQ.
DOVEL & LUNER, LLP
201 Santa Monica Boulevard
Suite 600
Santa Monica, California 90401
(310) 656-7066 Telephone
(310) 656-7069 Facsimile

*Counsel for Appellee,*
*Network-1 Technologies, Inc.*
*(formerly Network-1 Security Solutions, Inc.)*



## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellee, Network-1 Technologies, Inc., certifies the following:

1. The full name of the party represented by us is:  Network-1 Technologies, Inc. (formerly Network-1 Security Solutions, Inc.)

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:  None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by us are:  None.

4. The names of all law firms and the partners or associates that appeared for the party now represented by us in the trial court or agency or are expected to appear in this court are:

   - Gregory S. Dovel and Sean Luner of Dovel & Luner, LLP;

   - Robert Mukai and Charles F. Wieland III of Buchanan Ingersoll & Rooney PC.


Dated:  March 3, 2015             */s/ Gregory S. Dovel*
                                      Gregory S. Dovel
                                      *Counsel for Appellee*
                                      *Network-1 Technologies, Inc.*

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

Statement of related cases. .................................................................. 1

I.     Statement of the issues. ............................................................ 1

II.    Counterstatement of the Case. ................................................. 2

III.   Counterstatement of the Facts. ................................................ 2

       A.     The '930 Patent. .......................................................... 2

             1.     Prior art approach:  data, not currents, are used to carry information. ................................................................ 4

             2.     Prior art approach: current should be avoided until after a compatible device is detected. .................................. 7

       B.     Matsuno. ...................................................................... 7

       C.     The Board's *Inter Partes* Reviews. ........................... 10

             1.     The Board's Preliminary and Final Written Decisions ............. 10

             2.     The construction of "low level current." ................... 12

IV.   Summary of Argument. ........................................................ 13

Argument ............................................................................................ 18

V.     Standard of Review ................................................................ 18

VI.   Substantial evidence supports the Board's finding that Petitioners failed to demonstrate that Matsuno expressly or inherently discloses the claimed "low level current." ................................................ 20

       A.     Express:  Substantial evidence supports the Board's finding that Matsuno does not expressly disclose the claimed "low level current." ............................................................... 21

       B.     Inherent:  Substantial evidence supports the Board's finding that Matsuno does not inherently disclose the claimed "low level current." ............................................................... 29

VII.  Petitioners' arguments fail. ................................................... 32

A. Each of the four premises underlying Petitioners' arguments is wrong. ................................................................................34

B. Petitioners' inherency argument on appeal relies upon evidence that the Board ruled could not be considered for purposes of establishing Petitioners' *prima facie* case. ..........................................44

C. Each of Petitioners' remaining arguments fail. ..................................50

 1. Petitioners' arguments relating to their four underlying premises are wrong. ................................................................50

 2. Petitioners' arguments relating to the burden of proving unpatentability are wrong. ......................................................58

 3. Petitioners' arguments relating to what Matsuno states or implies are wrong. ................................................................59

VIII. Conclusion. ...................................................................................61

Certificate of Service ...............................................................................62

Certificate of Compliance ........................................................................63

# TABLE OF AUTHORITIES

**Cases**

*Agilent Technologies, Inc. v. Affymetrix, Inc.*,
  567 F.3d 1366 (Fed. Cir. 2009) ........................................................................31

*Akamai Technologies, Inc. v. Cable & Wireless Internet Servs., Inc.*,
  344 F.3d 1186 (Fed. Cir. 2003) ........................................................................54

*Allergan, Inc. v. Apotex Inc.*,
  754 F.3d 952 (Fed. Cir. 2014) ................................................................. 51, 52

*Application of Mead*,
  569 F.2d 1128 (C.C.P.A. 1978).........................................................................46

*Atlas Powder Co. v. Ireco, Inc.*,
  190 F.3d 1342 (Fed. Cir. 1999) ........................................................................52

*Broadcom Corp. v. Qualcomm Inc.*,
  543 F.3d 683 (Fed. Cir. 2008) ..........................................................................12

*Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*,
  725 F.3d 1341 (Fed. Cir. 2013) ........................................................................46

*Continental Can Co. v. Monsanto Co.*,
  948 F.2d 1264 (Fed. Cir. 1991) ........................................................................49

*Falko-Gunter Falkner v. Inglis*,
  448 F.3d 1357 (Fed. Cir. 2006) ............................................................ 18, 28, 32

Glaxo Group Ltd. v. Apotex, Inc.,
  376 F.3d 1339 (Fed. Cir. 2004) ............................................................... 15, 29

*In re Cuozzo Speed Technologies*,
  2015 WL 448667 (Fed. Cir. February 4, 2015) ................................................18

*In re Robertson*,
  169 F.3d 743 (Fed. Cir. 1999) ..........................................................................51

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,
  738 F.3d 1337 (Fed. Cir. 2013) ........................................................................19

*Lazare Kaplan Int'l, Inc. v. Photoscribe Technologies, Inc.*,
  628 F.3d 1359 (Fed. Cir. 2010) ........................................................................12

*Leggett & Platt, Inc. v. VUTEk, Inc.*,
  537 F.3d 1349 (Fed. Cir. 2008) ........................................................................55

*Motorola Mobility, LLC v. Int'l Trade Comm'n*,
  737 F.3d 1345 (Fed. Cir. 2013) ............................................................18

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...........................................................12

*Rapoport v. Dement*,
  254 F.3d 1053 (Fed. Cir. 2001) ...........................................................19

*Schering Corp. v. Geneva Pharms., Inc.*,
  339 F.3d 1373 (Fed.Cir.2003) .............................................................15

*Smith & Nephew, Inc. v. Rea*,
  721 F.3d 1371 (Fed. Cir. 2013) ...........................................................19

*SmithKline Beecham Corp. v. Apotex Corp.*,
  403 F.3d 1331 (Fed. Cir. 2005) ............................... 39, 53, 54, 55, 56

*SmithKline Beecham Corp. v. Apotex Corp.*,
  439 F.3d 1312 (Fed. Cir. 2006) ...........................................................46

**Statutes**

35 U.S.C. 316(e) ................................................................ 20, 44, 45, 58

**Regulations**

Final Rule, 77 Fed. Reg. 48,612 (Aug. 14, 2012)...................................45

Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756 (Aug. 14, 2012)..............45

# **ABBREVIATIONS**

This brief uses the following abbreviations:

| | |
|---|---|
| A | Appendix |
| '930 Patent | U.S. Patent No. 6,218,930 |
| V | Volts |

**Statement of related cases.**

There are no related cases.  No other appeal in or from this action has previously been before this or any other appellate court.  Network-1 is aware of no cases pending before this Court that will directly affect or be directly affected by the Court's decision in this appeal.

## I.    Statement of the issues.

1.    Should this Court affirm the Board's factual finding that Matsuno does not expressly disclose the claimed "low level current" because there is substantial evidence supporting this factual finding, including admissions from Petitioners' own expert that Matsuno does not expressly disclose a "low level current"?

2.    Should this Court affirm the Board's factual finding that Matsuno does not inherently disclose the claimed "low level current" because there is substantial evidence supporting this factual finding, including admissions from Petitioners' own expert that Matsuno does not inherently disclose a "low level current"?

3.    Although Matsuno does not disclose the values of any current levels or comment on the need for any current levels, does Matsuno expressly or inherently disclose the claimed "low level current" (a current that is sufficiently

1

low that, by itself, it will not operate the access device) because it is possible that a device (not disclosed in Matsuno) installed at a certain distance (not disclosed in Matsuno) from the disclosed power source may not operate based on the 48 volts disclosed in Matsuno?

4.    Does Matsuno inherently disclose the claimed "low level current" when Matsuno expressly states that the disclosed voltage (48 volts) is sufficient to operate the only access device disclosed in Matsuno, which can operate on 40 volts?

## II.    Counterstatement of the Case.

Petitioners' Brief sets forth an accurate Statement of the Case.

## III.    Counterstatement of the Facts.

### A.    The '930 Patent.

Generally speaking, the '930 Patent teaches and claims a method in which a data node (*e.g.*, Ethernet switch) determines whether a device connected to the end of a cable (*e.g.*, VoIP telephone) is capable of accepting "remote power"—power over the data transmission wires.  A47 (1:41-43); *id*. Title ("Apparatus and method for remotely powering access equipment over a 10/100 switched Ethernet Network.").

The '930 Patent addresses the problem of detecting whether a remote device attached to cables can accept remote power before delivering power that might otherwise damage connected equipment:  "It is therefore an object of the invention to provide methods and apparatus for reliably determining if a remote piece of equipment is capable of accepting remote power." A47 (1:41-43); *id.* (1:14-19).

The '930 Patent claims a system that can (a) detect whether a device is attached to the Ethernet cable and, in addition, (b) if a device is attached, determine whether the device can accept remote power:  "[a] automatic detection of remote equipment being connected to the network; [b] determining whether the remote equipment is capable of accepting remote power in a non-intrusive manner." *Id.* (1:53-56, enumeration added).  Determining whether a remote device can accept remote power is of central importance for the '930 invention because devices that connect to Ethernet cables include both devices that can accept power and devices that cannot.  A5079.

As set forth in Claim 6 of the '930 Patent, the claimed invention makes these determinations using the claimed "low level current"—a current delivered from the data node to the access device used to determine whether the access device is capable of accepting remote power before delivering remote power:

| 60 | delivering a low level current from said main power source to the access device over said data signaling pair, sensing a voltage level on the data signaling pair in response to the low level current, and |
| 65 | controlling power supplied by said secondary power source to said access device in response to a preselected condition of said voltage level. |

A48 (claim 6, 4:60-68). If the sensing based on the "low level current" reveals that the access device can accept remote power, then the data node controls the power by providing operating power over the data signaling pairs to the access device. *Id*.

