2014-1782, -1783, -1784, -1785

In The

# United States Court of Appeals

### For The Federal Circuit

## AVAYA INC., DELL INC., SONY CORPORATION OF AMERICA, AND HEWLETT-PACKARD CO.,

*Appellants*,

v.

## NETWORK-1 TECHNOLOGIES, INC.
## (formerly known as Network-1 Security Solutions, Inc.),

*Appellee*.

### APPEALS FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NOS. IPR2013-00071, IPR2013-00385, AND IPR2013-00495.

---

## CORRECTED REPLY BRIEF OF APPELLANTS

---

Jeffrey D. Sanok
Brian M. Koide
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500
*Counsel for Avaya Inc.*

Robert J. Walters
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC 20005
(202) 551-1700
*Counsel for Hewlett-Packard Co.*

Thomas M. Dunham
J. Michael Woods
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
(202) 282-5000
*Counsel for Dell Inc.*

Jonathan M. Lindsay
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, California 92614-8505
(949) 263-8400
*Counsel for Avaya Inc.*

David H. Dolkas
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, California 92614
(650) 815-7400
*Counsel for Hewlett-Packard Co.*

Kimball R. Anderson
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
*Counsel for Dell Inc.*

Scott L. Bittman
CROWELL & MORING LLP
590 Madison Avenue
New York, New York 10022
(212) 895-4223

Lionel M. Lavenue
Daniel C. Cooley
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, Virginia 20190
(571) 203-2700

Michael J. Scheer
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, California 90071
(213) 615-1700

*Counsel for Avaya Inc.*

*Counsel for Sony Corporation of America*

*Counsel for Dell Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

ABBREVIATIONS ............................................................................v

ARGUMENT ....................................................................................1

    I.    Threshold Issues ..................................................................1

        A.    Under *De Novo* Review for Analytical Errors, this Court Should Not Give the PTAB's Inherency Finding Any Deference as the PTAB Failed to Apply the Governing Legal Standards ...........................................................1

        B.    This Court Should Consider the Zimmerman Reply Declaration ...................................................................4

    II.    The PTAB's Analytical Errors ...........................................7

        A.    Network-1's Entire Argument Ignores the PTAB's Faulty Analytical Framework ...........................................7

        B.    Network-1's Attack on the Four "Premises" is Without Merit and Conflicts with its Own Positions and Dr. Zimmerman's Testimony ...........................................9

            1.    Matsuno Discloses a System Compliant with the ISDN Standard ...............................................10

            2.    Matsuno Discloses NT1/DTEs in the Blue Zone ...........12

            3.    The NT1/DTEs in the Blue Zone Only Receive Low Voltage, Which Results in a "Low Level Current" ...................................................16

III.    The PTAB's Finding that Matsuno Does Not Inherently Disclose "Low Level Current" Is Not Supported by Substantial Evidence ............................................................................. 17

    A.    The PTAB's Finding that "Low Level Current" is Not Inherent in Matsuno Conflicts with the Text of Matsuno ......... 18

        1.    The "Desired" Current in Matsuno is the Current Required for Operation ................................................... 21

        2.    "Minimal" Communication Discloses a Threshold Between Sufficient and Insufficient Operation .............. 23

    B.    The PTAB's Findings Regarding the 40 Volts and "Approximately 48" Volts Are Unsupported by Substantial Evidence ................................................................ 25

        1.    The Disclosed Access Device in Matsuno is the Combination NT1/DTE ................................................... 26

        2.    Matsuno Does Not Disclose that 40 Volts is Sufficient to Operate the Disclosed Access Device (NT1/DTE Combination) ............................................... 27

        3.    Matsuno Does Not Disclose That "Approximately 48" Volts are Available for the Disclosed Access Device (NT1/DTE Combination) from the 48 Volt Source .......................................................................... 28

CONCLUSION ..................................................................................... 32

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Application of Mead*,
    569 F.2d 1128 (C.C.P.A. 1978) ...................................................5, 6

*Becton Dickinson and Co. v. C.R. Bard, Inc.*,
    922 F.2d 792 (Fed. Cir. 1990) ........................................................6

*Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*,
    725 F.3d 1341 (Fed. Cir. 2013) ...................................................5, 6

*In re Lee*,
    277 F.3d 1338 (Fed. Cir. 2002) ...................................................2, 3

*Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.*,
    CBM2012-00002,
    2014 WL 1260851 (P.T.A.B. Jan. 23, 2014)...................................5

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013) .......................................................2

*Smith & Nephew, Inc. v. Rea*,
    721 F.3d 1371 (Fed. Cir. 2013) ...................................................1, 2

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005) ...................................................2, 3

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ...................................................5, 6

*St. Jude Med., Cardiology Div., Inc. v. Univ. of Mich.*,
    IPR2013-00041,
    2014 WL 1783276 (P.T.A.B. May 1, 2014)...................................5

## <u>OTHER AUTHORITIES</u>

112 Cong. Rec. S1375 (daily ed. March 8, 2011).....................................................7

PTAB Final Rule, 77 Fed. Reg. 48,612 (Aug. 14, 2012) ..........................................5

# ABBREVIATIONS

| | |
|---|---|
| Appellants | Avaya, Dell, HP, and Sony (defined below) |
| Avaya | Avaya Inc. |
| Blue Brief | Brief of Appellants |
| Dell | Dell Inc. |
| Di Nicolo | U.S. Patent No. 6,115,468 to Di Nicolo et al. |
| HP | Hewlett-Packard Co. |
| Matsuno | Japanese Unexamined Patent Application Publication No. H10-13576, published January 16, 1998 (A1488-98) |
| Network-1 | Network-1 Technologies, Inc. f/k/a Network-1 Security Solutions, Inc. |
| PTAB | Patent Trial and Appeal Board |
| PTAB Final Rules | Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions; Final Rule, 77 Fed. Reg. 48,612 (Aug. 14, 2012) |
| PTO | United States Patent and Trademark Office |
| Zimmerman Initial Declaration | Declaration of George A. Zimmerman (submitted with the petitions to institute *inter partes* proceedings) (A1499-1524) |
| Zimmerman Reply Declaration | Second Declaration of George A. Zimmerman (A1886-1928) |
| Red Brief | Brief of Appellee Network-1 Technologies, Inc. |
| Sony | Sony Corporation of America |

'930 Patent                      United States Patent No. 6,218,930 to
                                 Kaztenberg et al. (the subject matter of the *inter
                                 partes* review) (A43-49)

-071 Case                        Case No. IPR2013-00071

-385 Case                        Case No. IPR2013-00385

-495 Case                        Case No. IPR2013-00495

## ARGUMENT

Section I of this Reply addresses two threshold issues raised by Network-1: (a) the standard of review and (b) the Zimmerman Reply Declaration.