The detection problem tackled by the inventors of the '930 Patent (collectively "Katzenberg") had two characteristics that, for those of ordinary skill in the art, pointed sharply away from the "low level current" solution that Katzenberg discovered: the problem required (1) obtaining information from a remote device for purposes of determining further interactions, and (2) a solution that would avoid sending an operating current to power the device (which could damage a device that was not designed to accept remote power) until after detecting whether the device could accept remote power. A5019.

## 1. **Prior art approach: data, not currents, are used to carry information.**

The problem that Katzenberg confronted was not simply the problem of determining <u>whether</u> a device was attached to the remote end of a data signaling

pair.  It further required determining <u>what kind</u> of device was attached.  A5019.

In the words of the '930 Patent, the invention required not simply "automatic

detection of remote equipment being connected to the network," but further

required "determining whether the remote equipment is capable of accepting

remote power."  A47 (1:53-56).

Katzenberg sought to develop a system that would allow a wide variety of

remote devices to be safely attached to the data signaling pairs.  A user might

attach "known access equipment capable of accepting remote power."  A48 (3:12-

27); A5020.  Or a user might instead attach devices that were "unable to support

remote power feed."  A48 (3:4-11); A5020.  Katzenberg needed a solution that

could distinguish among these various devices and send power only to a device

that was confirmed to be capable of accepting power.  A5020; A47 (1:14-19);

A47-48 (2:65-3:27).

At the time of the Katzenberg invention, for problems that involved

obtaining information from a remote device for purposes of determining further

interactions, the accepted solution was to use a data signal that could carry

information (as contrasted with a current that, if increased to a certain level, could

power the device).  A5020.  There were many well-known examples of using data

signals from remote devices to determine further interactions (such as "handshake"

protocols for connecting modems).  A5020-21.  The characteristics of data signals

made them the natural avenue to use for detection and identification. Data signals are designed to contain information and therefore to convey information. A5021. When designing a system that calls for conveying an important piece of information (*i.e.*, whether a device can be powered), one of ordinary skill would have thought of using a data signal. *Id.*

As a result, in stark contrast to the claimed invention of using a "low level current" for detection, the prior art in the field (and even post-art in the period following Katzenberg's invention) used a very different approach. A5015. This other art taught using a data signal (something designed to contain information), rather than a "low level current," for detection. *Id.*; A5019; A5274 (10:18; 10:20-21).

Those of ordinary skill in the art at the time would not have viewed a current of the type that could drive a load as a likely tool to use in developing a method to determine whether an attached remote device was of a type suitable for further interactions. A5023. The ingrained thinking of a person of ordinary skill in the art at the time was that currents arranged to drive a load and power a device are not used to carry information. *Id.* This thinking would have impeded a person of ordinary skill from considering a current, even at a low level (as opposed to data) as a useful tool for determining whether an attached remote device was of a type suitable for further interactions. *Id.*

**2.    <u>Prior art approach</u>: current should be avoided until after a compatible device is detected.**

Another facet of the traditional view for addressing the detection problem addressed by Katzenberg was that a current arranged to power the access device should not be sent over the data signaling pairs until after the detection process has been completed.  A5023.  Accordingly, the problem was viewed as avoiding sending any such powering current until after the detection process determined that a given access device could receive remote power.  A5024.  This understanding would have further inclined one of ordinary skill in the art away from thinking outside the data signal box and in the direction of using a current (at a low level) as part of the solution to the problem.  *Id.*

Accordingly, the Katzenberg method of using a current at low levels was contrary to the conventional wisdom, and explored new territory when testing what devices can accept power through the data signaling pair.  A5022.

**B.    Matsuno.**

Unlike the '930 Patent, the system disclosed in Matsuno has nothing to do with detecting whether a remote device can accept remote power.  This is because all remote devices in Matsuno (NT1/DTEs) are presumed to be capable of accepting remote power.  A2816 ¶22.  Accordingly, Matsuno addresses a completely different problem than the '930 Patent, and does so in a completely different way.  A1488-1498; A2814-2816.

7

As illustrated in Figure 1, Matsuno discloses an integrated services digital network (ISDN) with an NT1 (2) and DTE (3) that are normally locally powered, for example, by being plugged into a wall outlet (11). A1495 (Figure 1). In Japan where the Matsuno system was designed to be implemented, there was a practice of having backup power available for the



NT1/DTE by supplying remote power over the subscriber lines (12). A1490 ¶6.

When the NT1/DTE is locally powered (rather than remotely powered), the load from the NT1/DTE is not present on the remote power circuit. A1490 ¶6. However, the remote power circuit uses a constant current source. A1490 ¶2. Accordingly, with no load and the constant current source remaining the same, the resistance of the subscriber loop wiring would be low, which would cause the voltage at the subscriber's home to increase and be relatively high, "for example, 85 to 105 V."[1] A1490 ¶6. Matsuno was concerned about the safety of this relatively high voltage at the subscriber home. A1490 ¶6 ("This type of voltage has been problematic in terms of safety.")

---

[1]    In this Brief, we refer to a negative voltage (-48 volts) or a positive voltage (48 volts) as a voltage interchangeably.

Addressing this problem, Matsuno proposed to implement a circuit that would reduce the voltage at the power source when the remote power source was not being used to power the NT1/DTE.   A1490 ¶7.  When the NT1/DTE is locally powered and the load of the NT1/DTE is not part of the power supply circuit, a voltage of 48 volts is applied to the subscriber line.  A1490 ¶7.  Because the "line impedance of the digital subscriber line" (*i.e.*, the resistance from the wire) is "small," (A1490¶6), the resulting voltage at the subscriber home would be reduced a small amount and would be at "approximately 48 V."  A1491 ¶26.  This voltage level of approximately 48 V "allow[s] safety to be ensured" when the NT1/DTE is locally powered.  A1491 ¶26.

Although Matsuno does not disclose detailed design parameters for its ISDN system, it does disclose that the NTE/DTEs are installed at distances from the power source such that the line loss is "small," in particular small enough that a 48 volt source results in "approximately 48 volts" being available at the subscriber location.  A1491 ¶26.  Matsuno further discloses that at that distance, all disclosed access devices would be operational from an applied 48 volt source, because they can be operated with a "voltage of 40 V."  A1490 ¶4.  While the 48 volts on the subscriber line are sufficient to power the NT1/DTEs—40 volts are sufficient (A1490 ¶4) and "approximately 48 volts" are available (A1491 ¶26)—when the NT1/DTEs are being remotely powered (and, therefore included on the load of the

9

subscriber line), the 120 volt source is used.  A1488 ¶57.  There are a number of
reasons the Japanese system uses a 120 volt source to power the NT1/DTEs in this
circumstance (for example, because "transmitting power at higher voltages is much
more cost effective").  A2863-64 ¶118.

Thus, unlike the Ethernet environment of the '930 Patent where both devices
that can and cannot accept remote power are connected to Ethernet cables, in the
environment of Matsuno there was no concern about detecting whether a
connected access device could receive remote power—all were designed to receive
remote power.  Accordingly, Matsuno had no motivation or desire to design a
system that sent a current that was so low it would not operate the access device.
In Matsuno's environment, it was beneficial—not harmful—if the delivered
current was sufficient to operate all access devices.  Accordingly, Matsuno does
not teach a current so low that it is insufficient to operate the disclosed access
device.  Matsuno teaches the opposite—a current that will operate the disclosed
access device.

## C.    The Board's *Inter Partes* Reviews.

### 1.    The Board's Preliminary and Final Written Decisions.

In the underlying IPRs, the Board initially agreed with Petitioners (before
the Board had received Network-1's evidence and the results of cross-examining
Petitioner's expert).  The Board determined that Petitioners made a threshold

showing that Matsuno disclosed all claimed elements, including the claimed "low level current." A1134-37. After the opportunity to evaluate both sides' evidence, however, the Board reanalyzed its position, weighed the competing evidence including the testimony of both sides' experts, and determined that Network-1's analysis of Matsuno was persuasive (as reflected in the testimony of Dr. Knox, its expert) while Petitioners' was not:

- "Dr. Knox's analysis is persuasive that the identified current in Matsuno is not a 'low level current.'" A22.

- "We find Dr. Knox's analysis persuasive." A22.

- "Avaya does not argue in its Reply that the reasons cited by Dr. Knox are technically incorrect or not possible, and we find them persuasive." A21.

- "Dr. Knox's explanation as to the line voltage of 'approximately' 48 V is persuasive." A25.

- "For the reasons explained above, we find Dr. Knox's analysis persuasive." A28.

- "Avaya's arguments are not persuasive, as they would require us to ignore the express language in Matsuno." A24.

In its Final Written Decision, the Board concluded that Petitioners did not meet

their burden of establishing that Matsuno discloses the claimed "low level current."

A29.

### 2.    The construction of "low level current."

The Board construed "low level current"—the single phrase relevant to this

appeal—as "a current (*e.g.*, approximately 20 mA) that is sufficiently low that, by

itself, it will not operate the access device."  A10.  Petitioners did not challenge the

Board's construction.  A9 ("Avaya does not argue in its Reply that this

interpretation is incorrect…").  Accordingly, Petitioners waived any challenge to

the Board's construction.  *See Lazare Kaplan Int'l, Inc. v. Photoscribe*

*Technologies, Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) ("As [the Federal Circuit]

ha[s] repeatedly explained, 'litigants waive their right to present new claim

construction disputes if they are raised for the first time after trial.'") (quoting

*Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008).[2]

---

[2]    The Board also construed other phrases not relevant for this appeal.  So that
the record is clear, Network-1 agrees with and adopts (as both the broadest
reasonable construction and the litigation standard construction of *Phillips v. AWH
Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)) the Board's construction of "data
signaling pair" as "a pair of wires used to transmit data" and the Board's
interpretation that "main power source" and "secondary power source" do not
require physically separate devices.  Network-1 does not agree with or adopt the
Board's constructions of "data node adapted for data switching" or "sensing a
voltage level on the data signaling pair."

## IV.    Summary of Argument.

Petitioners appeal a single issue—whether "the PTAB erred by finding that Matsuno does not expressly or inherently disclose a 'low level current.'"  Brief 24. The Board determined that both of Petitioners' grounds failed because "Avaya has not shown that Matsuno expressly or inherently discloses the 'low level current' recited in Claim 6."  A16.