Section II addresses Network-1's response to the analytical errors (Red Brief at 32-61), and why this Court should remand.

Section III explains the conflict between Network-1's position that Matsuno does not inherently disclose "low level current" (Red Brief at 20-31) and the text of Matsuno itself, and why substantial evidence is lacking.[1]

## I.    Threshold Issues

### A.    Under *De Novo* Review for Analytical Errors, this Court Should Not Give the PTAB's Inherency Finding Any Deference as the PTAB Failed to Apply the Governing Legal Standards

Arguing that the substantial evidence standard should apply, Network-1 casts the "analytical error" standard of *Smith* as being limited to situations where the "relevant facts were undisputed in favor of appellant." Red Brief at 19 (citing *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013)).

In *Smith*, however, this Court characterized the Board's ruling as "***mainly*** the result of the analytical errors discussed above, ***not the Board's resolution of***

---

[1] Appellants do not contend that Matsuno expressly discloses "low level current," and accordingly do not address those corresponding arguments. *See* Red Brief at 21-28.

*factual questions*." 721 F.3d at 1380 (emphasis added). After categorizing the error as "analytical," *Smith* held that the Board erred and did not review the factual findings under the substantial evidence standard. *See id.* (making no subsequent reference to substantial evidence). Contrary to Network-1, *Smith* is not limited to undisputed facts or when those undisputed facts were in one party's favor. *See id.*[2]

*De novo* review of "analytical errors" in *Smith* is consistent with review of compliance with governing legal standards. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) ("[W]e review the Board's compliance with governing legal standards de novo…."); *accord In re Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002)("Omission of a relevant factor required by precedent is both legal error and arbitrary agency action."). Both applying the wrong legal standard (*Randall*) or omitting a relevant factor (*Lee*) fall into the broader category of analytical errors (*Smith*).

Here, the PTAB failed to apply the proper legal standard by effectively requiring that a missing characteristic exist homogeneously throughout a prior art reference in order to establish inherency. But that is not the law. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1344 (Fed. Cir. 2005) (reasoning

---

[2] Network-1's reading of *Pasteur* case as indicating that *Smith* applied the "substantial evidence" standard is misplaced. Red Brief at 19 n.3. *Pasteur* merely noted the general application of the "substantial evidence" standard and did not address whether an analytical error was made. *Id.*

that a chemical process that produces only "trace" amounts of a compound inherently anticipates that compound).

The PTAB focused only on the operational NT1/DTE combinations within Dr. Knox's one-mile radius, and ignored the non-operational NT1/DTE combinations outside the one-mile radius. *See* Blue Brief at 31-34. In fact, Network-1 flatly concedes that "[t]he [PTAB] did not address (a) NT1/DTEs more than a mile from the power source, and (b) the nature of currents delivered to devices located more than a mile from the power source." Red Brief at 52. The PTAB's failure to apply the correct standard was legal error. *See Lee*, 277 F.3d at 1343.

Network-1 attempts to distinguish *SmithKline*, arguing that "the claimed 'low level current' does not 'inevitably result' from implementing the system disclosed in Matsuno." Red Brief at 56. Not only is this argument incorrect as a factual matter, it highlights the exact analysis that the PTAB failed to perform: resolving whether Matsuno's disclosure "inevitably results" in a low level current for NT1/DTEs ***more than*** a mile from the power source. The assumptions used by Network-1's own expert confirm that it does. And because the PTAB failed to apply the correct legal standard and resolve whether a low level current "inevitably results" from the disclosure in Matsuno, the related factual determinations should not be accorded any deference.

3

**B.      This Court Should Consider the Zimmerman Reply Declaration**

Network-1 argues that this Court should not consider the Zimmerman Reply Declaration because it was "not considered by the Board." Red Brief at 46. Network-1 points to the PTAB's reasoning that "none of the points raised in [the Zimmerman Reply Declaration] were made in [the Zimmerman Initial Declaration that accompanied the petition]." Red Brief at 45. Based on that reasoning, Network-1 relies on the PTAB's statement that "[w]e have not considered [the Zimmerman Reply Declaration] as part of Avaya's attempt to make out a *prima facie* case of unpatentability of the challenged claims." Red Brief at 46 (quoting A28).

Network-1's suggestion that this Court ignore the Zimmerman Reply Declaration conflates (a) the PTAB's refusal to consider the Zimmerman Reply Declaration for purposes of establishing its *prima facie* case with (b) outright exclusion of the declaration from the record. The PTAB did not exclude the Zimmerman Reply Declaration nor did it refuse to consider the declaration:  the PTAB only refused to consider the declaration as part of Petitioner's *prima facie* case. In fact, the PTAB explicitly stated that it considered Dr. Zimmerman's declaration "to determine whether it refutes the points made by Dr. Knox in his declaration." A28.

4

Ironically, it is Network-1 that has waived an argument by failing to file a motion to exclude the Zimmerman Reply Declaration and then by failing to challenge on appeal the PTAB's consideration of the declaration. And even if Network-1 had filed such a motion and challenged the PTAB's consideration of the declaration, both efforts would have failed.

The PTAB rules specifically contemplate and permit reply evidence. PTAB Final Rule, 77 Fed. Reg. at 48,620; *accord St. Jude Med.*, *Cardiology Div.*, *Inc. v. Univ. of Mich.*, IPR2013-00041, 2014 WL 1783276, at *20 (Pat. Tr. & App. Bd. May 1, 2014) (declining to exclude reply evidence submitted by petitioner and noting that a "petitioner is not expected to anticipate, in its petition, every counterargument a patent owner might make in response."); *Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.*, CBM2012-00002, 2014 WL 1260851, at *38 (Pat. Tr. & App. Bd. Jan. 23, 2014) (concluding that expert testimony was proper rebuttal evidence responding to claim construction newly proposed by the patent owner in its response).