Under the Board's construction (adopted by Petitioners) a "low level current" is a "current (*e.g.*, approximately 20 mA) that is sufficiently low that, by itself, it will not operate the access device."  A10.  Matsuno does not disclose the values of any currents.  A1488-98; A17.  Matsuno discloses two power sources operating at two different voltages—$V_2$ (48 volts) and $V_1$ (120 volts).  Petitioners relied on the current generated from the 48 volt source as the claimed "low level current."  Accordingly, Petitioners had the burden of demonstrating that the current generated from the 48 volt source disclosed in Matsuno constitutes the claimed "low level current"—a "current … that is sufficiently low that, by itself, it will not operate the access device."  A10.

**No express disclosure:**  Substantial evidence supports the Board's factual finding that Petitioners did not satisfy their burden of demonstrating that Matsuno expressly discloses the claimed "low level current" because:

(1)    Petitioners cannot point to any express disclosure in Matsuno of a current that is insufficient to operate the access device (NT1/DTE) disclosed in Matsuno.

(2)    Matsuno expressly states that the disclosed 48 volts generates "approximately 48" volts at the subscriber location, which is sufficient to operate the access device (NT1/DTE) disclosed in Matsuno, which Matsuno expressly discloses can operate on 40 volts.

(3)    Network-1's expert confirmed that Matsuno does not expressly disclose the claimed "low level current."

(4)    Petitioners' expert confirmed that Matsuno does not expressly disclose the claimed "low level current."

**<u>No inherent disclosure</u>:**  Substantial evidence supports the Board's factual finding that Petitioners did not satisfy their burden of demonstrating that Matsuno inherently discloses the claimed "low level current" because:

(1)    Matsuno expressly states that the disclosed 48 volts generates "approximately 48" volts at the subscriber location which is sufficient to operate the access device disclosed in Matsuno, which Matsuno expressly discloses can operate on 40 volts.

(2)    Network-1's expert confirmed that Matsuno does not inherently disclose the claimed "low level current."

14

(3)    Petitioners' expert confirmed that Matsuno does not inherently

disclose the claimed "low level current."

**Petitioners' arguments that Matsuno discloses the claimed "low level**

**current" fail:**  Petitioners argue that, despite the express language in Matsuno to

the contrary, Matsuno inherently discloses a "low level current" because it

"contemplate[s]" that such a current could exist under certain (undisclosed)

circumstances.  Brief 29.  Petitioners' arguments (Brief 27-35) can be summarized

as follows:

> The system in Matsuno complies with the ANSI T1.601 ISDN standard,
>
> which requires components to be designed to transmit data up to 18,000 feet.
>
> However, NT1/DTEs that are installed between 5,000 and 18,000 feet from
>
> the power source will not operate based on 48 volts.  Accordingly, Matsuno
>
> necessarily discloses that the current generated from the 48 volts disclosed in
>
> Matsuno is insufficient to operate access devices installed between 5,000
>
> and 18,000 feet from the power source and, therefore, necessarily discloses
>
> the claimed "low level current."

Inherency "requires that the 'missing characteristic is <u>necessarily present</u>,'"

not merely possible, or even probable.  *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d

1339, 1348 (Fed. Cir. 2004) (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339

F.3d 1373, 1377 (Fed.Cir.2003)) (emphasis added).  Petitioners' inherency

arguments, which are entirely based on undisclosed possibilities, require each of the following four underlying premises:

(1)    Matsuno references an ISDN standard and the system disclosed in Matsuno necessarily complies with that standard;

(2)    Matsuno necessarily complies with the American ANSI T1.601 standard;

(3)    Any system that complies with the American ANSI T1.601 standard necessarily includes NT1/DTEs installed at distances between 5,000 feet and 18,000 feet from the power source; and

(4)    The NT1/DTEs disclosed in Matsuno necessarily will not operate based on a 48 volt source at distances greater than a mile from the power source, as reflected in Dr. Zimmerman's calculations.

Based on these premises, Petitioners assert that Matsuno inherently discloses the claimed "low level current."

Each of Petitioners' necessary premises is missing:

(1)    Matsuno does not expressly mention an ISDN standard and it is not necessary that the system disclosed in Matsuno complies with an ISDN standard.

(2)    Had Matsuno (a Japanese patent application) necessarily complied with an ISDN standard, it would not necessarily be (but rather would

unlikely be) the American ANSI T1.601 standard, especially because the ANSI T1.601 standard does not provide for remotely powering NT1/DTEs over the data signaling line which is an essential ingredient of the Matsuno system.

(3)     Had Matsuno explicitly stated that the disclosed system complies with the American ANSI T1.601 standard, it would not be necessary that the NT1/DTEs disclosed in Matsuno must be installed at distances up to 18,000 feet from the power sources.

(4)     Petitioners' evidence attempting to demonstrate that NT1/DTEs installed at distances 18,000 feet from the power source would not operate based on 48 volts is demonstrably wrong and was properly rejected by the Board (and that finding was not appealed by Petitioners).

In addition, all of the evidence cited by Petitioners on appeal concerning the ISDN standard and calculations purporting to demonstrate distances for inoperability of access devices was found by the Board to be belated evidence that violated Patent Office Rules.  The Board refused to consider it for purposes of establishing Petitioners' *prima facie* case of unpatentability.  Accordingly, none of that evidence can be considered on appeal to establish Petitioners' *prima facie* case.

Because each of the four premises underlying Petitioners' arguments is wrong, each remaining argument is also wrong, including arguments (1) attempting to establish Petitioners' four premises, (2) relating to the burden of proving unpatentability, and (3) relating to what Matsuno discloses.

## Argument.

## V.    Standard of Review.

The Board's factual findings are reviewed under the substantial evidence standard:  "[W]e set aside factual findings that are unsupported by substantial evidence."  *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363-64 (Fed. Cir. 2006); *In re Cuozzo Speed Technologies*, 2015 WL 448667 at 9 (Fed. Cir. February 4, 2015) ("We review the Board's factual findings for substantial evidence…").  "An agency decision can be supported by substantial evidence, even where the record will support several reasonable but contradictory conclusions." *Falko-Gunter*, 448 F.3d 1364.

A finding that a reference (*e.g.*, Matsuno) does not expressly or inherently disclose a claim element (*e.g.*, "low level current") is a factual finding. "Anticipation, including whether a limitation is inherent in the prior art, is a question of fact."  *Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1348 (Fed. Cir. 2013).  "Anticipation is a question of fact, and we uphold decisions of the Board on factual matters if there is substantial evidence in the record to

support the Board's findings."  *Rapoport v. Dement*, 254 F.3d 1053, 1057 (Fed. Cir. 2001).

Accordingly, whether Matsuno discloses (expressly or inherently) the claimed "low level current" is a factual finding reviewed for substantial evidence with deference to the Board's findings.

Petitioners do not apply the deferential "substantial evidence" standard. Instead, Petitioners assert that "[t]his Court does not afford deference to the PTAB's decision" when "the facts are largely undisputed," and the Board "makes 'analytical errors.'"  Brief 27 (citing *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013)).

*Smith* does not create an exception to the deferential "substantial evidence" standard.  Rather, *Smith* held that the appellant in that case was able to establish that the Board's decision was not supported by substantial evidence because (a) the relevant facts were undisputed in favor of appellant, and (b) the Board's decision was the result of analytical errors.  *Smith*, 721 F.3d at 1380.[3]  Neither of these two circumstances are present here.  The underlying facts are either disputed or

---

[3]    Subsequent Federal Circuit cases confirm that *Smith* applied (rather than overturned or created an exception to) the deferential "substantial evidence" standard.  *E.g., Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1345 (Fed. Cir. 2013) ("Applying the deferential 'substantial evidence' standard of review, *see, e.g., Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013), we conclude .…").

undisputed in favor of Network-1 and against Petitioners.  *See* Sections III, VI,

and VII.  And, as demonstrated below, the Board did not make "analytical errors."

*See* Section VII.

## VI.    Substantial evidence supports the Board's finding that Petitioners failed to demonstrate that Matsuno expressly or inherently discloses the claimed "low level current."

Petitioners appeal a single issue—whether "the PTAB erred by finding that

Matsuno does not expressly or inherently disclose a 'low level current.'"  Brief 24.

Petitioners rely on Matsuno for the claimed "low level current" limitation for both

grounds on appeal—anticipation based on Matsuno (A1023) and a combination of

De Nicolo and Matsuno (A1042).  The Board determined that Petitioners' grounds

failed because "Avaya has not shown that Matsuno expressly or inherently

discloses the 'low level current' recited in Claim 6."  A16.

Petitioners had the burden of demonstrating that Matsuno disclosed the

claimed "low level current."  "In an *inter partes* review instituted under this

chapter, the petitioner shall have the burden of proving a proposition of

unpatentability by a preponderance of the evidence."  35 U.S.C. 316(e) (emphasis

added); A16 ("It is Avaya's burden to establish that Matsuno discloses the 'low

level current' step.").

Under the Board's construction (adopted by Petitioners) a "low level current" is a "current (*e.g.*, approximately 20 mA) that is sufficiently low that, by itself, it will not operate the access device." A10. Matsuno does not disclose the values of any currents. A1488-98; A17. Matsuno discloses two power sources operating at two different voltages—$V_2$ (48 volts) and $V_1$ (120 volts). Petitioners relied on the current generated from the 48 volt source as the claimed "low level current." A1027. Accordingly, Petitioners had the burden of demonstrating that the current generated from the 48 volt source disclosed in Matsuno constitutes a "current … that is sufficiently low that, by itself, it will not operate the access device." A10.

The Board found that "Matsuno does not expressly or inherently disclose that the current generated from low voltage $V_2$ (-48 V) is a 'low level current.'" A29. The Board's finding is supported by substantial evidence.

### A.    <u>Express</u>:  Substantial evidence supports the Board's finding that Matsuno does not expressly disclose the claimed "low level current."