Network-1's reliance on *Application of Mead*, 569 F.2d 1128, 1129 (C.C.P.A. 1978), *Cheese Sys.*, *Inc. v. Tetra Pak Cheese & Powder Sys.*, *Inc.*, 725 F.3d 1341, 1355 (Fed. Cir. 2013), and *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) is also misplaced. The court in *Mead*, in granting a motion to *supplement* the record, clarified that "an orderly judicial

5

process requires that review of an appealed decision be limited to consideration of issues raised below." 569 F.2d at 1130. In so doing, the court distinguished between the "(1) presence in the record of specific materials, and (2) issues presented." *Id*. There can be no dispute that the PTAB never excluded the Zimmerman Reply Declaration and that the PTAB also considered the declaration. And even though Network-1 asserts that *Cheese* prevents the court from considering "excluded material on appeal," Red Brief at 46, nothing in the instant case has been excluded, nor did Network-1 even request exclusion.

Network-1 turns to *SmithKline*, arguing that Appellants have waived reliance upon Dr. Zimmerman's declaration to establish a *prima facie* case.[3] Red Brief 45-46. But this argument misunderstands the nature of a *prima facie* case and the burdens of proof at the PTO. Petitioners did not need to address the use of the Zimmerman Reply Declaration for their *prima facie* case because Petitioners

---

[3] Network-1 also treats the law surrounding waiver as operative as a matter of law. It is not. *See Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990)(noting that the general practice of waiver of an issue not raised in an opening appeal brief is "not governed by a rigid rule but may as a matter of discretion not be adhered to where circumstances indicate that it would result in basically unfair procedure."). Here, the reply evidence has been considered and should be considered by this Court. Moreover, under the PTAB's rules, Avaya's Reply to the Patent Owners Response (A1247-64) and the accompanying Zimmerman Reply Declaration was the *first opportunity to respond* to both the PTAB's construction of "low level current" and Network-1's two preliminary rounds of argument on that issue.

had *already established* a *prima facie* case at institution. That is why the PTAB

instituted the proceeding. The PTAB concluded that Petitioners had "demonstrated

a reasonable likelihood of prevailing on the following grounds of unpatentability,"

including anticipation by Matsuno. A1148.

Congress explained that "[t]he 'reasonable likelihood' test is currently used

in evaluating whether a party is entitled to a preliminary injunction, and effectively

requires the petitioner to present a *prima facie case* justifying a rejection of the

claims in a patent." 112 Cong. Rec. S1375 (daily ed. March 8, 2011) (emphasis

added). Therefore, Appellants did not need the Zimmerman Reply Declaration to

establish their *prima facie* case, and Network-1's arguments to this effect are

irrelevant.

In sum, the Zimmerman Reply Declaration was proper evidence considered

by the PTAB in assessing the merits of Appellants' arguments, and is proper

evidence for consideration on appeal.

## II.     The PTAB's Analytical Errors

### A.     Network-1's Entire Argument Ignores the PTAB's Faulty Analytical Framework

On appeal, Network-1 does not dispute the two analytical errors identified

by Appellants in their Blue Brief. *See* Red Brief at 56-57. Instead, Network-1

addresses these two analytical errors *indirectly*, arguing that these errors were

harmless by asserting that the factual record was lacking, either by misreading

7

Matsuno or arguing that the Zimmerman Reply Declaration should not be considered.

With respect to inherency, Network-1 (a) disputes the four underlying factual "premises" (Red Brief at 34-44) and (b) argues that allegedly "belated" record evidence should not be considered on appeal (Red Brief at 44-50).[4]  But, as noted previously, the entire "belated" evidence argument is a red herring since the PTAB did consider the Zimmerman Reply Declaration and the declaration was never excluded from the record.

Tellingly, Network-1 concedes that an analytical error would have been made if the facts were as Appellants state, which they are.  *See, e.g.*, Red Brief at 56 ("This proposition would be relevant had Matsuno disclosed both (a) NT1/DTEs that operate based on the disclosed 48 volts, and (b) 'at least one' NT1/DTE positioned at a distance from the power source such that it would not operate based on the disclosed 48 volts."); *id.* at 57 (conceding that the PTAB "would have imposed a cable-length limitation on the construction of 'low level

---

[4] Network-1 also included a catchall Section VII.C. addressing other arguments "not specifically addressed above" but tied those arguments to their disputed premises.  Red Brief at 50 ("Because, as demonstrated above, each of the four premises underlying Petitioners' arguments is wrong, each of the remaining arguments is wrong.").

current'" but disputing that the PTAB "explicitly or implicitly" made certain findings).

Network-1 advances an upside-down approach to legal analysis that makes no sense. It asks this Court to review the underlying factual findings for substantial evidence even though the PTAB applied the wrong legal framework. *See supra* Section I.A. This Court should first determine if the PTAB applied the proper analytical framework. Only if concluding so should this Court review the underlying factual determinations under the substantial evidence standard.

### B.    Network-1's Attack on the Four "Premises" is Without Merit and Conflicts with its Own Positions and Dr. Zimmerman's Testimony

In attempting to rebut the analytical error identified by Appellants—that the PTAB erred by ignoring the non-operational devices in the blue zone outside the one-mile radius—Network-1 fabricates "four underlying premises" on which the analytical error is purportedly dependent. Red Brief at 33. The "four underlying premises" framework is faulty and contradicts the testimony of Network-1's own expert.

1.    **Matsuno Discloses a System Compliant with the ISDN Standard**

Network-1 creates and then attacks the first "underlying premise:"

> **Premise 1:**   "The system disclosed in Matsuno … complies with an 'ISDN standard, which is explicitly referenced in Matsuno.'"

Red Brief at 33.

Network-1 makes two arguments to refute its first premise:  (1) while Matsuno references the words "ISDN," it does not refer to a standard and (2) even if Matsuno referenced the ISDN standard, this does not mean that the system disclosed in Matsuno "necessarily complies" with the ISDN standard.  Red Brief at 34-36.  Both of Network-1's arguments lack merit.