A reference that expressly discloses a "low level current"—"a current … that is sufficiently low that, by itself, it will not operate the access device" (A10)— would (a) disclose a current (*e.g.*, a "20 mA current"), and (b) include words that expressly convey that such a current is insufficient to operate the disclosed access device. For example, in the '930 Patent, such a current is described as a current of

21

"approx. 20 ma" where "the low current level is unable to sustain the start up" of the access device.  A47-48 (2:66-3:16).  Petitioners do not (and cannot) identify any such disclosure in Matsuno.

Matsuno does not disclose the values of any current levels; nor does Matsuno comment on the need for any particular current levels.  Instead, Matsuno discloses two voltages—$V_2$ (48 volts) and $V_1$ (120 volts).  As the Board found:

> "Indeed, throughout its disclosure, Matsuno speaks in terms of voltage, not current…. Matsuno discloses, for example, 'high-voltage $V_1$ of -120 V and low voltage $V_2$ of -48 V,' but never discloses the specific amount of current that is generated on digital subscriber line 12 from low voltage $V_2$ (-48 V). …. Nor does Matsuno disclose the specific amount of current that would be needed for the NT1 or DTE to operate.  Thus, we simply cannot compare one level of current to another to determine whether what Avaya identifies as a 'low level current' is sufficient."

A17; A23 ("Matsuno does not speak in terms of current—it only discloses voltages.").[4]  As a result, Petitioners do not (and cannot) identify any statement in Matsuno to the effect that a current is insufficient to operate the disclosed access device, *e.g.*, "the current generated by the 48 volts will not be able to operate the NT1/DTE."

---

[4]    It is not the case that the current level generated by the 48 volt source is necessarily lower than the current generated by the 120 volt source.  "It is actually likely that the current generated by the 120 volts may be lower than the current generated by the 48 volts.  It is the power that operates (powers) the device.  Power is current times voltage ($I * V$).  So the same amount of power is delivered at a higher voltage using a lower current."  A2853 n.7.

Because Petitioners have the burden of proof, Petitioners' failure to identify any express disclosure of a "low level current" is sufficient evidence to support the Board's finding that "Avaya does not point to any express statement in Matsuno that the current generated from low voltage $V_2$ (-48 V) is insufficient by itself to operate the alleged 'access device' in Matsuno (*i.e.*, the NT1, either alone or in combination with the DTE)."  A16.  Moreover, additional evidence affirmatively demonstrates that Matsuno does not expressly disclose the claimed "low level current."

> <u>Evidence 1</u>:  Matsuno expressly states that the disclosed 48 volts is sufficient to operate the specific access device disclosed in Matsuno.

The Board found that the current generated by the 48 volt source was sufficient to operate the access device because "approximately 48 volts" are available to the NT1/DTE and 40 volts are sufficient to operate the NT1/DTE. A22-25; 28.  This finding is supported by substantial evidence.

*First*, Matsuno states that 40 volts would be sufficient to operate the subscriber terminal (DTE):

> "When the commercial AC power source 111 is functioning normally, for example, an AC current of 100 V is rectified in the phantom power supply part 112 and is converted to a prescribed voltage, for example, a DC <u>voltage of 40 V</u>, for use as the local power supply that is supplied to the subscriber terminal 103."

A1490 ¶4 (emphasis added).[5]  Although this statement is presented in connection with a "conventional example" (A1489 ¶2), Petitioners' expert confirmed that this 40 volts is the only voltage disclosed in Matsuno that would potentially be needed by the subscriber terminal:

> "Q.  It is the case that the <u>only voltage identified in Matsuno</u> that would be potentially needed by a subscriber terminal, a DTE, is the <u>40 volts</u> that's in Paragraph 4?  A.  <u>I believe that is the case</u>."

A2251 32:4-8 (emphasis added). Network-1's expert also confirmed that a DTE can operate at 40 volts and an NT1 can operate at a much lower voltage, 28 volts. A2857 ¶107; ¶106.

---

[5]    "Matsuno does not state that 40 volts is the minimum operating voltage, only that 40 volts is sufficient.  Therefore, and in agreement with other documents, it is reasonable that many lower voltages are also adequate."  A2854 ¶100.



A1496 (Matsuno Fig. 3)

Accordingly, Matsuno expressly states (and the experts both confirmed) that 40 volts is sufficient to operate the disclosed access device (NT1/DTE).

*Second*, Matsuno confirms that the 48 volt supply makes "approximately 48" volts available to the access device at the subscriber terminal: "The voltage to ground or the line voltage of the digital subscriber line 12 that runs into the home of the subscriber is thus at approximately 48 V…" A1491 ¶26 (emphasis added). Petitioners' expert confirmed what Matsuno says—that "approximately 48" volts are available at the subscriber location (the location of the NT1/DTE):

> "Is it your understanding that in the Matsuno reference, it discloses that the 48-volt low-level current will provide 48 volts to the subscriber at his home?  A.  It says 'approximately 48 volts,' but yes."

25

A2247 (28:4-8) (emphasis added).



The reason why the voltage at the subscriber location is "approximately 48" volts rather than the full 48 volts is because there is a small voltage loss resulting from the "small" impedance of the subscriber line. A1490 ¶6 ("During station power supply, the line impedance of the digital subscriber line 104 in the network terminal device 102 becomes small…."); *see* A2956-57 ¶278.

Because Matsuno expressly states that (a) 40 volts is sufficient to operate the disclosed access device (NT1/DTE) at the subscriber location, and (b) "approximately 48" volts are available, Matsuno expressly discloses that the 48 volts are sufficient to operate the disclosed access device (NT1/DTE). Accordingly, the current generated from the 48 volts cannot be the claimed "low

level current," which is a current "that is sufficiently low … that, by itself, it will not operate the access device."  A10.  This evidence, without more, is sufficient to affirm the Board's finding that Matsuno does not expressly disclose a "low level current."  But there is more.

> Evidence 2:  Network-1's expert confirmed that Matsuno does not expressly disclose the claimed "low level current."

"Matsuno does not expressly state that the current generated from the 48 volts is insufficient to operate the specific access device disclosed in Matsuno."  A2862 ¶116.  This evidence alone is sufficient to affirm the Board's decision that Matsuno does not expressly disclose a "low level current."  But there is more.

> Evidence 3:  Petitioners' expert, on cross examination, confirmed that Matsuno does not expressly disclose the claimed "low level current."

As the Board correctly determined:

We begin by noting that Avaya does not point to any express statement in Matsuno that the current generated from low voltage $V_2$ (-48 V) is insufficient by itself to operate the alleged "access device" in Matsuno (i.e., the NT1, either alone or in combination with the DTE). Avaya's declarant, Dr. Zimmerman, acknowledged this lack of disclosure during cross-examination:

> Q. Does Matsuno anywhere expressly state that the 48 volts is insufficient to operate a DTE that requires 40 volts?
>
> A. Matsuno does not expressly state that 48 volts delivered at the U interface point would be insufficient.
>
> Q. Does Matsuno disclose that the 48 volts would be insufficient to operate the NT1?
>
> A. He doesn't discuss that at all.

Ex. 2016 at 36:24-37:3, 39:6-8. Indeed, throughout its disclosure, Matsuno

A16-17 (quoting A2255-56 (36:24-37:3); A2258 (39:6-8).

\* \* \*

Petitioners' Brief completely ignores the evidence outlined above from (a) Matsuno, (b) Network-1's expert, and (c) their own expert, demonstrating that Matsuno does not expressly disclose the claimed "low level current." This evidence is "substantial evidence" because "a reasonable person might accept [this evidence] as adequate to support a conclusion"—that Matsuno does not expressly disclose a "low level current." *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363-64 (Fed. Cir. 2006). Accordingly, Petitioners' appeal fails with respect to express disclosure.

**B.**    **Inherent**:  **Substantial evidence supports the Board's finding that Matsuno does not inherently disclose the claimed "low level current."**

Inherency "requires that the missing characteristic is <u>necessarily present</u>."

*Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (emphasis added).  Accordingly, inherency turns on whether it is "necessary" that the disclosed access device (NT1/DTE) cannot operate based on a current generated by the disclosed 48 volts.  Substantial evidence demonstrates that Matsuno does not inherently disclose the claimed "low level current."

> <u>Evidence 1</u>:  Matsuno expressly states that the 48 volts is sufficient to operate the access device disclosed in Matsuno, which can operate on 40 volts.

A reference cannot inherently disclose a limitation (the limitation cannot be "necessarily present") when the reference expressly discloses that the limitation is not present.  As set forth above, Matsuno expressly states (and both experts confirmed) that (a) 40 volts is sufficient to operate the disclosed access device (NT1/DTE), and (b) "approximately 48" volts are available for the disclosed access device (NT1/DTE) from the 48 volt source.  A1490 ¶4; A1491 ¶26; A19.  Therefore, Matsuno expressly discloses that the 48 volt source is sufficient to operate the disclosed access device.  *See* above VI(A).  As a result, it is not "necessary" that the 48 volts generate a current that is insufficient to operate the disclosed access device.  This evidence alone is sufficient to affirm the Board's

decision that Matsuno does not inherently disclose a "low level current." But there is more.

> <u>Evidence 2</u>:  Network-1's expert confirmed that Matsuno does not inherently disclose the claimed "low level current."

He testified:

> "[A] current that, in itself, is sufficient to operate the access device is also not inherent in the Matsuno reference. … An NT1 that cannot operate on a current generated from 48 volts is not 'necessarily present' because NT1s can operate on currents generated from much lower voltages…. ('The minimum voltage at the NT1 required for correct operation is 28V.')."

A2862 ¶117 (quoting A5284); A2862 ¶117 (opining that it is not necessary that the 48 volts would not be "sufficient to power the DTE").  This evidence alone is sufficient to affirm the Board's decision that Matsuno does not inherently disclose the claimed "low level current."  But there is more.

> <u>Evidence 3</u>: Petitioners' expert confirmed that Matsuno does not inherently disclose the claimed "low level current."