The phrase "ISDN" is not a generic term (such as "computer" or "network"). It only has meaning in the context of the standard by which it is defined.  Dr. Zimmerman testified in the Zimmerman Initial Declaration that ISDN is a standard:

> Integrated Services Digital Network (ISDN) is a set of communication standards for the simultaneous transmission of voice and digital data over a traditional Public Switched Telephone Network ("PSTN"). ISDN was defined in 1988 by the Telephone and Telegraph Consultative Committee in the "Red Book."

A1504¶17.

Although Network-1 incorrectly challenges the Zimmerman Reply Declaration, it concedes that Zimmerman's *Initial* Declaration was part of the record and concedes that this Court should consider it. Red Brief at 47 (describing the Zimmerman Initial Declaration as the "only evidence Petitioners presented to the [PTAB] in support of their prima facie case" and not objecting to its consideration below or on appeal). At no point in the proceedings below did Network-1 or Dr. Knox dispute Zimmerman's testimony that "ISDN" referenced a standard. Nor did Network-1 or Dr. Knox take a position that the references to "ISDN" in Matsuno taught anything other than an ISDN standard network. Indeed, Network-1 did just the opposite by admitting that Matsuno discloses an ISDN network. *See* A1099 ("Matsuno discloses a system involving an ISDN network that operates over standard telephone lines."); A1220 ("undisputed that Matsuno only discloses an ISDN network"). Only now on appeal does Network-1—faced with the analytical error identified by Appellants—dispute whether Matsuno discloses a network compliant with the ISDN standard.

Network-1's second argument is that the system in Matsuno does not necessarily comply with the ISDN standard. Red Brief at 35-36. The problem with this argument is that there is no such thing as a non-standard compliant ISDN network. "ISDN network" has no meaning other than a network that complies

with an ISDN standard, and Network-1's own words state that "[i]t is undisputed that Matsuno only discloses an ISDN network." A1220.

### 2. Matsuno Discloses NT1/DTEs in the Blue Zone

The next two "underlying premises" created by Network-1 are inapposite and resulted from Network-1's own positions during the IPR:

> **Premise 2:** "Matsuno … must … comply with what the American "ANSI T1.601 standard specifies."

> **Premise 3:** "Because the system disclosed in Matsuno … complies with the American ANSI T1.601 standard, Matsuno … discloses NT1/DTEs located at all distances 'up to 18,000 feet (or 3.41 miles)' from the power source."

The argument that Matsuno discloses a "low level current" does not depend on whether the American ANSI document or another implementation of the ISDN standard applies. Network-1, via Dr. Knox's "calculations," first introduced the ISDN standard into the proceeding. The Appellants only referenced the American ANSI document in response to establish that Dr. Knox's calculations, which were limited to devices within a one-mile radius, do not account for all devices connected to the subscriber cables. Indeed, Dr. Knox already testified that devices existed well beyond the one-mile radius of his calculation:

> One skilled in the art would understand that the higher power [120 volt power] is most likely provided by the system in Matsuno to allow devices to operate *at full functionality* over *very long subscriber loop runs (e.g., up to 10 miles)* that have higher line losses, *i.e.*, *the*

> *houses and installations outside the one mile - 8,500 installation - radius*.

A2864¶118 (emphasis added).

Dr. Knox acknowledges that it is "quite probable" that devices exist more than one mile from the power source, which would require subscriber lines to run for more than one mile. Red Brief at 44 (A1676 (31:5-25); A1688 (43:17-22)). This concedes the existence of installations outside of his one-mile radius. *See id.* It is not germane what country's implementation of the ISDN standard applies because Dr. Knox has already conceded the ultimate conclusion—that NT1/DTE combinations in Matsuno exist outside the one-mile radius, as illustrated by the blue zone of Appellants' figure. *See* Blue Brief at 34.

Network-1's remaining arguments regarding its second and third premises are without merit and conflict with Dr. Knox's testimony.

Network-1 argues that Matsuno "as a Japanese reference … would more likely comply with a Japanese standard than an American Standard." Red Brief at 38. Network-1's position on appeal is wholly inconsistent with positions it took below and testimony of its expert.

For example, Dr. Knox relied on European and other American standards to calculate his one-mile radius and to support his calculation that 8,500 homes would receive operational power within the red zone. A2861¶114 (relying on an average suburban lot "in the United States" to calculate that 8,500 homes would receive

operational power); A2857¶106 (relying on the characteristics of a "European

ISDN" disclosed in the Burd reference manual); A2859¶112 (relying on American

wire standard for electrical resistance). Not only did Dr. Knox rely on these

European and American standards, he affirmatively opted not to rely on Japanese

references because he did not consider them more useful than the Burd reference's

discussion of the European ISDN standard:

> I did try to find some Japanese references.
> Unfortunately, they were in Japanese. And I didn't find
> any that I considered more useful or more important than
> Burd. Again, Burd seemed to be a very good textbook on
> the material.

A1656-57(11:21-12:10).

Thus, Network-1 cannot now argue that Matsuno "as a Japanese

reference … would more likely comply with a Japanese standard than an American

Standard," when its own expert eschewed the Japanese standard and affirmatively

relied on both American and European standards in his calculations.

Network-1 also argues that "NT1/DTEs located outside a mile radius from a

central office are not the 'inevitable result' of a system" that complies with the

ISDN standard. Red Brief at 39. Network-1 argues that "[a] compliant system

could have all devices installed within 500 feet, 1,000 feet, or 5,000 feet of the

central office." *Id.* But Network-1's conjecture again flies in the face of the

testimony of its own expert, Dr. Knox, who testified that "one skilled in the art

14

would understand" Matsuno as having "*very long subscriber loop runs* (*e.g.*, up to 10 miles) … *i.e.*, the houses and installations *outside the one mile - 8,500 installation - radius*."  A2864¶118 (emphasis added).  Accordingly, Dr. Knox's testimony establishes that NT1/DTEs in the blue zone and outside the one-mile radius are present.