As the Board determined:

> Similarly, Dr. Zimmerman acknowledged that the current generated from low voltage $V_2$ (-48 V) is not inherently sufficient or insufficient for at least the DTE to operate. Dr. Zimmerman testified as follows:
>
>> Q. Is it inherent in Matsuno that the 48 volts would be insufficient to operate the DTE?
>>
>> A. It is not inherent. It is implied.
>>
>> . . .
>>
>> Q. Is it the case that, if we have a relatively short subscriber line, that 48 volts would be sufficient to power a DTE?
>>
>> A. Not necessarily. And Matsuno doesn't really speak to that at all.
>
> Ex. 2016 at 38:17-19, 42:20-24. Avaya's position, therefore, appears to be

A17 (quoting A2257-58 (38:17-19); A2261 (42:20-24)). "Especially in light of this admission, [Petitioners'] argument that the [NT1/DTE] might [not operate based on the 48 volts], and in turn, that [the current generated from such a voltage could be a "low level current"], is insufficient under this court's precedent to establish inherency." *Agilent Technologies, Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1383 (Fed. Cir. 2009). This evidence alone is sufficient to affirm the Board's decision that Matsuno does not inherently disclose a "low level current."

\* \* \*

Petitioners' Brief does not address the substantial evidence set forth above from (a) Matsuno, (b) Network-1's expert, and (c) their own expert, demonstrating that Matsuno does not inherently disclose the claimed "low level current." This "evidence" is "substantial evidence" because "a reasonable person might accept

[this evidence] as adequate to support a conclusion"—that Matsuno does not inherently disclose the claimed "low level current." *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363-64 (Fed. Cir. 2006). Accordingly, Petitioners' appeal fails with respect to inherent disclosure.

## VII. **Petitioners' arguments fail.**

Because the evidence demonstrates that Matsuno neither expressly nor inherently discloses the claimed "low level current," Petitioners make an imaginative but defective series of arguments trying to establish that Matsuno inherently discloses the claimed "low level current." Petitioners' argument can be summarized as follows:

The system in Matsuno complies with the ANSI T1.601 ISDN standard, which requires components to be designed to transmit data up to 18,000 feet. However, NT1/DTEs that are installed between 5,000 feet and 18,000 feet from the power source will not operate based on 48 volts. Accordingly, Matsuno necessarily discloses that the current generated from the 48 volts disclosed in Matsuno is insufficient to operate access devices installed 5,000 feet to 18,000 feet from the power source and, therefore, necessarily discloses the claimed "low level current." *See* Brief 27-35.

Petitioners' arguments are all based on the following four underlying premises, with each premise dependent on each prior premise:

- Premise 1:  The system disclosed in Matsuno necessarily complies with an "ISDN standard, which is explicitly referenced in Matsuno."  Brief 22.

- Premise 2:  Because the system disclosed in Matsuno necessarily complies with an ISDN standard, it must necessarily comply with what the American "ANSI T1.601 standard specifies."  Brief 22 (quoting A1895 ¶20; A1489 ¶2).

- Premise 3:   Because the system disclosed in Matsuno necessarily complies with the American ANSI T1.601 standard, Matsuno necessarily discloses NT1/DTEs located at all distances "up to 18,000 feet (or 3.41 miles)" from the power source.  Brief 25.

- Premise 4:   Because Matsuno necessarily discloses NT1/DTEs located at all distances from one mile to 18,000 feet from the power source, Matsuno necessarily discloses a low level current because "Avaya's expert, Dr. Zimmerman calculated that" NT1/DTEs at distances greater than a mile from the power source "would receive an insufficient current [from the 48 volt source] to render them operable."  Brief 30 (citing A1894-96 ¶¶ 18-23).

Petitioners' arguments require each of these four underlying premises to be true. If one fails, Petitioners' arguments all fail.

In <u>Section A</u>, we demonstrate that each of the four premises underlying Petitioners' arguments is wrong.

In <u>Section B</u>, we demonstrate that each of the four premises underlying Petitioners' arguments cannot even be considered on appeal.

## A.    Each of the four premises underlying Petitioners' arguments is wrong.

<u>Petitioners' premise 1</u>:   The first necessary premise underlying Petitioners' arguments is that Matsuno necessarily complies with an ISDN standard that is explicitly referenced in Matsuno:  "The PTAB further failed to consider that the power supply circuit of Matsuno, operating in an ISDN-compliant network, must necessarily be designed to …."  Brief 25.  This premise is wrong for two reasons.

*First*, contrary to Petitioners' assertion—"The ISDN standard, which is explicitly referenced in Matsuno…." (Brief 22)—Matsuno does not explicitly reference an ISDN standard.  An explicit reference to an ISDN standard would look something like this:  "The present invention relates to the ABC Standard." For example, the '930 Patent explicitly references a standard:  "It is another object of this invention to … maintain compliance with IEEE 802.3 standards."  A47

(1:44-47).   Matsuno contains no such reference to an ISDN standard.  In fact, the

only time the letters "ISDN" (not "ISDN standard") even appear in Matsuno is at

the end of Paragraph 2:

> (Prior Art) Fig. 11 is an explanatory diagram of a conventional
> example, wherein 101 is a power supply circuit for a switching
> station, 102 is a network terminal device (NT1) (or digital
> service unit (DSU)), 103 is a subscriber terminal (DTE), 104 is
> a digital subscriber line consisting of a tip (TIP) line and ring
> (RING) line, 105 is a power supply source that allows constant
> current power supply, 106 is a transformer, 107 is a capacitor,
> 108 is a transformer, 109 is a capacitor, 110 is a full wave
> rectification circuit, 111 is a commercial alternating current
> power source (AC100 V), and 112 is a phantom power supply
> part. The U and S/T points represent reference points in the
> ISDN.

A1489 ¶2.[6]   But even here Matsuno does not mention an "ISDN standard"; this

passage does no more than identify components (such as the U and S/T interface

points) of an integrated services digital network (ISDN).  A1489 ¶2.

    *Second,* had Matsuno explicitly referenced an ISDN standard, this would not

mean that the system disclosed in Matsuno necessarily complies with the standard.

If a prior art patent or publication mentions a standard, there are two possibilities:

(1) the prior art teaches that one or more embodiments of the disclosed system

comply with the standard (*see e.g.*, A47 (1:44-47) ("It is another object of this

---

[6]    Petitioners cite this paragraph of Matsuno as support for the following:
"The ISDN standard defines mandatory cable lengths (referred to as 'subscriber
loops') over which all ISDNs must operate."  Brief 8, citing A1489 ¶2.  This
paragraph (shown above in its entirety) does not even mention the ISDN standard,
much less "mandatory cable lengths… over which all ISDNs must operate."

invention to … maintain compliance with IEEE 802.3 standards")), or (2) the prior art refers to the standard (*e.g.*, as context) but does not teach that the system complies with the standard (*e.g.*, something like "the disclosed system can be used in connection with IEEE 803.af standard devices").  Accordingly, had Matsuno mentioned an ISDN standard, it would not have been inherent (*i.e.*, necessarily the case) that such mention would have required the system disclosed in Matsuno to comply with an ISDN standard.  The Board found:  "Avaya does not explain sufficiently why the identified standards would apply necessarily to the system disclosed in Matsuno."  A27.  That finding is correct, because nothing in Matsuno requires the disclosed system to necessarily function in accordance with any ISDN standard.

The first necessary premise underlying Petitioners' arguments fails.

Petitioners' premise 2:  The second necessary premise underlying Petitioners' arguments is that because the system disclosed in Matsuno necessarily complies with <u>an</u> ISDN standard, it must necessarily comply with the American ANSI T1.601 standard:  "The <u>ANSI T1.601 standard specifies</u> 12 mandatory test loops which are representative of the subscriber loop lengths in North America."  Brief 22 (quoting A1895 ¶20; A1489 ¶2) (emphasis added).  This premise is wrong.

Because there are different ISDN standards and implementations in different countries (A1685-86 (40:22-41:4)), it is not necessary that Matsuno, a Japanese reference, would comply with ANSI T1.601, an American standard (the "A" in ANSI refers to "American").  If a technology has different standards and implementations in different countries, it is not necessary (in fact, it would be highly unlikely) that a reference developed in one country would necessarily disclose compliance with a standard of a different country.  For example, "a device in Japan would be designed differently than it would be in the United States … because they have a different standard."  A1685-86 (40:22-41:4); A1659 (14:1-22) ("you would want to consult the standards of the countries in which you wanted to certify the device"); A5280 ("the test loops and conditions which are defined for conformance testing of the U transceiver in different countries may be different"); A1848-1850 (203:21-205:6) ("one of ordinary skill in the art" would "expect" subscriber lengths to be "shorter" in Japan).

Matsuno is a Japanese patent with Japanese inventors living in Japan:

```
(71)出願人   000005223
        富士通株式会社
        神奈川県川崎市中原区上小田中４丁目１番
        １号
(72)発明者   松野　秀樹
        神奈川県川崎市中原区上小田中４丁目１番
        １号　富士通株式会社内
(74)代理人   弁理士　柏谷　昭司　（外２名）
```

A2983; A1488.  Accordingly, as a Japanese reference, if Matsuno specifically stated that the disclosed system complied with an ISDN standard, it would more likely comply with a Japanese standard than an American standard.  A1846 (201:4-14); A1685-86 (40:22-41:4).  It is certainly not necessary that the system disclosed in Matsuno complies with the American ANSI T1.601 standard.

Because it is not necessary that Matsuno complies with the American ANSI T1.601 standard, the second necessary premise underlying Petitioners' arguments fail.

Petitioners' premise 3:  The third necessary premise underlying Petitioners' arguments is that because the system in Matsuno necessarily complies with the American ANSI T1.601 standard, it necessarily discloses devices obtaining power at distances between one mile and 18,000 feet from the power source.  Petitioners assert that there is a "subscriber area that is mandated by the ISDN standard."  Brief 23, 30.  Petitioners assert that "ISDN-standard equipment must be compatible with a cable length of up to 18,000 feet" and therefore "Matsuno discloses a current that must necessarily reach an access device beyond one mile."  Brief 25. This premise is wrong for two reasons.