Dr. Knox further testified that the Burd reference book—a text that he considers "authoritative on the subject of ISDN subscriber loops"—"indicates that those test loops can be up to 18,000 feet."  A1656(11:17-20); A1680(35:19-24). He also testified that "typically, the goal is to operate ISDN equipment at subscriber loop lengths of up to about … 18,000 feet."  A1667(22:14-24).  He conceded as one of skill in the art it would be "reasonable" to assume that the Japanese ISDN standard would have subscriber loop lengths "just like the United States standard does." A1687(42:1-7).

Network-1 further argues that the ISDN standard "says nothing about whether a remotely supplied 'current … must necessarily reach an access device beyond one mile.'"  Red Brief at 39.  Again, Network-1's conjecture on appeal conflicts with the testimony of its own expert.  Dr. Knox testified that a person skilled in the art would understand that the devices beyond the one-mile radius receive a current "to operate at full functionality."  *See* A2864¶118.  Network-1 admits that "all remote devices in Matsuno (NT1/DTEs) are presumed to be

capable of accepting remote power." Red Brief at 7. Accordingly, it is not disputed that the current reaches the devices beyond the one-mile radius, and Network-1's argument to the contrary is without merit.

### 3. The NT1/DTEs in the Blue Zone Only Receive Low Voltage, Which Results in a "Low Level Current"

Network-1 states its fourth "underlying premise" as follows:

> **Premise 4:** "Matsuno necessarily discloses a low level current because 'Avaya's expert, Dr. Zimmerman calculated that' NT1/DTEs at distances greater than a mile from the power source 'would receive an insufficient current [from the 48 volt source] to render them operable.'"

Red Brief at 33.

Network-1 disputes Dr. Zimmerman's calculation that the 48-volt power supply results in only 8 volts being provided to the NT1/DTE and argues in favor of its own expert's "reading" of Matsuno that approximately 48 volts is *available at the subscriber location (at the NT1/DTE)*. As explained below, however, Dr. Knox's own calculations for line resistance betray that "reading" of Matsuno.

Network-1 argues that because the line resistance is described as "small" in Matsuno, there must be "approximately 48 volts (not 8 volts)" *available at the subscriber's location*. Red Brief at 42. But this argument on appeal conflicts with the testimony of its own expert below. Dr. Knox calculated a voltage drop attributed to subscriber line resistance for his one-mile radius to be 6.8 volts. *See*

A2860¶114.  With a 6.8-volt voltage drop across the subscriber line, at best only 41.2 volts of the 48-volt power supply reaches the subscriber terminal.  It cannot be said that 41.2 volts is "approximately 48 volts."  Thus even under Dr. Knox's own calculations "approximately 48 volts" is not available at the subscriber's location.  Network-1 is wrong as explained further in Section III. B. 3, *infra*.

Accordingly, even if the Court determines that the PTAB applied the correct analytical framework, which it did not, then the Court should still remand because the subscribers in the blue zone receive a "low level current"—*i.e.*, a current that by itself is not sufficient for operation.   This is established by Dr. Knox's own understanding of what Matsuno discloses and is corroborated by Dr. Zimmerman.

## III.  The PTAB's Finding that Matsuno Does Not Inherently Disclose "Low Level Current" Is Not Supported by Substantial Evidence

As noted above, this Court should not review the factual findings with any deference.  But even under the substantial evidence standard, Network-1 can only make out its case for substantial evidence support by:

> (a)    ignoring the teaching in Matsuno of a "minimal" communication state as a threshold and the resulting "desired" state that is equated with operation;

> (b)    misreading Matsuno as stating that 40 volts is sufficient for operation of the combination NT1/DTE and that "approximately 48" volts is received by the NT1/DTE; and

(c)    asking the Court to not consider the Zimmerman Reply Declaration.

Sections III.A. and III.B., *infra*, address (a) and (b), respectively; Section I.B, *supra*, addressed (c).

### A.    The PTAB's Finding that "Low Level Current" is Not Inherent in Matsuno Conflicts with the Text of Matsuno

Network-1 argues that "all disclosed access devices would be operational from an applied 48-volt source."  Red Brief at 9.  In defense of this proposition, Network-1 relies on the PTAB's conclusion that Matsuno does not "inherently disclose that the current generated from low voltage $V_2$ (-48V) is a 'low level current,' *i.e.*, a current (*e.g.*, approximately 20 mA) that is sufficiently low that, by itself, it will not operate the access device." A29; Red Brief at 21(citing A29).

Network-1's position on appeal that "all disclosed access devices would be operational" (Red Brief at 9) conflicts with an earlier position it took below.  In arguing that standard telephone equipment should be the access device (a position that the PTAB rejected), Network-1 stated that while "the current generated by this -48 volts would be sufficient to operate standard telephony equipment connected to the telephone subscriber line, ***that current may not be able to fully power all connected ISDN equipment***." A1099-1100 (emphasis added).

Thus, Network-1 has already confirmed that Matsuno discloses current generated from the 48-volt power supply that "may not be able to fully power" all access devices, and thus has already conceded that Matsuno discloses a "low level current." *Id.* The PTAB failed to recognize this concession by Network-1, and Network-1 should be estopped from taking a different position on appeal.

Network-1's statement that "all disclosed access devices would be operational" is further flawed as it conflicts with the overall logic and teaching of Matsuno. Network-1 admits the following with respect to Matsuno:

1. "Matsuno discloses two power sources operating at two different voltages—$V_2$ (48 volts) and $V_1$ (120 volts)." Red Brief at 13.

2. The access device in Matsuno is the combination of the NT1/DTE. *Id.* at 8 (referring to "all remote devices in Matsuno (NT1/DTEs)").

3. Matsuno teaches two ways of powering the NT1/DTE: (a) "normally, locally powered, for example, by being plugged into a wall socket" and (b) "remote power" as a "backup power." *Id.* at 8.

4. When the NT1/DTE is "locally powered," a "voltage of 48 volts is applied to the subscriber line." *Id.* at 9 (citing A1490¶57).

5. Matsuno teaches that the "120 volt source" is used "when the NT1/DTEs are being remotely powered." *Id.* at 9-10 (citing A1488¶57).