*First*, ANSI T1.601 requires only that compliant-equipment be designed to exchange data up to 18,000 feet with a prescribed minimum loss of signal strength

("a bit error ratio (BER) of less than 10-[7]" which "equates to … about 42-db loss", A1535 § 5.4, A1533 §5.1).[7] But the standard does not require that a standard-compliant system must have some NT1/DTEs installed 18,000 feet away from a central office. Indeed, there is no minimum distance for installing NT1/DTEs. *See* A1535, §5.4.1 ("zero length"). A compliant system could have all devices installed within 500 feet, 1,000 feet, or 5,000 feet of a central office. Accordingly, NT1/DTEs located outside a mile radius from a central office are not the "inevitable result" of a system that includes equipment that complies with the ANSI T1.601 standard. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1344 (Fed. Cir. 2005).

<u>Second</u>, that ANSI T1.60 standard-compliant equipment is designed to meet minimum signal requirements up to 18,000 feet says nothing about whether a remotely supplied "current … must necessarily reach an access device beyond one mile." Brief 25. Petitioners assume that because ANSI T1.601 compliant equipment is designed to operate up to 18,000 feet with a certain data signal

---

[7]    The ANSI T1.601 standard "include[s] test arrangements and procedures which are intended to be used to qualify the performance of … equipment for use in ISDN BRA [basic rate access] subscriber loops." A5280. The ANSI T1.601 standard states that compliant equipment should be tested for "BER" (bit error ratio) at various subscriber "loop" distances up to 18,000 feet. A1581-82 (Annex A "Test loops and performance measurements"); A1535; A1566 (Figure 8 "Loops for testing received signal performance"). For these test loops, "[t]he NT shall receive … pulses with a bit error ratio (BER) of less than 10-[7]". A1535 § 5.4.

strength, systems that comply with the ANSI T1.601 standard are necessarily required to deliver currents to devices up to 18,000 feet away. That assumption is false.

In the United States, only data (and not power) is transferred over the subscriber line: "[i]n the United States, the telco does not provide power to the NT1, nor is it allowed to draw operating power from that line." A1681 (36:19-21); A5285 ("In America, it is expected that remote powering of the NT1 is not provided and both primary power and emergency, or secondary, power may have to be sourced locally at the customer premises.").[8] Accordingly, the ANSI T1.601 standard—developed for American ISDN systems—does not require power to be remotely delivered over the subscriber line at any distance, much less 18,000 feet. Because the ANSI T1.601 standard does not mandate that a compliant system must have at least one NT1/DTE more than a mile away that is receiving remote power, it is not the necessary or inevitable result that an ANSI-compliant ISDN system would have a NT1/DTE receiving remote power more than a mile away from the power source.

---

[8]    In fact, the ANSI T1.601 standard identifies issues that would need to be considered first before the ANSI T1.601 standard could be modified to allow for remote power that exists in ISDN applications in other countries. A1531.

The third necessary premise underlying all of Petitioners' arguments fails.

Petitioners' premise 4:   The fourth necessary premise underlying Petitioners' arguments is that if the system in Matsuno necessarily discloses NT1/DTEs located beyond one mile and up to 18,000 feet from the power source, then Dr. Zimmerman's calculations accurately demonstrate that the disclosed 48 volts would generate insufficient current for such NT1/DTEs to operate:   "Dr. Zimmerman, calculated that the vast majority of the access devices in the service area mandated under the ISDN standard would receive an insufficient current to render them operable," because "only on the order of about 8 V would actually be available to the NT1/DTE."   Brief 30 (citing A1894-96 ¶¶ 18-23); A1253 (citing A1900-02 ¶¶32-35).

Dr. Zimmerman calculated that "on the order of about 8 volts" would be available to the NT1/DTE, reasoning as follows:  (a) Matsuno discloses that the voltage available at the NT1 when the 120 volts is applied to the subscriber line can be 80 volts or less, which is a differential of 40 volts; (b) this same 40 volt difference exists when the 48 volt source is applied to the subscriber line; and (c) 48 volts minus the 40 volt difference results in only 8 volts being available to the access device.  A2953 ¶275.  Dr. Zimmerman concludes that because a voltage drop of 40 volts would occur from the 48 volt power source to the NT1/DTE,

"about 8 V of potential would be available to the NT1/DTE, which ... would be well below any level of voltage that could operate such an NT1/DTE."  A1900-01 ¶32.

Dr. Zimmerman, however, failed to consider that his calculated voltage drop (from 120 volts to 80 volts) was attributable to the voltage drop across transistors (24a and 24b) in a constant current circuit at the 120 volt power source.  A2953-58 ¶¶275-280.  These transistors that reduce the voltage, however, are <u>bypassed</u> when power is supplied by the 48 volt source and, therefore, cannot reduce the voltage that is available to the NT1/DTE from the 48 volt power supply.  *Id.* Accordingly, the voltage drop calculated by Dr. Zimmerman does not exist when the 48 volts are applied to the subscriber loop.  *Id.* "[I]nexplicably, Dr. Zimmerman did not consider this voltage drop attributable to the constant current circuit in his analysis."  A2956 ¶277; *see also* A1420-23 (39:19-42:20).

Moreover, Zimmerman's calculation ignored the express language in Matsuno stating that the NT1/DTE was positioned at a distance such that the voltage drop due to the line resistance is "small" and the result is "approximately 48" volts (not 8 volts) available at the subscriber location.  A1490 ¶6; A1491 ¶26. The Board expressly found that "Avaya's arguments are not persuasive" and "Dr. Knox's explanation as to the line voltage of 'approximately' 48 V is persuasive." A24-25.

Petitioners' are also wrong in asserting that Dr. Knox provided evidence that NT1/DTEs at distances greater than a mile from the 48 volt power source would not operate.  Brief 32.  Dr. Knox demonstrated that a "low level current" was not inherent in Matsuno because, using "conservative," "worst case assumptions," the 48 volts could operate NT1/DTEs at 8,500 homes located within a mile circumference of the power source.  A2856-2861.  Petitioners' assert:  "For his part, Dr. Knox limits his calculations to access devices that are less than 4,945 feet (what he described as about one mile) from the power supply, concluding that those access devices would be operational. … He thus acknowledged by implication that access devices farther from the power supply than that distance would not be operational."  Brief at 30.  Dr. Knox did nothing of the sort.

The required premise underlying Petitioners' argument is that if an expert calculates that 8,500 devices within a mile would be operational, this is evidence that devices at any distance greater than a mile would not be operational.  This premise would only be valid if the expert calculated that the maximum distance that devices would operate is one mile.  Conversely, if the expert used conservative assumptions and determined that devices would operate at a minimum at least to distances of one mile, this would not be evidence that devices would not be operational at any distance greater than one mile.

Dr. Knox did not determine that one mile was the maximum distance that NT1/DTEs would operate.  Instead, Dr. Knox used "worst case assumptions" (A2857) and "very conservative measurements" to determine that devices would be operational up to at least one mile.  A1676 (31:5-25).  As the Board found:  "Dr. Knox makes a number of 'conservative' 'worst case assumptions' due to the limited detail available in Matsuno."  A25.  Moreover, Dr. Knox confirmed that it is "quite probable" that such devices "would operate at considerably more distance" than one mile from the power source.  A1676 (31:5-25); A1688 (43:17-22) ("And if that distance was more than 5,000 feet away, in your example, he would not be able to power those devices? ... THE WITNESS: I'm sorry.  You're talking about Matsuno, and that would not be true.")

Accordingly, Dr. Knox's calculations do not support Petitioners' premise that NT1/DTEs located between a mile and 18,000 feet from the central office necessarily would not operate if provided power from the 48 volt source disclosed in Matsuno.

### B. Petitioners' inherency argument on appeal relies upon evidence that the Board ruled could not be considered for purposes of establishing Petitioners' *prima facie* case.

Because Petitioners have the burden of proving that the '930 Patent is unpatentable (35 U.S.C. 316(e)), it was Petitioners' burden to establish their *prima*

*facie* case of invalidity. Petitioners necessarily lose before the Board (and on

appeal) if they are unable to establish a *prima facie* case. *Id.*

The only evidence Petitioners may rely on to make out a *prima facie* case of

unpatentability is the evidence presented with their initial Petition. In particular,

PTAB regulations require that evidence submitted with a reply brief cannot be

considered for purposes of making out a *prima facie* case of unpatentability—it

may only be considered to rebut arguments submitted by the patent holder. *See*

A28-29; Rules of Practice for Trials Before the Patent Trial and Appeal Board and

Judicial Review of Patent Trial and Appeal Board Decisions, Final Rule, 77 Fed.

Reg. 48,612, 48,620 (Aug. 14, 2012) ("Reply evidence … must be responsive and

not merely new evidence that could have been presented earlier to support the

movant's motion."); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756,

48,767 (Aug. 14, 2012) ("[A] reply that raises a new issue or <u>belatedly presents</u>

<u>evidence will not be considered</u>… Examples of indications that a new issue has

been raised in a reply include <u>new evidence necessary to make out a *prima facie*</u>

<u>case</u> for the … unpatentability of an original… claim, and new evidence that could

have been presented in a prior filing." (emphasis added)).

The Board found that "none of the points raised by Dr. Zimmerman in his

reply declaration … were made in his initial declaration … served with the

Petition, or in the Petition itself." A28. Citing the above PTAB regulations, the

Board ruled "[w]e have not considered it as part of Avaya's attempt to make out a *prima facie* case of unpatentability of the challenged claims." A28. In their opening Brief on appeal, Petitioners did not challenge the Board's ruling that Petitioners' reply evidence could not be considered for purposes of establishing their *prima facie* case, and Petitioners may not raise such a challenge for the first time in their Reply brief on appeal. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived."). Accordingly, the Board's ruling that Dr. Zimmerman's second declaration would not be considered as evidence to establish Petitioners' *prima facie* case of unpatentability was correct, unchallenged, and is (now) unchallengeable.