6. "Matsuno was concerned about the safety of this relatively high [*i.e.*, the 120-volt] voltage at the subscriber home." *Id.* at 8.

7.    "Matsuno proposed to implement a circuit that would reduce the voltage at the power source [to the 48-volt power source] when the remote power [*i.e.*, the 120-volt power source] source was not being used to power the NT1/DTE."  *Id.* at 9 (citing A1490¶7).

If the 48-volt power source is sufficient to power "all disclosed access devices" as Network-1 now contends, there would be no need for Matsuno's invention.  But there was a need.  Matsuno explained that 48 volts was generally used in the prior art for "analog" subscriber lines.  A1490¶5.  With the advent of ISDN networks with digital subscriber lines, however, Matsuno explains that "the line voltage is taken to be about 120 V" in order to "provide the prescribed power" to the subscriber terminal (access device).  *Id.*  Left unsaid, but certainly understood by a skilled artisan, is that the *48 volt power supply would be insufficient to operate (power) subscriber terminals in an ISDN network.*

Matsuno also made this clear in the "Effect of the Invention" section. Matsuno explained that the "*advantage*" of switching from the 48-volt power supply to the 120-volt power supply is "that the prescribed power *can be* supplied *to the network terminal device*" (NT1).   A1490¶56.  There would be *no advantage* in having the 120-volt power supply provide the prescribed power if the 48-volt power supply could do the same.  Skilled artisans comprehend patents.

20

Dr. Zimmerman confirmed that "it is unreasonable to believe that Matsuno is inadvertently already providing an operating current using only the low voltage power supply (-48 volts), yet nonetheless decides to switch to a power source that increases the amount of voltage applied by two and half times (-120 volts)." A1903¶37.

The only way Network-1 can justify its logical disconnect is by ignoring critical teachings of Matsuno that equate the 120-volt power source with the "desired" or "prescribed" power for the NT1/DTE and the resulting "minimal" communication that can only be achieved with the 120-volt power source. *E.g.*, A1489¶1, A1490¶4.  Network-1's Red Brief does not even refer to the words "minimal" or "desired" despite repeated use of those terms throughout Matsuno.

### 1.    The "Desired" Current in Matsuno is the Current Required for Operation

As Appellants noted in their opening brief, "the power supply switches to a 'high voltage $V_1$' of -120 volts to provide the desired power/current necessary to allow the access device to operate *with at least minimal communication*." Blue Brief at 10 (emphasis added); *see also id*. at 18. But the PTAB erred in later finding that "Matsuno does not describe what is meant by 'minimal communication,' or indicate whether such communication equates with overall operation of the NT1 and DTE."  A18-19.  Network-1 intentionally avoided this issue.  *See generally* Red Brief at 7-10, 13-18, 20-32.

21

Appellants also noted in their opening brief that Matsuno discloses "a power supply circuit that switches power supply voltage and supplies the ***desired power*** while ensuring safety."  Blue Brief at 8 (citing A1488, Abstract (emphasis added)).  Because digital subscriber lines (ISDN) used about 120 volts to provide remote power during a power outage (for "minimal restricted communication"), a safety issue was presented by the 120 volts being on the line when not needed.  A1490¶5.

Matsuno describes how to address this safety concern and still provide the "desired current" when needed.  Matsuno uses the 48 volts only to deliver a current that can be sensed in order to switch to the 120-volt power source.  *See* Blue Brief 8-9; A1491¶¶19, 20; *see also* A1492¶32 ("High voltage is thus applied to the digital subscriber line 12, and the ***desired power*** is supplied to the network terminal device 2."); A1492¶35 ("… the power supply voltage is high during local power supply stoppage, which allows the ***desired power*** to be supplied.").

Matsuno therefore describes its invention as addressing two different states:

1.   "when local power supply is occurring," the 48-volt power supply is provided to improve "safety" while serving to provide a "detection" current;

2.   "when local power supply is stopped," the 120-volt power supply is provided to "allow the **desired power**."

A1491¶¶19-20.

Accordingly, the references in Matsuno to "desired" current or power describe an operational state. And Matsuno is clear that remote powering of digital subscriber lines requires a higher voltage of, for example, 120 volts, (*i.e.*, the desired power). *See* Blue Brief at 28-29. Otherwise, the advantage of the invention—that the prescribed power can be supplied—would not be achieved. A1491¶56.

### 2. "Minimal" Communication Discloses a Threshold Between Sufficient and Insufficient Operation

The PTAB erroneously reasoned that "just because one power level is sufficient for "minimal communication" does not mean necessarily that a lower power level is not." A19. But under the heading of "Technological Field of the Invention," Matsuno references "minimal restricted communication during power outages," which teaches that the 120-volt station power supply is designed so that NT1/DTEs in the network can at least operate minimally. Such minimal operation equates the desired power/current with a threshold level, below which the network devices would not operate.

Matsuno consistently uses the phrases "minimal communication" and "minimal restricted communication" to equate "minimal" with the 120-volt power supply, *see* A1490¶4 ("Switching to the aforementioned station power supply [*i.e.*, the 120-volt power supply] occurs with shutdown of the commercial AC power supply [*i.e.*, the wall socket], and ***power sufficient to allow minimal***

23

*communication* on the digital subscriber terminal 103 is thus *supplied*") (emphasis added), and accordingly the current resulting from the 120-volt power supply is the "minimal" or threshold value.  Combined with Matsuno's teaching of "desired," the phrase "minimal communication" means a threshold value for sufficient operation.

Dr. Zimmerman testified why this is correct:  "One of ordinary skill in the art would understand [the phrase 'allow minimal communication'] to mean that, if the high-voltage power were capable of providing only 'minimal communication,' then the low-voltage power source (which is two and a half times smaller), would be insufficient to operate the access device, as it was intended to be operated." A1903¶36.  Importantly, Matsuno *never* describes the remotely supplied 48 volts as being sufficient to operate an NT1/DTE.  Thus, because Matsuno discloses that the 120-volt power supply results in a threshold for operation (*i.e.*, a dividing line between sufficient and insufficient current), the lower 48-volt power source cannot, by definition, provide a current sufficient to operate an access device.  The 48-volt power supply thus provides a "low level current," which is used as a detection current for switching to the high voltage power supply.