Moreover, on appeal this Court will not consider material not considered by the Board. *Application of Mead*, 569 F.2d 1128, 1129 (C.C.P.A. 1978) ("An orderly judicial process precludes this Court from resting a reversal or affirmance of the board's decision on materials not considered by the board."); *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1355 (Fed. Cir. 2013) ("this court does not consider the excluded material on appeal"). Because the Board determined it would not consider Dr. Zimmerman's reply declaration to make out Petitioners' *prima faci*e case of unpatentability, Petitioners may not rely on that evidence on appeal.

The only evidence Petitioners presented to the Board in support of their *prima face* case on the "low level current" element is the text of Matsuno and the following paragraph in Dr. Zimmerman's first declaration:

> 40.    Matsuno further describes how, in response to providing a low level current, such as -V$_2$, it detects a resulting voltage or current and, based on that detected voltage or current, it then controls whether to provide a high voltage or a low voltage.    See e.g., Matsuno (AV-1004), ¶¶ (0018) – (0020), (0033), (0035), (0036) and (0039).    Thus, Matsuno teaches the same general approach to controlling power as claim 6 in the '930 Patent.

A1510 ¶40.  Petitioners presented no evidence in support of their *prima facie* case regarding (a) any ISDN standard, (b) the American ANSI T1.601 standard, (c) the required subscriber line distances for testing ANSI T1.601 compliant equipment, or (d) calculations attempting to demonstrate that that NT1/DTEs will not operate at certain distances from a power source.  On appeal, however, Petitioners' effort to make out their *prima facie* case of inherency rests on Dr. Zimmerman's second declaration (A1886-1928).  Here are some examples:

- "The ISDN standard defines mandatory cable lengths … over which all ISDNs must operate."  Brief 8 (citing A1895 ¶20).[9]

---

[9]    Petitioners also cite A1489 ¶2 (Matsuno) as support for this point.  That cite, however, offers no support because Matsuno does not mention any ISDN standard

- "the ISDN standard requires that all ISDNs be designed to operate over a cable length of approximately three (3) miles." Brief 8 (citing A1895 ¶20).

- "The ANSI T1.601 standard specifies 12 mandatory test loops which are representative of the subscriber loop lengths in North America." Brief 22-23 (citing A1895 ¶20).

- "Those test loops require all compliant ISDN equipment to operate at a distance of 18,000 feet from the switching station. That is, the design loop distance for ISDN equipment is 18,000 feet." Brief 22-23 (citing A1895 ¶20).

- "an access device contemplated by Matsuno will still receive current that is insufficient for operation." Brief 29 (citing A1894-96 at ¶¶18-23).

- "Dr. Zimmerman, calculated that the vast majority of the access devices in the service area mandated under the ISDN standard would receive an insufficient current to render them operable." Brief 30 (citing A1894-96 ¶¶18-23).

- "By its very nature, the ISDN network disclosed in Matsuno is designed to serve a wide geographic area. Indeed, according to the ISDN standard, 92.5 percent of the geographic area serviced by an ISDN switching station would

---

and certainly does not refer to any "mandatory cable lengths."

be further than 4,945 feet." Brief 30 (citing A1895 ¶¶20-21).

As demonstrated above, none of this evidence from Dr. Zimmerman can be used to establish Petitioners' *prima facie* case of unpatentability.[10] And when this evidence is discarded, all of the key premises of Petitioners' inherency argument on appeal disappear. Petitioners are left with the text of Matsuno, and that text contains no information about the ANSI T1.601 standard, no calculations to determine operability at given distances, etc.

Moreover, the text of Matsuno was the <u>only</u> evidence submitted by Petitioners to make out a *prima facie* case of inherency on the "low level current" element. (Dr. Zimmerman's single paragraph in his first declaration addressing "low level current" says nothing on the issue of inherency. A1510 ¶40.). As a result, Petitioners' inherency argument fails as a matter of law. To prove inherency, "[s]uch evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268-1269 (Fed. Cir. 1991). The text of Matsuno by itself can never tell us what is unstated by the text but necessarily present. Without Dr. Zimmerman's second declaration, Petitioners cannot make out a *prima facie* case of inherency, and their appeal necessarily fails.

---

[10]    This evidence submitted with Petitioners' reply could be considered solely for the purpose of attempting to discredit Network 1's expert and Network 1's responsive case, not to support Petitioners' *prima facie* case.

## C.    Each of Petitioners' remaining arguments fail.

Because, as demonstrated above, each of the four premises underlying

Petitioners' arguments is wrong, each remaining argument (not specifically

addressed above) is also wrong.  Petitioners' remaining arguments are grouped and

addressed below in three categories:  arguments (1) attempting to establish

Petitioners' four premises, (2) relating to the burden of proving unpatentability,

and (3) relating to what Matsuno discloses.

### 1.    Petitioners' arguments relating to their four underlying premises are wrong.

Argument 1:    Petitioners assert that "Dr. Knox's analysis establishes that

access devices in Matsuno fall into two categories: (i) those being less than 4,945

feet (*i.e.*, almost a mile) from the power supply and therefore receiving operational

power; and (ii) those being greater than 4,945 feet from the power supply and

therefore receiving non-operational power."  Brief 32.  Therefore, "such 'access

devices' exist—*i.e.*, those NT1/DTE combinations within the ISDN standard of

Matsuno that are outside of the 'almost a mile' range created by Dr. Knox."  Brief

26.  Petitioners' assertion is wrong for four reasons.

(1)  As demonstrated above in Section VI(A), Dr. Knox did not "establish"

that devices outside Petitioners' contrived red circle (Brief 26, 34) receive "non-

operational power" from the power source.  Rather, Dr. Knox (a) confirmed that

50

under "worst case assumptions" (A2857) and "under very conservative measurements" (A1676 (31:5-25)), the NT1/DTEs would operate at a minimum of up to a mile from the central office (within the red circle), and (b) opined that NT1/DTEs would also "operate at considerably more distance" (*i.e.*, outside the red circle). *Id*; A1688 (43:17-22).

(2) Petitioners' outer blue circle is not found in Matsuno, and, as demonstrated above (Section VI(A)) , (a) there is no "ISDN standard of Matsuno," (b) Matsuno would not likely be an ISDN system that complies with the American ANSI standard, (c) a system that complies with the American ANSI standard would not be providing any remote power to access devices, and (d) a system that complies with the American ISDN standard may have all devices located within 500, 1000, or 5000 feet of the central office.

(3) If there were a possibility, or even a probability, that an NT1/DTE could be installed in Matsuno's system outside of Petitioners' red circle, this would not be an inherent disclosure. "Inherency … may not be established by probabilities or possibilities.  The mere fact that a certain thing may result from a given set of circumstances is not sufficient."  *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (citations omitted).  It would not require "extraordinary measures" for all access devices to be installed in Matsuno's system within a mile of the power source.  *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 961 (Fed. Cir. 2014) (quoting

*Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1349 (Fed. Cir. 1999)).  Because it is "at least possible" that Matsuno's NT1/DTEs are installed within the smaller red circle, Petitioners' argument fails.  *Allergan*, 754 F.3d at 961 (affirming a finding that there was no inherent disclosure where "it was at least possible to administer eyedrops in a way as to reduce the flow of liquid to the eye to close to zero.").

(4) Matsuno expressly discloses that the subscribers in its ISDN system are within sufficient proximity that the 48 volt source delivers "approximately 48" volts at the subscriber's home.  A1491 ¶26.

Argument 2:  "[N]either Dr. Knox nor the PTAB addressed the nature of the low current that would exist for devices located at distances greater than 'almost a mile' from the power source."  Brief 22.

The Board did not address (a) NT1/DTEs more than a mile from the power source, and (b) the nature of currents delivered to devices located more than a mile from the power source, because Matsuno does not disclose such NT1/DTEs. Petitioners do not (and cannot) identify any disclosure in Matsuno of any device (and corresponding current received by such device) installed more than a mile from the power source.  Dr. Knox did address the subject and opined that access devices located a "considerabl[e]" distance beyond a mile would operate from a 48 volt source.  A1676 (31:5-25); A1688 (43:17-22).

Argument 3:  Petitioners assert:  "Dr. Knox agreed that higher power consuming access devices would not be guaranteed to operate using Matsuno's 48-volt power supply," and "that at least some NT1/DTE installations in Matsuno would not receive a current sufficient to operate the device," but Dr. Knox "then ignore[d] those non-operational devices."  Brief 29, 30, 33.

Dr. Knox never agreed that there were NT1/DTE installations "in Matsuno" that would not receive a current sufficient to operate.  He agreed only that if there were a hypothetical system (not Matsuno) that attached higher power consuming devices (not disclosed in Matsuno), then such devices might not operate on 48 volts.  *E.g.*, A2146 (456:22-457:3) ("I can certainly hypothetically come up with something where the lower voltage would not be adequate but that's not the issue…").

Dr. Knox properly ignored undisclosed non-operational devices because devices that might not operate on the voltage resulting from the 48 volt source are not disclosed in Matsuno, nor is it necessary that Matsuno's system must include an access device installed so far away as to not be operational.  That there "may be devices 'that might not operate on the lower voltages'" (Brief 30) is irrelevant in an inherency analysis.  Inherency requires that the system disclosed in the reference must necessarily include devices that do not operate on the lower voltages.  *SmithKlien Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1344 (Fed.

Cir. 2005). "A claim limitation is inherent in the prior art if it is <u>necessarily</u> <u>present</u> in the prior art, <u>not merely probably or possibly present</u>." *Akamai Technologies, Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003) (emphasis added).

<u>Argument 4</u>:  The Board "focused on the wrong 'access device.'"  Brief 31. Although Petitioners included this argument as a heading, it is not clear what argument they are making.  There are two possibilities.  Both fail.