Accordingly, the PTAB's conclusion that the 48-volt power supply of Matsuno does not inherently provide a "low level current" is not supported by

substantial evidence.  It conflicts with Matsuno itself and was confirmed by the

testimony of Dr. Zimmerman.

>    **B.    The PTAB's Findings Regarding the 40 Volts and**
>           **"Approximately 48" Volts Are Unsupported by Substantial**
>           **Evidence**

In its Red Brief, Network-1 argues that "low level current" is not inherent in

Matsuno because the 48-volt power supply would provide a current sufficient for

operation.  Red Brief at 29.  To make out its case, Network-1 makes a similar

analytical error to Dr. Knox's one-mile calculation.  It attempts to establish that the

disclosed access devices (NT1/DTE) receive power sufficient for operation and

fails to focus on the proper inquiry:  whether access devices (NT1/DTE) ***would not***

receive power sufficient for operation.

Even if Network-1's approach was sound, and it is not as noted above, the

factual underpinnings lack merit.  Network-1 relies on the following two-part

proposition:

> Matsuno expressly states … that (a) 40 volts is sufficient
> to operate the disclosed access device (NT1/DTE), and
> (b) "approximately 48" volts are available for the
> disclosed access device (NT1/DTE) from the 48-volt
> source.

*Id.* (citing A1490¶4; A1491¶26; A19).  The PTAB's ruling tracks Network-1's

two-part proposition.  A22, A25.

Both parts (a) and (b) conflict with Matsuno, and thus are unsupported by the substantial evidence. Section III.B.1. first addresses Network-1's admission regarding the disclosed access device in Matsuno. Section III.B.2. addresses part (a). Section III.B.3. addresses the error made in part (b).

### 1. The Disclosed Access Device in Matsuno is the Combination NT1/DTE

Both sides agree that the disclosed access device is the combination of both the NT1 and DTE—referenced as "NT1/DTE."[5] Red Brief at 8 (referring to "all remote devices in Matsuno (NT1/DTEs)"); *id.* at 9-10 (making multiple references to "NT1/DTE"); *id.* at 14 (referring to "the access device (NT1/DTE)"); *id.* at 25 (referring to the "the disclosed access device (NT1/DTE)"); *e.g.*, Blue Brief at 22. The NT1 is a network terminal device and is separate from the DTE, which is the subscriber terminal. A1489¶2.

---

[5] The PTAB noted Avaya's contention that the "access device" disclosed in Matsuno is the "network terminal device (NT1) 2, 'either alone or in combination' with subscriber terminal (DTE) 3." A14. Both before this Court and below, however, both Network-1 and the Appellants focused only on the combination of the NT1/DTE since without the NT1 the DTE cannot operate.

**2.    Matsuno Does Not Disclose that 40 Volts is Sufficient to Operate the Disclosed Access Device (NT1/DTE Combination)**

Network-1 argues that "Matsuno expressly states … that 40 volts is sufficient to operate the disclosed access device (NT1/DTE)."  Red Brief at 25.  For support, Network-1 relies on the following portion of Matsuno:

> When the commercial AC power source 111 is functioning normally, for example, an AC current of 100 V is rectified in the phantom power supply part 112 and is converted to a prescribed voltage, for example, a DC voltage of 40 V, ***for use as the local power supply that is supplied to the subscriber terminal 103***.

Red Brief at 23 (citing A1490¶4) (emphasis on different text).  The PTAB also relied on the same paragraph.  A22 (citing A1490¶4) (emphasis on different text).

As Matsuno expressly states, however, this DC voltage of 40 volts is used "as the local power supply that is supplied ***to the subscriber terminal 103*** [*i.e.*, the DTE]." *Id.* (emphasis added).  Nowhere does Matsuno state that 40 volts is used for the NT1.  Rather, the NT1 is plugged into the 100 V AC power source for operation.

Network-1, however, keys off the phrase "a DC voltage of 40 V" and relies on the declaration of Dr. Knox to wrongly draw the conclusion that 48 volts is "sufficient to operate the disclosed access device (NT1/DTE)."  Red Brief 25; *accord* A22.

27

As noted above, however, the disclosed access device is the combination NT1/DTE, and within that combination the subscriber terminal 103 (DTE) is a separate component from the network terminal device 102 (NT1).  A1490¶2.  The only power supply voltage Matsuno describes to provide "desired power" *over the subscriber line* to the combination NT1/DTE is the 120 volts that enables minimal restricted communication. A1490¶4.   This provides the advantage not otherwise achievable with the 48-volt power supply ("… conversion to high voltage power supply is carried out immediately upon stoppage of local power supply,  providing *the advantage that the prescribed power can be supplied to the network terminal device* 2 by the station power supply." (emphasis added)).  A1490¶56.

Matsuno does not disclose the 40 volts being sufficient to operate the combination NT1/DTE.

### 3. Matsuno Does Not Disclose That "Approximately 48" Volts are Available for the Disclosed Access Device (NT1/DTE Combination) from the 48 Volt Source

Network-1 next argues that "[b]ecause Matsuno expressly states that … 'approximately 48' volts are available, Matsuno expressly discloses that the 48 volts are sufficient to operate the disclosed access device (NT1/DTE)."  Red Brief at 26.  This is yet another attempt by Network-1 to argue that 48 volts would not correlate to a "low level current."

Network-1's argument tracks the PTAB finding that "Matsuno states plainly that 'the line voltage of the digital subscriber line 12 that runs into the home of the subscriber is thus at approximately 48 V." A24-25 (citing A1491¶26).[6]  Based on this evidence, the PTAB endorsed the reasoning of Dr. Knox that "when low voltage $V_2$ (-48 V) is applied by the power supply circuit in Matsuno, the line voltage at the subscriber is approximately 48 volts." A23-24.

As will be explained below, however, the crux of the dispute is whether the "approximately 48" volts is measured at the power source before any drop in voltage due to the resistance on the line (Appellants' position) or whether the "approximately 48" volts is measured at the subscriber's home (Network-1's position).  The difference where this "approximately 48" volts is measured is significant because the decrease in the voltage due to the resistance of the subscriber line, when the line is one mile in length or more, can be substantial.  Both sides' respective positions are illustrated in the figure below.