(1) Petitioners could be arguing that the Board focused on something other than the NT1/DTE disclosed in Matsuno and therefore "focused on the wrong access device."  This argument fails because:  (a) Petitioners identified the "access device" in Matsuno as the "'network terminal device (NT1) 2,' either alone or in combination with its 'subscriber terminal (DTE 3)'" (Brief 14); and (b) the Board's analysis focused on this exact same "access device."  A14; A16 ("Avaya does not point to any express statement in Matsuno that the current generated from low voltage $V_2$ (-48 V) is insufficient by itself to operate <u>the alleged 'access device'</u> in Matsuno (*i.e.*, <u>the NT1, either alone or in combination with the DTE</u>)." (emphasis added)).

(2) Petitioners could be arguing that the Board focused on an NT1/DTE that is installed near the power source when it should have been focusing on an

NT1/DTE that is installed 18,000 feet away from the power source.  This argument

fails because Matsuno does not disclose a system in which  NT1/DTEs are

installed at the 18,000-foot distance for bit error rate compliance under the

American ANSI standard; nor is that inherent.  In fact, the NT1/DTEs expressly

disclosed in Matsuno are installed at a distance such that a "small" line loss results

when powering remotely over the subscriber line (A1490 ¶6), and, from a 48 volt

supply, "approximately 48 V" are available at the subscriber's home (A1491 ¶26).


Argument 5:   Petitioners assert:  "Even if other access devices receive

current sufficient for operation, they are not relevant to the presence of at least one

access device that does not receive current sufficient for operation."  Brief 33

(citing *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1356 (Fed. Cir. 2008)).

Petitioners assert:  "inherency does not require that the missing characteristic exist

homogeneously throughout a prior art reference as long it is present to some

degree."  Brief 28 (citing *SmithKline Beecham Corp. v. Apotex Corp.* 403 F.3d

1331, 1344 (Fed. Cir. 2005)).[11]

---

[11]    *See also* Brief 26 ("there is no requirement that every possible NT1/DTE
combination at every length of cable satisfy the 'low level current' limitation as
long as at least one of them falls within the non-operational range.") (emphasis in
original); Brief 25 ("The fact that some NT1/DTE combinations could receive a
current sufficient, by itself, for operation is wholly irrelevant if other NT1/DTE
combinations do not.") (emphasis in original); Brief 33 ("Dr. Knox erred in

This proposition would be relevant had Matsuno disclosed both (a) NT1/DTEs that operate based on the disclosed 48 volts, and (b) "at least one" NT1/DTE positioned at a distance from the power source such that it would not operate based on the disclosed 48 volts. But Matsuno does not disclose <u>any</u> devices installed so that they cannot operate based on the 48 volts—not a single one.

Petitioners assert that "the case for inherency is much stronger here compared to some of the 'trace' amount chemical cases where inherency was found." Brief 30-31 (*citing SmithKline*, 403 F.3d at 1344). Petitioners are wrong. In *SmithKline*, the patent holder admitted that producing the claimed element (PHC hemihydrate) "inevitably results" from the disclosed process. *SmithKline*, 403 F.3d at 1344. The exact opposite is true here. It is undisputed that the system disclosed in Matsuno can be implemented without generating the claimed "low level current" (*i.e.*, with NT1/DTEs located within the red circle of Petitioners' diagram) and that, as a result, the claimed "low level current" does not "inevitably result" from implementing the system disclosed in Matsuno.

---

applying the law of anticipation by arguing that non-operational devices are 'irrelevant' if there are some operational ones...")

Argument 6:  The Board improperly limited "its construction of 'low level current'…to particular cable lengths and corresponding operational ranges." Brief 34-35.[12]  Here Petitioners argue: (a) NT1/DTEs will not operate at the longer distances permitted within the bit error rate threshold of the American ANSI T1.601 standard based on the 48 volts disclosed in Matsuno, and therefore (b) to disregard such NT1/DTEs at longer distances the Board must have implicitly imposed a cable length limitation on the construction of "low level current." Petitioners are wrong.

The Board would have imposed a cable-length limitation on the construction of "low level current" if (a) the Board found that Matsuno expressly or inherently disclosed an NT1/DTE installed at a particular distance X from the power source and also disclosed expressly or inherently that the current generated from the 48 volts would not operate that NT1/DTE, and (b) the Board disregarded that disclosure because distance X was beyond a certain cable length limitation imposed by the Board.  The Board did nothing of the sort explicitly or implicitly. With respect to (a), the Board did not find that Matsuno disclosed such a non-operational NT1/DTE at a particular distance; rather, the Board found the

---

[12]    *See also* Brief 21 ("Notwithstanding the PTAB's statements rejecting Network-1's cable-length restriction, in rendering its decision the PTAB nevertheless did rely on the distance/length-based argument advanced by Network-1's expert, Dr. Knox, in concluding that Matsuno did not disclose a 'low level current.'").

opposite—*i.e.*, that Matsuno disclosed NT1/DTEs placed at distances such that "approximately 48" volts reached the subscriber's home, which was sufficient to operate the disclosed access devices.  A22-29.  Because the Board did not find (a), there could be no (b).  That is, because there was no express or inherent disclosure of a non-operational access device at a particular distance, the Board had no occasion to consider a cable length limitation, and therefore never (neither implicitly nor explicitly) imposed one.

### 2.    Petitioners' arguments relating to the burden of proving unpatentability are wrong.

Petitioners assert:  "Matsuno never states that the low voltage of -48 volts is sufficient to operate ISDN devices."  Brief 16.  And they assert:  "Patent Owner does not point to any disclosure in Matsuno itself indicating that the current generated from low voltage $V_2$ (-48 V) is sufficient, by itself, to operate network terminal device 2."  Brief 15 (quoting A1136 (emphasis added by Petitioners)).  Petitioners (i) have the burden of proof backwards, and (ii) are wrong.

*First*, it is not Network-1's burden to affirmatively show that Matsuno is missing the claimed "low level current."  Rather, it is Petitioners' burden to show that Matsuno affirmatively discloses the claimed "low level current":  "the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence."  35 U.S.C. 316(e) (emphasis added).

58

*Second*, Matsuno does affirmatively state that the 48 volt source generates "approximately 48" volts at the subscriber location and that 40 volts would be sufficient to operate the access device at the subscriber location. *See* Section VI(A).

### 3.      Petitioners' arguments relating to what Matsuno states or implies are wrong.

Argument 1:  "Matsuno expressly states that the lower 48 volts may be sufficient for remotely powering telephones on analog subscriber lines, but that remote powering of digital subscriber lines requires a higher voltage of, for example, 120 volts."  Brief 29 (citing A1490 ¶5).  Both parts of this assertion are wrong.

Matsuno's express disclosure about the sufficiency of 48 volts is not limited to "powering telephones on analog subscriber lines." *Id*.  Matsuno states when "functioning normally" the system delivers "a prescribed voltage …of 40V, for use as the local power supply that is supplied to the subscriber terminal 103 [the DTE]."  A1490 ¶4.  Petitioners' expert confirmed that this prescribed 40 volts is "the only voltage identified in Matsuno that would be potentially needed by a subscriber terminal, a DTE."  A2251 (32:4-8).  Moreover, nothing in paragraph 5 of Matsuno cited by Petitioners (or any other part of Matsuno) suggests that 120 volts is required to operate an NT1/DTE.  A1490 ¶5.

Argument 2:  Three times in their Brief (Brief 15, 18, 29), Petitioners quote the following statement by the Board:  "If low voltage $V_2$ (-48 V) was sufficient, by itself, for the device to operate, presumably there would be no need to switch to high voltage $V_1$ (-120 volts) when local power is unavailable."  Petitioners' repeated use of this statement suggests that it was undisputed, or at least supported by overwhelming evidence.  The opposite is true.

Petitioners omit that (a) the Board made this statement in its preliminary decision before it had received any evidence on the point and the Board cited no evidence to support its supposition, (b) Network-1 presented substantial evidence demonstrating that this supposition was wrong (A2863-64 ¶118), (c) Network-1's evidence was never challenged by Petitioners (A21), and (d) the Board made a factual finding that Network-1's evidence was persuasive (A21).

Network-1's expert presented evidence as to why Matsuno would use a higher voltage source (120V) when only 48 volts is needed to operate the NT1 and DTE.  A2863-64 ¶118.  The Board found Network-1's evidence persuasive:  "As explained herein, Network-1 has come forward with sufficient evidence and reasoning, particularly with respect to Dr. Knox's testimony, to put that assumption into question."  A21.

> "Dr. Knox also provides numerous reasons why the opposite would be true (*i.e.*, high voltage is used even though the NT1 and DTE would operate based on the low voltage).  [A2863-64] ¶ 118. …. Avaya does

not argue in its Reply that the reasons cited by Dr. Knox are technically incorrect or not possible, and we find them persuasive."

A21 (emphasis added).  The Board's factual findings are supported by substantial

evidence (indeed undisputed evidence) and therefore must be accepted on appeal.

## VIII.  Conclusion.

For the foregoing reasons, this appeal should be denied.

Dated:  March 3, 2015                    Respectfully submitted,

                                         */s/ Gregory S. Dovel*
                                         Gregory S. Dovel
                                         Sean A. Luner
                                         Dovel & Luner, LLP
                                         201 Santa Monica Blvd., Suite 600
                                         Santa Monica, CA 90401
                                         (310) 656-7066
                                         *Counsel for Appellee*
                                         *Network-1 Technologies, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery to the following non-CM/ECF participants:

Michael J. Scheer
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166

*Attorney for Appellant,*
*Dell, Inc.*

Robert J. Walters
McDermott, Will & Emery LLP
500 North Capitol Street, NW
Washington, DC 20001

*Attorney for Appellant,*
*Hewlett-Packard Co.*

s/ Stephen Moore
Senior Appellate Paralegal
COUNSEL PRESS LLC

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  This brief uses a proportional typeface and 14-point font, and contains 12,934 words.  This word count includes 484 words in the pull-outs cut and pasted into the text of the brief.

Dated:  March 3, 2015                         */s/ Gregory S. Dovel*
                                              Gregory S. Dovel
                                              *Counsel for Appellee*
                                              *Network-1 Technologies, Inc.*