---

[6] The PTAB also relied on testimony from Dr. Zimmerman, A25, and Network-1 relies on this testimony.  Red Brief at 25-26.  Network-1, however, asked whether Matsuno discloses a "48-volt *low-level* current," and accordingly Dr. Zimmerman answered affirmatively because the question presupposed the ultimate issue— whether the 48 volt current is "low level."



Network-1's and the PTAB's logic is flawed for a number of reasons.

*First*, it conflicts with the language of Matsuno itself. Contrary to Network-1's suggestion, Matsuno does not state that the "voltage ***at*** the subscriber location is approximately 48 volts." Red Brief at 26 (emphasis added). Rather, Matsuno states that the "***line*** voltage of the ***digital subscriber line*** 12 ***that runs into the home*** of the subscriber is thus at approximately 48 V." A1491¶26. Matsuno recognizes that in this condition no current is flowing over the line. Matsuno further expressly states that "-48 V is applied to the digital subscriber line 12 via the resistors R2, R6 [in the power source 1]." *Id.* Thus, Matsuno teaches that the "line voltage" at the power source is 48 volts, before any voltage drop that would

occur due to current flowing through the digital subscriber line that eventually "runs" into the home.

Matsuno uses the phrase "runs into the home" in other contexts, when current is flowing, but is very precise in doing so by referencing the voltage drop due to the subscriber line and transistor components. *See* A1492¶27. In particular, Matsuno uses the phrase "runs into the home" in two different contexts. It qualifies that the voltage "includ[es] the voltage drop of the digital subscriber line and … the transistors" (Paragraph 27), when current flows but does not include that language when current does not flow. When current does not flow (Paragraph 26), the voltage does not include such losses, and it is measuring the line voltage at the power supply. Accordingly, the text of Matsuno conflicts with the PTAB's conclusion that 48 volts is the line voltage measured "at" the subscriber's home, undermining Network-1's argument that Matsuno does not disclose a low level current.

*Second*, the PTAB's finding conflicts with the Zimmerman Reply Declaration. In particular, Dr. Zimmerman describes how Matsuno discloses the voltage drop on the subscriber line: "Matsuno tells us is that only on the order of about 8 V of potential would be available to the NT1/DTE, which I believe would be well below any level of voltage that could operate such an NT1/DTE." A1900-02¶¶32-34. Dr. Zimmerman testified that Dr. Knox's position that approximately

31

48 volts would be "somehow actually available to the NT1/DTE inside the subscriber's home" is both "physically impossible" and a "complete mischaracterization of what Matsuno actually says." *Id.*

Anticipating that Appellants would rely on the Zimmerman Reply Declaration, Network-1 argues that Dr. Zimmerman's 8-volt calculation is improper because he did not include the voltage drop due to transistors. Red Brief at 43. Dr. Zimmerman, however, testified that the calculated voltage drop was "predominantly" due to the subscriber line loss and that any resulting voltage drop from the transistors was "secondary." A2445-46(226:14-227:1). Accordingly, Dr. Zimmerman's 8-volt calculation includes any effect of transistors, and Network-1 is wrong.

Substantial evidence is lacking for both parts of the two-part conclusion by the PTAB, as they both conflict with Matsuno and the Zimmerman Reply Declaration.

## **CONCLUSION**

This Court should vacate and remand for the reasons noted in this Reply.

August 3, 2015                     Respectfully submitted,

                                   /s/  Jeffrey D. Sanok
                                   JEFFREY D. SANOK
                                   BRIAN M. KOIDE
                                   CROWELL & MORING LLP
                                   1001 Pennsylvania Avenue, NW
                                   Washington, DC 20004-2595
                                   (202) 624-2500 (Telephone)
                                   (202) 628-5116 (Facsimile)
                                   jsanok@crowell.com
                                   bkoide@crowell.com

                                   JONATHAN M. LINDSAY
                                   CROWELL & MORING LLP
                                   3 Park Plaza, 20th Floor
                                   Irvine, CA 92614-8505
                                   (949) 263-8400 (Telephone)
                                   (949) 263-8414 (Facsimile)
                                   jlindsay@crowell.com

                                   SCOTT L. BITTMAN
                                   CROWELL & MORING LLP
                                   590 Madison Avenue
                                   New York, NY 10022
                                   (212)895-4223 (Telephone)
                                   (212)895-4201 (Facsimile)
                                   sbittman@crowell.com

                                   *Counsel for Appellant Avaya Inc.*

/s/ Robert J. Walter (with consent)
ROBERT J. WALTERS
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC 20005
(202) 551-1700 (telephone)
(202) 551-1705 (facsimile)
robertwalters@paulhastings.com
charleshawkins@paulhastings.com

DAVID H. DOLKAS
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 92614
(650) 815-7400
ddolkas@mwe.com

*Counsel for Appellant Hewlett-Packard Co.*

/s/ Thomas M. Dunham (with consent)
THOMAS M. DUNHAM
J. MICHAEL WOODS
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
(202) 282-5000

KIMBALL R. ANDERSON
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
(312) 558-5600

MICHAEL J. SCHEER
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
(213) 615-1700

*Counsel for Appellant Dell Inc.*

/s/ Lionel M. Lavenue (with consent)
LIONEL M. LAVENUE
DANIEL C. COOLEY
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square, 11955 Freedom Drive
Reston, VA 20190
(571) 203-2700

*Counsel for Sony Corporation of America*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 3rd day of August, 2015, I caused this Corrected Reply Brief of Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users, and one PDF copy was served via email, upon:

> Gregory S. Dovel
> Sean Luner
> DOVEL & LUNER, LLP
> 201 Santa Monica Boulevard, Suite 600
> Santa Monica, California  90401
> greg@dovellaw.com
> luner@dovellaw.com
>
> *Counsel for Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Corrected Reply Brief of Appellants will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/  Jeffrey D. Sanok
*Counsel for Appellant Avaya Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*6,867*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: August 3, 2015                  /s/ Jeffrey D. Sanok
                                                       *Counsel for Appellant Avaya Inc.*